# 12-4422-cv

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

➤➤ ◄◄

THOMAS BOYD, HUMBERTO MENESES,

*Plaintiffs,*

*and*

JOAN GRANT BOYD, SYBIL TAYLOR, RANDA JONES, TONYA WARTERS,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants,*

*v.*

J.E. ROBERT CO., INC., JER REVENUE SERVICES, LLC,
NYCTL 1996-1 TRUST, NYCTL 1997-1 TRUST, NYCTL 1997-2 TRUST,
NYCTL 1998-1 TRUST, NYCTL 1999-1 TRUST,

*Defendants-Appellees.*

———————

*On Appeal from the United States District Court
for the Eastern District of New York (Brooklyn)*

## SPECIAL APPENDIX

ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Boulevard
P.O. Box 1740
Bridgeport, Connecticut 06601
203-333-9441

DONA B. MORRIS
    ASSISTANT CORPORATION COUNSEL
NEW YORK CITY LAW DEPARTMENT
100 Church Street, Room 6-201
New York, New York 10007
212-788-1233

*Attorneys for Defendants-Appellees*

PAUL STUART GROBMAN, ESQ.
555 Fifth Avenue, 17th Floor
New York, New York 10017
212-983-5880

LAW OFFICES OF
    CURTIS V. TRINKO, LLP
16 West 46th Street, 7th Floor
New York, New York 10036
212-490-9550

*Attorneys for Plaintiffs-Appellants*

# **Table of Contents**

**Page**

Report and Recommendation, dated August 27, 2012 ......................... SPA1

Memorandum and Order on Motion for Reconsideration,
    filed September 27, 2013 ............................................................... SPA39

Order Adopting in Part and Modifying in Part Report and
    Recommendation on Motion for Summary Judgment,
    dated October 2, 2012 .................................................................... SPA74

Notice of Appeal, filed November 2, 2012 ........................................ SPA130

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
JOAN GRANT BOYD, *et al.*,

                                    Plaintiffs,            **REPORT & RECOMMENDATION**

            - against -
                                                          05-CV-2455 (KAM) (RER)
J.E. ROBERT CO., *et al.*,

                                    Defendants.
-------------------------------------------------------X

**RAMON E. REYES, JR., United States Magistrate Judge:**

**TO THE HONORABLE KIYO A. MATSUMOTO,**
**UNITED STATES DISTRICT JUDGE**

        Plaintiffs Joan Grant Boyd ("Boyd"), Randa Jones ("Jones"), Sybil Taylor ("Taylor"), and

Tonya Warters ("Warters") (collectively, "Plaintiffs"), commenced this action on behalf of

themselves and a putative class against Defendants J.E. Robert Co., Inc. and JER Revenue

Services, LLC ("JER") (collectively, "JER Defendants"), and NYCTL 1996-1 Trust ("1996-1

Trust"), NYCTL 1997-1 Trust ("1997-1 Trust"), NYCTL 1998-1 Trust ("1998-1 Trust"), and

NYCTL 1999-1 Trust ("1991-1 Trust") (collectively, "Trust Defendants"), alleging violations of

the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA") and New York

statutory and common law.

        Before the Court are Defendants' respective motions for summary judgment.  For the

reasons set forth below, I respectfully recommend that Defendants' motions for summary

judgment be granted in part and denied in part.

## FACTS AND PROCEDURAL HISTORY[1]

Plaintiffs were all homeowners subject to New York City ("the City") Tax Liens that secured amounts owed for real estate taxes, water and sewer charges, and other statutory charges. (JER Defs.' Stmt. of Material Facts Pursuant to Local Rule 56.1 dated 6/03/12 (Dkt. No. 227) ("JER 56.1 Stmt."), ¶ 3.)  The City sold the Tax Liens to Trust Defendants, who in turn retained JER Revenue Services to assist with the collection of the amounts secured by the Tax Liens. (*See id.* ¶ 1.)  In servicing the Tax Liens, JER managed collection efforts, accounted for taxes collected, maintained records, and retained outside counsel to foreclose upon the Tax Liens in New York Supreme Court. ( *Id.* ¶ 7.)  JER Defendants entered into retainer agreements with outside counsel on behalf of Trust Defendants. ( *Id.* ¶¶ 66-67.)  None of the Plaintiffs were parties to any of these retainer agreements.  (JER 56.1 Stmt. ¶ 67; Pls.' Responses to Def. JER'S Rule 56.1 Stmt. dated 10/5/11 (Dkt. No. 235) ("Pls.' Responses to JER 56.1 Stmt."), ¶ 67.)

On behalf of Trust Defendants, outside counsel commenced actions in New York Supreme Court to foreclose on one or more Tax Liens against the following properties: (1) 480 Quincy Street, Brooklyn, New York (the "Jones Property")[2]; (2) 1459 Carroll Street, Brooklyn,

---

[1] The facts of this case are amply set forth in prior Report and Recommendations and Orders on Defendants' two separate motions to dismiss, and I repeat them here only to the extent necessary for the analysis below.  (*See* Order Adopting Report and Recommendation dated 2/2/11 (Dkt. No. 191)("2/2/11 Order"); Report and Recommendation dated 3/31/10 (Dkt. No. 183)("3/31/10 R&R"); Order dated 9/24/08 (Dkt. No. 70); Report and Recommendation dated 3/20/08 (Dkt. No. 63); Report and Recommendation dated 6/27/06 (*Binson et al v. J.E. Robert Co., Inc. et al,* No. 03-CV-3562 (JG) (CLP), Dkt. No. 130), adopted by, Order dated 11/07/06.)

[2] As to the Jones Property, the foreclosure complaint identifies Irene Sterling, Lincoln Savings Bank, "John Doe," and "Jane Doe," among others, as defendants.  (Decl. of Paul Grobman in Opp'n to Defs.' Mots. for Summ. J. dated 10/3/11 (Dkt. No. 233) ("Grobman Decl."), Exh. H.)  Defendants allege that Plaintiff Jones was not served as a defendant with the original foreclosure complaint.  (JER 56.1 Stmt. ¶ 36).  Plaintiffs, conversely, allege that Jones

2

New York (the "Boyd Property")[3]; (3) 128-39 Inwood Street, Queens, New York (the "Warters Property"); (4) 1152 Wheeler Avenue, Bronx, New York (the "Taylor Property"). (Grobman Decl., Exh. H ("Jones Compl."); Exh. EE ("Boyd Compl."); Exh. SS ("Warters Compl."); Exh. JJJ ("Taylor Compl.").) The complaint in the action to foreclose on the Jones Property sought the sale of property to recover amounts "due on the Tax Lien, with interest to the time of such payment, together with costs, allowances and disbursements of this action, including attorneys' fees, and together with the expenses of the sale . . . . " (Jones Compl., at JER2 07098.) The complaints as to the Boyd, Warters, and Taylor Properties contained nearly identical language. (Boyd Compl.,  at 7; Warters Compl., at JER2 07289; Taylor Compl., at JER2 10432.)

In their responses to Defendants' interrogatories, all of the Plaintiffs, except for Boyd, indicated that they had retained counsel to represent them "with respect to the relevant tax lien or any foreclosure with respect thereto." (JER 56.1 Stmt., Exh. 4 at No. 5.) Boyd testified at her deposition that attorney Bennett had represented her in the past. (JER 56.1 Stmt., Exh. 2 ("Boyd Dep."), at 53:12-16.) Plaintiffs now seek to qualify the extent to which they were represented by counsel. (*See, e.g.*, Pls.' Responses to JER 56.1 Stmt. ¶¶ 30-32 (Boyd), 38 (Jones), 43 (Taylor), 50 (Warters).) As relevant here, Jones admits that attorney William Simms represented her only in connection with refinancing her home. (*Id.* ¶ 38.) Boyd also admits that attorney Michael

---

was served with the complaint on July 23, 2002, and sued therein as "Jane Doe #1."  (Pls.' Responses to JER 56.1 Stmt. ¶ 36 (citing Grobman Decl., Exh. I ("Affidavit of Service")). Plaintiffs further allege that Jones became record owner of the Jones Property on October 31, 2002.  (Grobman Decl. ¶ 24 (citing *id.,* Exh. F ("Jones Indenture")).)

[3] The Boyd property was jointly owned by former plaintiff Thomas Boyd and Ms. Boyd (*see* Grobman Decl., Exh. CC ("Boyd Indenture"), at JER2 00332; Exh. DD ("Boyd Title Report"), at JER2 00321.)

Bennett represented her in refinancing her home, which transaction required the payoff of the Tax Lien.  (*Id.* ¶¶ 30-32.)

In general, all of the Plaintiffs, or their counsel were able to inquire as to the amounts necessary to discharge the Tax Liens.  (JER 56.1 Stmt. ¶ 60.)  In fact, each Plaintiff did submit such an inquiry, to which Defendants responded with payoff quotes.  (*See* JER 56.1 Stmt. ¶ 62; Pls.' Responses to JER 56.1 Stmt. ¶ 60.)

As to their communications with JER, Jones testified at her deposition that she does not recall talking to, or receiving correspondence from, anyone affiliated with JER Defendants.  (JER 56.1 Stmt., Exh. 3 ("Jones Dep."), at 18:12-19:11.)  JER alleges that it communicated only with attorney Simms and Home Abstract regarding the payoff for the Jones Property.  (JER Stmt. 56.1 ¶ 40.)  Plaintiffs maintain, however, that JER records reflect that letters may have been sent to Jones directly.  (Pls.' Responses to JER 56.1 Stmt. ¶ 37; Grobman Decl. ¶ 23 (citing Exh. C ("Jones Communication History"), at JER2 00279, lines (11)-(20); *see also id.* ¶ 22 (citing Exh. C, at JER2 0281, lines (94), (99).)  The evidence reflects that, on one or more occasions, Simms and Homes Abstract contacted JER on behalf of Jones for a payoff quote, and JER responded by faxing a quote to them.[4]  (Grobman Decl., Exh K ("Payoff Quote Request Fax dated 10/24/02"); *see also* Jones Communication History, at JER2 00282, lines (162)-(166), (183) (10/11/02 entry stating "Faxed POQ [ ] to Michell @ Simms WB/KLT).)[5]

_____

[4] Although not expressly cited by Plaintiffs, a review of the Jones Communication History indicates that JER also faxed a payoff quote to attorney William Simms, at his request, on 07/17/02.  (Jones Communication History, at JER2 00281, lines (126)-(130), (135)).

[5] The record does not contain a copy of the purported 10/11/02 payoff quote prepared for Jones.

Additionally, Plaintiffs allege that JER may have sent numerous letters to Boyd. (Grobman Decl. ¶ 64 (citing Exh. AA ("Thomas Boyd Communication History"), at JER2 00384, lines (013)-(016), (21), (26)-(30); JER2 00385, lines (43), (46), (56); JER2 00386, line (114).) Plaintiffs also cite to JER records indicating that a payoff quote for the Boyd Property was requested on 05/20/02,[6] and in response, JER provided a payoff quote. (Thomas Boyd Communication History, at JER2 00385, lines (54)-(62); Grobman Decl., Exh. FF ("5/20/02 Payoff Quote").)[7] Former plaintiff Thomas Boyd entered into a Forbearance Agreement with the Bank of New York, as Trustee and as Collateral Agent and Custodian of NYCTL 1998-1 Trust by its servicer, on June 12, 2002. (JER 56.1 Stmt. ¶ 24; Grobman Decl., Exh. GG ("Forbearance Agreement").) Ms. Boyd was not a signatory of the Forbearance Agreement. (JER 56.1 Stmt. ¶ 25.) On April 4, 2003, attorney Michael Bennett, stating that the Boyds retained his office to represent them in connection to refinancing the Boyd Property, requested an "updated pay-off quote" for the Boyd Property. (*See* Grobman Decl, Exh. HH ("4/4/03 Bennett Request").) According to JER records, a payoff quote was faxed to attorney Michael Bennett. (*See* Thomas Boyd Communication History, at JER2 00390, line (329) ("Fax POQ [ ] to Michael Bennett - WB/KLT").) While the record does not contain this payoff quote, it does contain an "Officer's Certificate Check List," which reflects the amount paid as $8,544.93. (Grobman Decl., Exh. II.)

---

[6] Plaintiffs assert that the Boyds requested the 5/20/02 Payoff Quote. (Grobman Decl. ¶ 67.)

[7] Although not expressly cited by Plaintiffs, a review of the Thomas Boyd Communication History indicates that JER faxed payoff quotes in response to inquires submitted by different parties. (*See, e.g.*, *id.*, at JER2 00387, lines (179)-(185), (194) ("08-12-02 Faxed POQ [ ] OK WB/YA"); JER2 00389, lines (273)-(277), (288) ("03-21-03 Fax POQ [ ] to Fran @ Vintage WB/ KLT").) Of note, JER faxed a payoff quote on 3/20/03 in response to a request by Sibogile Boyd. (*See id.*, JER2 00389, lines (256)-(259), (271).)

In general, the payoff quotes identified the "TAX LIEN BALANCE" as of a certain payoff date, the "LEGAL FEES AND COSTS (estimated)," and the "TOTAL DUE." (*See, e.g.*, Grobman Decl., Exh. FF ("5/20/02 Boyd Payoff Quote"); Exh. VV ("06/22/04 Warters Payoff Quote"); Exh. PPP ("11/21/03 Taylor Payoff Quote").) The payoff quotes included the following language: "If a foreclosure has already been commenced, an estimate of legal fees and costs is included below. Actual legal fees and costs may be different than the estimate." *Id.*

Plaintiffs do not dispute any principal amounts alleged to be due and owing under the Tax Liens, (JER 56.1 Stmt. ¶ 19), but instead challenge the propriety of the attorney's fees and costs charged to them (*see* Second Am. Compl. dated 11/12/08 (Dkt. No.83), ¶ 2). The estimated legal fees included the fees and costs billed to date, as well as the legal expenses projected to be due as of the anticipated payoff date. (*See* JER 56.1 Stmt. ¶ 62; Pls.' Responses to JER 56.1 Stmt. ¶ 62.)

Thus, each Plaintiff paid the amounts identified in the payoff letters to satisfy the Tax Liens. (JER 56.1 Stmt. ¶ 17; Pls.' Responses to JER 56.1 Stmt. ¶17.) As a result of the redemption, the foreclosure actions were discontinued. (JER 56.1 Stmt. ¶ 17; Pls.' Responses to JER 56.1 Stmt. ¶ 17.) Defendants later issued refunds to Plaintiffs for overpayments. (JER 56.1 Stmt. ¶ 62; Pls.' Responses to JER 56.1 Stmt. ¶ 62.) Specifically, Jones received a $295.00 refund sent to attorney William K. Simms, (Grobman Decl.*,* Exh. W); former plaintiff Thomas Boyd received a $663.85 refund sent to Vintage Abstract, (*id.*, Exh. RR); Warters received a $5,250.21 refund sent to attorney Charles Cipolla, (*id.*, Exh. CCC); and Taylor received a $2,382.86 refund sent to attorney Jay Bialek, (*id.*, Exh. XXX).

After extensive motion practice, Plaintiffs filed their Second Amended Complaint, which now governs this action subject to Your Honor's 2/2/11 Order on Defendants' renewed motions to dismiss certain claims.  Now before the Court are Defendants' respective motions for summary judgment on Plaintiffs Jones' and Boyd's claims against the 1998-1 Trust and JER Defendants[8] for alleged violations of §§ 1962e and 1962f of the FDCPA, and all of the Plaintiffs' state law claims against Defendants under § 349 of the New York General Business Law ("GBL § 349"), the theory of unjust enrichment, and common law breach of contract.  (Notice of Motion for Summ. J. by Trust Defs. dated 06/03/11 (Dkt. No. 219); Mot. for Summ. J. by JER Defs. dated 06/03/11 (Dkt. No. 226).)

## DISCUSSION

### I.    Applicable Standards

#### A.    Summary Judgment

The standards for summary judgment are well established.  The party moving for summary judgment has the burden to demonstrate that: (1) "there is no genuine dispute as to any material fact" and (2) "the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine dispute as to a material fact is one that "might affect the outcome of the suit under the governing law" and that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).  In determining whether

---

[8] By the 2/2/11 Order, Your Honor dismissed Plaintiffs claims against the 1996-1 Trust, the 1997-1 Trust, and the 1999-1 Trust.  (*Id.* at 31.)  As such, FDCPA claims remain as to the 1998-1 Trust and JER Defendants only.  (*Id.* at 32.)

summary judgment is warranted, "[t]he Court 'is not to weigh the evidence but is instead

required to view the evidence in the light most favorable to the party opposing summary

judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility

assessments.'" *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir. 2004) (quoting

*Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996)). The non-movant cannot create a genuine

dispute of material fact by "rely[ing] on the allegations in his or her pleadings, conclusory

statements, or on mere assertions that affidavits supporting the motion are not credible."

*Cushing v. Morning Pride, Mfg., L.L.C.*, No. 05-CV-3612 (DRH), 2008 WL 283772, at *10

(E.D.N.Y. Jan. 30, 2008) (citation and internal quotation marks omitted).

    B.    <u>FDCPA</u>

    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt

collectors, to insure that those debt collectors who refrain from using abusive debt collection

practices are not competitively disadvantaged, and to promote consistent State action to protect

consumers against debt collection abuses." 15 U.S.C. § 1692(e). Thus, the FDCPA seeks to "(1)

ensure the protection of all consumers, even the naive and the trusting, against deceptive

collection practices, and (2) protect debt collectors against liability for bizarre or idiosyncratic

interpretations of collection notices." *Kropelnicki v. Siegel,* 290 F.3d 118, 127 (2d Cir. 2002)

(quoting *Clomon v. Jackson,* 988 F.2d 1314, 1320 (2d Cir. 1993)). The Second Circuit reviews

claims of FDCPA violations "objectively from the viewpoint of the 'least sophisticated

consumer.'" *Gutierrez v. GC Servs. L.P.*, No. 09-CV-4606 (JBW), 2010 WL 3417842, at *2

(E.D.N.Y. Aug. 27, 2010) (quoting *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 85 (2d

Cir.1998)). Nonetheless, "[e]ven in 'crafting a norm that protects the naive and the credulous,'

[the Second Circuit has] carefully preserved the concept of reasonableness." *Jacobson v. Healthcare Fin. Servs, Inc.*, 516 F.3d 85, 90 (2d Cir. 2008) (quoting *Clomon*, 988 F.2d at 1319.) Additionally, the Second Circuit has recognized that it "may decline to interpret the FDCPA in a manner that would thwart the obvious purpose of the statute." *Id.* (citing *Romea v. Heiberger & Assocs.*, 163 F.3d 111, 118 (2d Cir. 1998) (internal quotation marks omitted)).

In their summary judgment motions, Defendants raise a host of challenges that dispute both the applicability of the FDCPA and the propriety of Plaintiffs' claims of substantive violations of the same.  For purposes of these motions, it unnecessary to address all of Defendants' claims, because even assuming that the FDCPA applies, Defendants have demonstrated that, as a matter of law, the evidence fails to establish that they violated the provisions at issue.

## II.    Plaintiffs Jones' and Boyd's FDCPA § 1692e Claims Should Be Dismissed

In their Second Amended Complaint, Plaintiffs claim that Defendants "*attempted to collect* amounts for attorneys' fees, so-called Debt Cancellation or Discontinuance Fees, service of process fees and other costs and expenses from plaintiffs . . . *which were not owed, in violation of §1692e* of the FDCPA."  (Second Am. Compl. ¶ 147 (emphasis added).)  Section 1692e prohibits "false, deceptive, or misleading" communications from debt collectors, whether written or oral, "in connection with the collection of any debt."  "Without limiting the general application of the foregoing," § 1692e includes a list of sixteen (16) prohibited practices that constitute a violation of that section.  The record is unclear as to which of these subsections Plaintiffs contend Defendants violated.  Defendants suggest the applicability of subsections (2) and (10).  (JER Mem. of Law in Supp. of Defs. JER Revenue Services LLC's and J.E. Robert

Co., Inc.'s Mot. for Summ. J. dated June 3, 2011 (Dkt. No. 232) ("JER Mem.").)  Subsection (2)

prohibits, in relevant part, "the false representation of . . . the character, amount, or legal status of

any debt" while subsection (10) prohibits "use of any false representation or deceptive means to

collect or attempt to collect any debt or to obtain information concerning a consumer."

    A.    <u>Plaintiffs Have Effectively Abandoned Their FDCPA § 1692e Claims</u>

Defendants' motion papers challenge Plaintiffs' § 1962e claims directly.  For example,

JER Defendants state at the outset of their legal memorandum that they challenge "the FDCPA

claims on the assumption that they are directed to 15 U.S.C. § 1692e(2), § 1692e(10) . . . ."  (JER

Mem. at 8.)  Similarly, in their introduction, Trust Defendants summarize Plaintiffs Jones' and

Boyd's claims – "[Plaintiffs] claim that defendants violated § 1692e by attempting to collect

monies that were not actually due and owing . . ." – and argue that Plaintiffs' "FDCPA claims

fail at all levels."  (Defs. 1996-1 Trust, 1997-1 Trust, 1998-1 Trust, and 1999-1 Trust's Mem. of

Law in Supp. of Their Mot. for J. Pursuant to R. 56 of the Fed. R. of Civ. Pro. dated 6/03/11

(Dkt. No. 224) ("Trust Defs.' Mem."), at 13.)

Substantively, Defendants argue, *inter alia*, that any FDCPA claims predicated upon §

1692e fail because the purportedly misleading communications – the payoff quotes and

forbearance agreement [9] – were directed to Plaintiffs' attorneys, and therefore they are not

---

[9] It is not entirely clear whether Plaintiffs allege that the Forbearance Agreement between
Thomas Boyd and JER constitutes a violation of the FDCPA.  Although Plaintiffs appear to
address only the payoff letters in their brief, (Pls.' Mem. at 13-15), they do allege elsewhere that
the Forbearance Agreement "falsely represented that an unspecified amount of attorneys' fees
and expenses were due and owing" and calculated attorneys' fees and costs together as the
amounted allegedly owed.  (Grobman Decl. at ¶¶ 68,-69.)

covered by the FDCPA.  (JER Mem. at 13.)[10]  Plaintiffs, however, neither directly address

Defendants' substantive challenges to their § 1692e claims, nor as a general matter defend the

merits of such claims.

For example, Plaintiffs' first argument in their opposition brief ("Point I") attempts to

justify Plaintiffs' claims under *§ 1692f*, and not § 1692e:

> BECAUSE PLAINTIFFS RANDA JONES AND JOAN GRANT BOYD WERE
> ASSESSED ATTORNEYS' FEES AND EXPENSES WHICH WERE NOT OWED,
> DEFENDANTS HAVE VIOLATED §1692(F)(1) OF THE FDCPA

(Pls.' Mem. in Opp'n to Defs' Mot. for Summ. J dated 10/5/11 (Dkt. No. 230) ("Pls.' Mem.") at

8.)  Notably absent from the point heading and the body of their brief is a single argument that

supports the viability of Plaintiffs' claims under § 1692e.

Indeed, in responding to Defendants' contention that any alleged false, deceptive or

misleading communications are not covered by § 1692e because they were sent to Plaintiffs'

attorneys, Plaintiffs distinguish § 1692e claims from those under § 1692f(1).  The gravamen of

Plaintiffs' argument in this regard is that the recipient of Defendants' demands for payment is

"irrelevant" for purposes *§ 1692f(1)*:

> In contrast to the conflicting treatment of §1692e of the FDCPA when alleged
> misrepresentations are made to attorneys, every court which has addressed
> §1692f(1)'s separate prohibition against the 'collection' of improper fees or expenses
> has held that it is irrelevant whether the payoff demand was communicated through
> the consumer-plaintiff's attorney.

(*id.* at 14 (citation omitted); *see also id.* at 13-16.)  Similarly, in response to Defendants' reliance

on *Kropelnicki v. Siegel*, 290 F.3d 118 (2d Cir. 2002), Plaintiffs criticize Defendants for

---

[10] Although Trust Defendants do not expressly address the issue of whether
communications directed at a consumer's attorney are actionable under the FDCPA, they state in
their brief that they expressly adopt and incorporate by reference the facts and arguments
proffered by JER Defendants.

11

"strech[ing] the *dicta* in *Kropelnicki* beyond the breaking point" because the court addressed

claims brought under § 1692e(10), and not § 1692f(1).  (*Id.* at 13.)

Plaintiffs similarly rely on *Allen v. Lasalle Bank, N.A.*, 629 F.3d 364 (3d Cir. 2011), as a

case that is "*on all fours with the facts of this case.*"  (*Id.* at 15 (emphasis added).)  In *Allen*, the

Third Circuit held that a payoff letter transmitted to a borrower's attorney is actionable under *§*

*1692f(1)*, not § 1692e.  *Id.* at 368.  In an unauthorized *sur reply*, Plaintiffs again urge the Court to

adopt the Third Circuit's interpretation that *§ 1692f(1)* governs demands for improper amounts

directed to a consumer's attorney, in light of amicus briefing submitted by the Solicitor General,

the Fair Trade Commission, and the Consumer Financial Protection Bureau at the invitation of

the Supreme Court, which was then considering the *Allen* defendants' Petition for Writ of

Certiorari.  (Pls.' Notice of Supplemental Authority in Further Opp'n to Defs' Mots. for Summ.

J. dated 02/02/12 (Dkt. No. 238.).)

In all, Plaintiffs' entire opposition brief is an attempt to justify their claims under § 1692f,

not § 1692e.  Plaintiffs have failed to respond directly to Defendants' challenges to their § 1692e

claims, and have thus abandoned those claims.  *See Taylor v. City of New York*, 269 F. Supp. 2d

68, 75 (E.D.N.Y. 2003), *order clarified by*, 2003 WL 21781941 (E.D.N.Y. July 29, 2003)

("Federal Courts may deem a claim abandoned when a party moves for summary judgment on

one ground and the party opposing summary judgment fails to address the argument in any

way."); (*see also* Defs. 1996-1 Trust, 1997-1 Trust, 1998-1 Trust, and 1999-1 Trust's Reply

Mem. of Law in Further Supp. of Their Mot. for J. Pursuant to R. 56 of the Fed. R. Civ. Pro.

dated 11/23/11 ("Trust Defs.' Reply"), at 2 n. 1 (arguing that Plaintiffs' failure to address

Defendants' purported liability for attempting to collect monies not actually due and owing under §§ 1692e and 1692f constitutes abandonment of such claims).)[11]

> B.    Plaintiffs' FDCPA § 1692e Claims Lack Merit

Even if Your Honor finds that Plaintiffs have not abandoned their § 1692e claims, Defendants have establish that these claims fail on their merits.  As noted above, § 1692e prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  Relying on the Second Circuit's dictum in *Kropelnicki,* Defendants argue that any alleged misrepresentations in the Payoff Quotes and Forbearance Agreement are not actionable under § 1692e because Defendants directed these communications to Plaintiffs' counsel.  290 F.3d at 127 ("A review of the FDCPA's purpose, as explained both in the statute and in the legislative history, and this Court's treatment of the FDCPA in other cases leads us to believe that alleged misrepresentations to attorneys for putative debtors cannot constitute violations of the FDCPA.")  Defendants further argue that Your Honor previously adopted the Second Circuit's reasoning of *Kropelnicki* in this action, and accordingly, such reasoning is the law of the case.[12]

---

[11] Although Plaintiffs do cite in a footnote to authority from the Fourth and Seventh Circuits where the Circuits held that misrepresentations directed to a debtor's attorney can be actionable under § 1692e, (Pls.' Mem. at 14 n. 8), Plaintiffs have made no real attempts to argue that such case law applies here to save their § 1692e claims.  Plaintiffs also cite to *Jerman v. Carlisle*, 130 S. Ct. 1605, 1609 (2010), where the Supreme Court addressed the applicability of the bona fide error defense, as applied to an attorney who included in a "Notice" to the complaint that the validity of the debt would be presumed unless disputed in writing, allegedly in violation of § 1692g. *Id.* at 1609-10.  I do not find this case applicable here.

[12] In the 3/31/10 R&R to Your Honor, I reasoned that communications directed to Plaintiff Warters' attorney, and in response to her attorney's inquiries, could not form a basis of liability under § 1692e of the FDCPA.  (*Id.* at 25-26.)  Your Honor adopted the portion of the R&R that concluded "Warters's failure to allege or present evidence that any communications within the limitations period were initiated by the defendants warrants dismissal of her FDCPA

13

Although the language in *Kropelnicki* is dictum, it provides "strong support" for Defendants' position.  *See Tromba v. M.R.S. Assoc., Inc*., 323 F. Supp. 2d 424, 427 (E.D.N.Y. 2004); *see also Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 936 (9th Cir. 2007) ("communications to a debtor's attorney, and unaccompanied by any threat to contact the debtor, are not actionable under the Act"); *but see Sayyed v. Wolproff & Abramson*, 485 F.3d 226, 233 (4th Cir. 2007) ("plainly, the FDCPA covers communications to a debtor's attorney").

Consistent with my 3/31/10 R&R, I again recommend that Your Honor apply the reasoning of *Kropelnicki* to find that, as a matter of law, communications directed to a debtor's attorney are not actionable under § 1692e of the FDCPA.  *See also Schuh v. Druckman & Sinel, L.L.P.*, 751 F. Supp. 2d 542 (S.D.N.Y. 2010) (adopting report and recommendation which held that a letter sent to a title company did not fall within the purview of the FDCPA); *Evory v. RJM Acquisitions Funding, LLC*, 505 F.3d 769, 775 (7th Cir. 2007) ("[A] representation by a debt collector that would be unlikely to deceive a competent lawyer, even if he is not a specialist in consumer debt law, should not be actionable.").  Thus, any communication directed to Plaintiffs' attorneys, including the purported 10/11/02 and 10/24/02 Payoff Quotes faxed to Simms and Homes as to the Jones property, and the 4/7/03 Payoff Quote faxed to attorney Michael Bennett as to the Boyd property, are not governed by the FDCPA.

Moreover, inasmuch as Plaintiffs allege FDCPA violations based on communications initiated by Plaintiffs and/or their attorneys, Your Honor previously adopted the portion of the 3/31/10 R&R that found such communications not actionable under the FDCPA.  (2/02/11 Order at 15-16); *see Nichols v. Washington Mutual Bank*, No. 07-CV-3216 (JG), 2007 WL 4198252, at

---

claim."  (2/2/11 Order at 16.)

*4-5 (E.D.N.Y Nov. 21, 20087); *Gorham-Dimaggio v. Countrywide Home Loans, Inc.*, No. 05-CV-0583, 2005 WL 2098068 at *2 (N.D.N.Y. Aug. 30, 2005).)  The evidence reflects that the Boyds requested a payoff quote on May 20, 2002, and JER responded by letter with an estimate. This debtor-initiated communication resulted in Thomas Boyd executing a Forbearance Agreement with the 1998-1 Trust.  Thus, in accordance with applicable case law and the law of the case, such debtor-initiated communications are not actionable under the FDCPA.

Finally, Plaintiffs' counsel identifies several instances where Defendants appeared to contact Plaintiffs Jones and Boyd directly.[13]  Importantly, Plaintiffs do not allege that these communications resulted in substantive violations of the FDCPA.  Instead, Plaintiffs claim that these alleged direct communications establish Plaintiff Jones' and Boyd's standing to bring FDCPA claims.  (*See* Pls.' Mem. at 16; *see also* Grobman Decl. ¶ 22.)  Moreover, and in any event, the record is devoid of any copies of these communications.  Thus, even when drawing all inferences in favor of Plaintiffs, no reasonable fact finder could conclude that such communications amounted to violations of the FDCPA.

\*     \*     \*

In light of the foregoing, I respectfully recommend that Your Honor grant summary judgment in favor of the 1998-1 Trust and JER Defendants as to Plaintiffs Jones' and Boyd's § 1692e claims.

---

[13] It bears noting that Plaintiff Jones testified at her deposition that she does not recall talking with, or receiving any correspondence from, anyone at JER or its affiliates.  (Jones Dep. 18-19.)

15

### III.   1998-1 Trust and JER Defendants are Entitled to Summary Judgment on Plaintiffs Jones' and Boyd's FDCPA § 1692f(1)

Plaintiffs Jones and Boyd argue that Defendants violated § 1692f by collecting attorney's fees, costs, and expenses that were not owed, imposing charges in violation of applicable law and/or relevant agreements, overcharging delinquent taxpayers, and failing to pay statutorily mandated interest on the refunds.  (Second Am. Compl. ¶¶ 148-150.)  Section 1692f provides that "unfair practices" proscribed by the FDCPA include:

> The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) *unless such amount is expressly authorized by the agreement creating the debt or permitted by law*.

15 U.S.C. § 1692f(1) (emphasis added).  Defendants argue they did not violate § 1692f(1) because they collected attorney's fees and costs "permitted by law."

### A.   Defendants Attempted to Collect, And Did Collect, *Attorney's Fees* That Were "Permitted By Law"

By way of background, Defendants commenced actions to foreclose on liens secured by the Jones and Boyd Properties.  In each of the foreclosure complaints, Defendants sought "costs, allowances and disbursements of this action, including attorneys' fees."  (*See, e.g.*, Jones Compl. at JER2 07098.)  At some point during the foreclosure actions, Plaintiffs and/or their attorneys requested a payoff quote of the amount necessary to pay off the Tax Lien.  JER responded by providing a quote that represented the total amount due as the sum of the projected Tax Lien balance and estimated attorney's fees and costs.  Plaintiffs redeemed their Tax Liens, and Defendants discontinued the foreclosure actions.

16

Defendants maintain that applicable law, and in particular § 11-335 of the New York City Administrative Code ("Administrative Code"), permits them to collect attorney's fees for maintaining foreclosure actions.  Section 11-335, which is entitled "Foreclosure of tax liens," states that

> a plaintiff in an action to foreclose a tax lien shall recover reasonable attorney's fees for maintaining such action.  Except as otherwise provided in this chapter an action to foreclose a tax lien shall be regulated by the provisions of the civil practice law and rules and by all other provisions of law, and rules of practice applicable to actions to foreclose mortgages on real property.

Based on the plain language of the statute, Defendants argue they were entitled to recover reasonable attorney's fees for the "mere maintenance of the foreclosure action."  (Trust Defs' Mem. at 18; *see also* JER Mem. at 14-16.)  Having established a statutory basis for recovery of attorney's fees, Defendants argue that they appropriately collected such fees pursuant to their agreements with Plaintiffs to settle the foreclosure proceedings.

Plaintiffs argue that § 11-335 does not authorize the recovery of attorney's fees and costs in the absence of a judgment of foreclosure awarding them to the "prevailing party."  Plaintiffs argue that § 11-335 must be read narrowly because the statute marks a departure from the "American Rule," where each party bears their own attorney's fees and disbursements.  *See Gottlieb v. Laub*, 82 N.Y.2d 457, 464 (1993); *Hamilton v. Menalon Realty, LLC*, 829 N.Y.S.2d 400, 402 (2d Dep't 2006).  Even under the narrowest reading of the statute, however, there is no basis to impose a prerequisite of a judgment, as the statute's plain language states "[a] plaintiff in an action to foreclose a tax lien shall recover reasonable attorney's fees for maintaining such action."  The statute speaks only of "maintaining" a foreclosure action as a basis for recovering

17

of attorney's fees.  Accordingly, Plaintiff's argument that § 11-335 imposes entry of judgment as

a precondition to recovery of attorney's fees is without merit.

Plaintiffs rely additionally on *Veech v. Sheeks*, 316 F.3d 690 (7th Cir. 2003) and *Shula v.

Lawent,* 359 F.3d 489 (7th Cir. 2004) to argue that Defendants "had absolutely no right to claim

legal expenses at issue as being due and owing under the FDCPA."  (Pls.' Mem. at 18.)

Plaintiffs' reliance on these cases is misplaced.

In *Veech*, the debt collector sent plaintiff a notice describing "the 'amount of the claimed

debt' as 'Remaining principal balance $1,050.00; plus reasonable attorney fees as permitted by

law, and costs if allowed by the court.'"  316 F.3d at 693.  The Seventh Circuit found that the

debt collector violated the FDCPA by incorrectly stating the amount of the debt, "but not because

he specified indeterminate attorney's fees and court costs" as part of the demand for payment.

*Id*.  Instead, the Circuit's holding was based on its conclusion that the $1,050 balance improperly

included *in the amount of the debt* legal fees that had not yet been awarded, "penalties that for

FDCPA purposes should have been separated out from the debt."  *Id.*  Here, Plaintiffs do not

contest the projected Tax Lien balance as reflected in the payoff quotes, but challenge the

propriety of including estimated legal fees and costs in the letters.  Unlike the debt collector in

*Veech*, Defendants clearly separated the legal fees and costs from the amount of the debt itself,

and explained the basis for the amounts due.  The reasoning of *Veech* therefore does not apply

here.

Equally unpersuasive is Plaintiffs' reliance on *Shula*.  There the plaintiff claimed that the

debt collector violated the FDCPA by sending a letter demanding $52.73 for court costs,

claiming that plaintiff "owe[d] this amount to the defendants."  *Shula*, 359 F.3d at 491 (internal

quotation marks omitted.)  Importantly, the debt collector sent the letter two years after the state

court had dismissed *sua sponte* the underlying foreclosure action as abandoned. *Id.* Judge

Posner, writing for the court, reasoned that

> [i]f the court had awarded costs, they would have become a debt owed by Shula. But
> there was no award, nor any certainty that had the defendants moved for one they
> would have gotten it. Whether to award costs in such a case is a matter committed
> to the judge's discretion.

*Id.* (citation omitted). Unlike the parties in *Shula,* where the state court had already dismissed the

action at the time of the alleged FDCPA violation, here Defendants attempted to collect, and did

in fact collect, attorney's fees in the context of a live action in state court. Defendants expressly

demanded attorney's fees and costs in each of the foreclosure complaints. Under these

circumstances, each Plaintiff presumably weighed the risks and benefits of continuing the

foreclosure proceeding, and reached an agreement with Defendants providing for the satisfaction

of the Tax Lien, plus attorney's fees and costs, in exchange for discontinuance of the foreclosure

action. Given these factual distinctions, Plaintiffs' reliance on *Shula* is misplaced.

Even if Your Honor were to find *Veech* and *Shula* applicable, Your Honor should

nonetheless decline to apply the reasoning of these cases to the instant facts. Here, Plaintiffs

agreed to pay attorney's fees, which were permitted under § 11-335, pursuant to their agreement

with Defendants to settle the foreclosure actions against their properties. As Defendants

highlight, parties to a litigation are able to fashion a settlement agreement as they see fit to

resolve the controversy. *See Childs v. Levitt*, 543 N.Y.S.2d 51, 53 (1st Dep't 1989) ("[I]t has

long been recognized that a stipulation need not be consistent with applicable statutes. Parties by

their stipulations may in many ways make the law for any legal proceeding to which they are

parties, which not only binds them, but which the courts are bound to enforce. They may stipulate

away statutory, and even constitutional rights.") (citation and quotation marks omitted). Thus,

19

even if Plaintiffs were correct in arguing that entry of judgment is a prerequisite to recovery of attorney's fees, nothing in the statute precludes parties from contracting around that requirement in the context of settlement.[14]  *See Singer v. Pierce & Associates*, 383 F.3d 596, 598 (7th Cir. 2004) ("Had the foreclosure proceedings continued, [the defendants] could only have collected attorneys' fees authorized by the court.  But [the plaintiff] avoided the foreclosure proceedings by selling the property on her own and paying [the defendant] at closing the amount it had calculated.").

Plaintiffs' entire argument, and the reasoning of *Shula*, is at odds with the pro-settlement ideology of the federal courts.  *Carotek, Inc. v. Kobayashi Ventures, LLC*, No. 07-CV-11163 (NRB) (lead case), 2009 WL 2850760, at *3 (S.D.N.Y. Aug. 31, 2009) (citing *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994) ("[P]ublic policy wisely encourages settlements . . . . ").  At its core, Plaintiffs argue that before a defendant can assert claims for attorney's fees (or costs), the FDCPA and relevant state statutes first require that he obtain a judgment concerning the award of fees and costs.  Such a rule would practically eliminate voluntary settlements.  This is true even if the creditor attempts to settle only the amount of the debt itself, and leaves the award of attorney's fees and costs for resolution in court.  Since the award of these fees and costs is not, at least in Plaintiffs' minds, authorized by law until judgment is entered, no creditor or debtor could ever be able to settle that amount.  Nothing in the FDCPA's text or legislative history

---

[14] Plaintiffs argue the parties did not engage in a "bargained-for *quid pro quo* which resulted in a 'settlement' because Defendants were statutorily required to dismiss the foreclosure actions against the Jones and Boyd Properties after Plaintiffs' redemption.  (Pls.' Mem. at 39.)  This argument is flawed.  As Trust Defendants note, the foreclosure plaintiffs (here, Defendants) forewent their right to pursue "any further claims they might have had concerning the enforcement of the tax lien and charges arising therefrom," including their statutory right to attorney's fees.  (Trust Defs.' Reply at 8.)  Defendants demanded attorney's fees and costs in their foreclosure complaint, and as part of their settlement with Plaintiffs, discontinued the entire foreclosure action and related litigation.

indicate an intent by Congress to either block such settlements or categorically prohibit creditors

from recovering attorney's fees and costs which are otherwise "permitted by law."  *See Fields v.*

*Wilber Law Firm*, 383 F.3d 562, 564 (7th Cir. 2004) (rejecting plaintiffs' argument that a debt

collector must seek court approval for a specific amount of attorney's fees because it "would

require every debt collector under the FDCPA to go to court every time it sought to enforce a

provision in a payment agreement signed by the debtor that allows reimbursement of attorneys'

fees and collection costs.  Plainly stated, the statute does not require such an extraordinary

result."); *see also Carotek, Inc. v. Kobayashi Ventures, LLC*, 2009 WL 2850760, at *3 ("Federal

courts are designed to resolve disputes, not encourage their creation.") (citation omitted).

     In sum, Defendants entered into settlement agreements with Plaintiffs Jones and Boyd

pursuant to which they collected amounts otherwise permitted by law.  Having freely entered into

such agreements, Plaintiffs cannot now be heard to complain about the terms and conditions of

their settlements, or Defendants' actions in negotiating the terms and conditions.  I therefore

respectfully recommend that Your Honor grant summary judgment in favor of Defendants on

Plaintiffs Jones' and Boyd's § 1692f claims.

     B.    Defendants Attempted to Collect, And Did Collect, *Costs* That Were "Permitted By Law"

     In addition to attorney's fees, Defendants argue that § 11-335, which incorporates by

reference the New York Civil Practice Law and Rules ("CPLR"), permits them to collect costs.

*See, e.g.*, CPLR § 8301.  The CPLR, in addition to authorizing specific costs and disbursements,

includes broad language that allows recovery for "reasonable and necessary expenses as are

taxable according to the course and practice of the court, by express provision of law or by order

of the court."  § 8301(12).  Plaintiffs again argue that Defendants had no claim to costs and

21

disbursements under the CPLR absent entry of judgment in their favor.  *See, e.g.*, CPLR § 8101 ("The party *in whose favor a judgment* is entered is entitled to costs in the action, unless otherwise provided by statute or unless the court determines that to so allow costs would not be equitable . . . .") (emphasis added); § 8301(a) ("A party *to whom costs are awarded* in an action or on appeal is entitled to tax his necessary disbursement.") (emphasis added).  Plaintiffs further argue that the CPLR does not authorize recovery of many of the costs and disbursements for which Defendants charged them.

As set forth above in Point II.A, Plaintiffs' argument is unavailing.  The parties agreed to pay attorney's fees and costs prior to entry of judgment.  *See Oliphant v. Simboski*, No. Civ.A. 303CV2038SRU, 2005 WL 756505, at *3 (D. Conn. Mar. 31, 2005) (finding that state statutes authorizing attorney's fees and costs "as the court may determine" or "upon obtaining a judgment" do not "prohibit parties from agreeing to pay costs and attorneys' fees necessary for enforcement of a note, even when the enforcement does not result in a court judgment").[15]  The CPLR, with its broad language, permits Defendants to collect the costs and disbursements that they sought.  In short, nothing in the FDCPA precludes parties from agreeing to the terms and conditions of such recovery, as Plaintiffs and Defendants did here.

Thus, I respectfully recommend that Your Honor find that Defendants collected costs, disbursements, and expenses as permitted by law.

_____

[15]  In *Oliphant*, the note securing the mortgage provided that "in the event the lender required immediate payment in full, she would pay the costs and expenses of enforcing the note 'to the extent not prohibited by applicable law.'"  2005 WL 756505, at *1 (citation omitted).  While in *Oliphant* the plaintiff agreed to pay costs and expenses per the contract underlying the debt (i.e. the note), I do not find this distinction to be material, because the contract authorized recovery of fees and costs in accordance with applicable law.  Thus, relevant state law was the governing standard per the terms of the contract.  Here too, Plaintiffs agreed to pay attorney's fees and costs permitted by law pursuant to the terms of a settlement.

C.      Defendants' Failure to Pay Interest on Overcharges Is Not Actionable Under The
        FDCPA

Plaintiffs argue that Defendants violated § 1692f of the FDCPA by failing to pay required

statutory interest on overpayments.  In support of their argument, Plaintiffs highlight that the

FDCPA is "a remedial statute which should be liberally construed" in favor of the consumer.

(Pls.' Mem. at 38.)  Additionally, Plaintiffs argue that Defendants' failure to pay interest on

overpayments is tantamount to an improper "collection" within the meaning of the law.  *Id.*

Plaintiffs site to no provision in the FDCPA that speaks to refunds of overpayments, and

as a general matter, this Court is unpersuaded by Plaintiffs' attempt to analogize a failure to pay

interest as an improper collection.  Even when construing the statute liberally, there is simply no

basis to interpret § 1692f to govern refunds of excessive payments.  Nor does anything in the

legislative history suggest that Congress intended the statute to govern anything but efforts to

collect the debt in the first instance.  Specifically, the legislative history reflects a concern about

"debt collection abuse" and a desire to "protect consumers from a host of unfair, harassing, and

deceptive debt collection practices."  S. Rep. No. 95-382, at 2 (1977), *reprinted in* 1977

U.S.C.C.A.N. 1695, 1696; 15 U.S.C. 1692(e).  This concern for abusive debt collection practices

does not translate to refunds on overpayments.  Thus, absent support from the text of the statute

and the legislative history, Plaintiffs' argument that they have a right to interest on the

overpayments under the FDCPA should be rejected.

III.   **Defendants Are Entitled to Summary Judgment on Plaintiffs' GBL § 349 And Breach of Contract Claims**

A.   Plaintiffs Lack Standing to Enforce the Retainer Agreements Between JER Defendants and Outside Counsel

Throughout their opposition papers, Plaintiffs argue that Defendants collected legal fees and costs that were "palpably improper" under Defendants' retainer agreements with outside counsel, as well as JER's Policy Manual.  In this regard,  Plaintiffs complain that outside counsel charged legal fees without fully completing the requisite milestone and/or billed at hourly rates higher than that agreed upon in the retainer agreements.[16] (*See, e.g.*, Grobman Decl. ¶¶ 47-51, 129).  Additionally, Plaintiffs allege Defendants overcharged for expenses such as photocopying, title fees, and service of process, (*see, e.g.*, *id.* ¶¶ 52, 106-108), and inadequately described expenses as "Miscellaneous" or "Error Code," (*id.* ¶ 110).  Finally, Plaintiffs allege that Defendants charged them for services not in fact rendered, as evinced by a comparison of JER's itemization of the legal fees with the court docket in a given case.  (*See, e.g.*, *id.* ¶ 108-109.) Plaintiffs argue that "[b]ecause each of the fees and expenses described in this section breached the Retainer Agreements between defendants and their counsel, they could not be passed onto plaintiffs . . . ."  (Pls.' Mem. at 32.)

Plaintiffs lack standing to bring a claim based on the content of the retainer agreements. Plaintiffs do not claim to be third-party beneficiaries, and in any event, have not presented

---

[16] Under the retainer agreements, foreclosure attorneys were required to charge fixed fees, payable "in parts as certain milestone in the foreclosure action were reached."  (*See, e.g.*, Grobman Decl., Exh. E ("Buchanan Agreement"), at 232.) Additionally, outside counsel was permitted to charge an additional fee of $650 for obtaining an Order of Publication.  (*See id.* at 233, 243.)  If the delinquent taxpayer paid off the lien before a particular milestone was completed, the retainer agreement allowed foreclosure counsel to "be paid only for the portion of the fixed fee earned to date based upon the foreclosure milestone reach, if any, and then be paid hourly for the time spent working toward the next milestone."  (*Id.* at 233.)

evidence that the contracts were intended for their immediate benefit.  *See State of Cal. Pub. Emps' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 435 (2000) ("A party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.") (citation and quotation marks omitted).  Indeed, as Trust Defendants suggest, one is hard pressed to find "that the party being sued (here, the plaintiffs) was an intended beneficiary of the retainer agreement between JER (the adverse party in the underlying [foreclosure] litigation) and the very attorneys retained to sue plaintiffs."  (Trust Mem. at 22.)  Therefore, as a matter of law, Plaintiffs have no standing to challenge or enforce the terms of the contract.  *See VAC Serv. Corp. v. Tech. Ins. Co., Inc.*, 853 N.Y.S.2d 577, 577 (2d Dep't 2008) (citations omitted).

Moreover, Plaintiffs do not expressly allege a direct cause of action as to the purported breaches of the retainer agreements, but simply argue that Defendants overcharged them for numerous fees and expenses.  (Pls.' Mem. at 29.)  Plaintiffs argue that, inasmuch as outside counsel charged fees and expenses in breach of the retainer agreements, Defendants could not collect those expenses from Plaintiffs.  (*See id.* at 32.)  Plaintiffs do not cite authority for this proposition; and moreover, such a claim is difficult to reconcile with well-established contract principles that non-parties do not have standing to enforce a contract, *supra*, and that parties to a contract may alter or waive the terms of a contract through their course of conduct, as the Defendants and their outside counsel have arguably done here.  *See Ficus Invs., Inc. v. Private*

*Capital Mgmt., LLC*, 872 N.Y.S.2d 93, 100 (1st Dep't 2009) (citing *CT Chemicals (U.S.A.), Inc.*

*v. Vinmar Impex, Inc*, 597 N.Y.S.2d 284, 287 (1993); (*see also* Trusts Reply at 6 n 6.).

 Furthermore, contrary to Plaintiffs' argument, proof of expenses charged in violation of

the retainer agreements, either because they were inadequately described or exceeded the

authorized amount, is not evidence of improper billing *as to Plaintiffs*.  To hold otherwise would

implicitly allow Plaintiffs to enforce the terms of a contract of which they are neither a party nor

third party beneficiaries.  While Plaintiffs may properly seek relief for  that outside counsel did

not in fact perform, *infra*, evidence of overcharges pursuant to the retainer agreements, as a

general matter, does not establish a claim for relief.

 B. <u>Defendants Are Entitled to Summary Judgment on Plaintiffs' GBL § 349 Claims</u>

 Defendants argue that Plaintiffs' failed to satisfy, as a matter of law, the elements of their

GBL § 349 claims of misleading and deceptive practices.  Section 349 of the GBL prohibits

"[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the

furnishing of any service."  To establish a claim under GBL § 349, the plaintiff must show: "(1)

that the defendant's conduct is 'consumer-oriented'; (2) that the defendant is engaged in a

'deceptive act or practice'; and (3) that the plaintiff was injured by this practice."  *Wilson v. Nw.*

*Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (citing *Oswego Laborers' Local 214 Pension Fund*

*v. Marine Midland Bank, N.A.("Oswego"),* 623 N.Y.S.2d 529, 532-33 (1995).

 A plaintiff may satisfy the "consumer-oriented" element by showing that the alleged

deceptive act or practice "has a broader impact on consumers at large or similarly situated

consumers."  *Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 491 (S.D.N.Y. 2008)

(citation and internal quotation marks omitted).  In addition to establishing that the acts were

directed at consumers, the plaintiff must "show that defendant is engaging in an act or practice

that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *Oswego,* 623 N.Y.S.2d at 532 (citation omitted).  New York courts employ "an objective definition of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego,* 623 N.Y.S.2d at 533.

As to the consumer-oriented prong, Defendants argue that the alleged misleading or deceptive practices occurred within the context of private settlement agreements, which fall outside the scope of the statute.  *See id.* ("Private contract disputes, unique to the parties, for example would not fall within the ambit of the statute.") (citation omitted).  While it is true that Defendants entered into private settlement agreements with Plaintiffs, Defendants sought attorney's fees and costs in accordance to their established practice and policies.  As the payoff quotes essentially governed the settlement negotiations, all defendants in foreclosure actions involving City Tax Liens would be subject to the same overriding policy.  Defendants' acts therefore arguably had a "broader impact" on the public, however, it cannot be said that the challenged conduct affected *consumers*.

GBL § 349 is clearly a consumer protection statute, as it falls under a section titled "Consumer Protection from Deceptive Acts and Practices."  Under New York law, "the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for 'personal, family or household purposes.'" *Cruz v. NYNEX Info. Res.*, 703 N.Y.S.2d 103, 106 (1st Dep't 2000) (citing various state statutes).  Courts have defined "consumer" for purposes of GBL § 349 accordingly.  *See Exxonmobil Inter-America, Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004) ("The New York

27

courts have also suggested that a consumer, for § 349 purposes, is one "who purchase[s] goods and services for personal, family or household use." (citing *Sheth v. N.Y. Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (1st Dep't 2000)).  Indeed, the Southern District of New York declared in *Genesco Entm't, a Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743 (S.D.N.Y. 1984) that the "typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising." *Id.* at 751.

Here, Plaintiffs do not address the "consumer" aspect of the GBL § 349, but instead focus on the broader impact of charging purportedly illegal fees to "thousands of New York City homeowners who owed water and sewer charges." (Pls.' Mem. at 42.)  The challenged practices here do not concern consumer transactions as contemplated by the law.  Instead, Plaintiffs challenge allegedly improper attorney's fees and costs that they paid in the context of settlement, removing the issue from the market place into the courtroom.  Plaintiffs have therefore failed to establish that they were "consumers" within the meaning of GBL § 349.

Even if they were found to have satisfied the "consumer-oriented" element, Plaintiffs have failed to establish that Defendants engaged in "deceptive acts or practices" as required by the statute.  Without citing to authority, Plaintiffs challenge the sufficiency of Defendants' disclosures of attorney's fees and costs in the payoff quotes, arguing that Defendants only summarily identified the amounts as "legal fees and costs (estimated)," without any itemization. Plaintiffs further argue that Defendants failed to disclose that they sought to collect legal fees and expenses that were not authorized by their retainer agreements with outside counsel.

As Plaintiffs acknowledge, Defendants did in fact disclose that they were collecting legal fees and costs separate and apart from the Tax Lien balance.  Defendants clearly identified the

28

costs as "estimated," and included an explanatory paragraph of the legal fees and costs.

Specifically, the payoff quotes read in relevant part: "If a foreclosure has already been

commenced, an estimate of legal fees and costs is included below.  Actual legal fees and costs

may be different than the estimate."

As such, no reasonable trier of fact could find that Defendants engaged in practices or

acts that were deceptive or materially misleading, as Defendants disclosed the amount due for

legal fees and costs, and identified the same as only an estimate that may be different than the

actual amount.  A reasonable consumer acting reasonably under the circumstances would

understand that the amount disclosed represented an estimated value subject to change.

Inasmuch as Plaintiffs claim that Defendants omitted that the estimated legal fees and costs

exceed the amounts authorized by Defendants' retainer agreement with outside counsel, I find

such argument without merit.

In light of the foregoing, I respectfully recommend that Defendants' motions for summary

judgment on Plaintiffs' GBL § 349 claims be granted.

C.     Defendants Are Entitled to Summary Judgment on Plaintiffs' Breach of Contract
        Claims

Plaintiffs allege that Defendants breached the agreements entered into between JER and

Plaintiffs, or JER and outside counsel, by collecting fees, costs, and interest in excess of that

authorized by the same.  (Second Am. Compl. ¶171.)  Beyond the complaint, Plaintiffs have not

alleged, much less argued in their opposition, that they were party to any contract between

Defendants and outside counsel, and the record does not substantiate such a claim.  *See, e.g.*, *JP*

*Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 239 (2d Dep't 2010) (identifying the

existence of a contract as an essential element of a breach of contract claim (citations omitted));

29

*TeeVee Toons, Inc. v. Gerhard Schubert GmbH*, No. 00-CV-5189 (RCC), 2006 WL 2463537, at

*3 (S.D.N.Y. Aug. 23, 2006) ("As a general rule, absent status as an intended third-party

beneficiary, one may sue on a contract only if one is a party to that contract.") (citing 3

Farnsworth, Farnsworth on Contracts §10.1 (2d ed. 2001)).

       1.    *Defendants Are Entitled to Summary Judgment on Boyd's Breach of*
             *Contract Claim as to the Forbearance Agreement.*

      Boyd brings a breach of contract claim premised on the Forbearance Agreement between

Boyd's late husband, Thomas Boyd, and the 1998-1 Trust.  As an initial matter, and contrary to

Defendants' assertions, Boyd has standing to enforce the terms of the Forbearance Agreement as

a third party beneficiary of the contract.  "A party asserting rights as a third-party beneficiary

must establish '(1) the existence of a valid and binding contract between other parties, (2) that

the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate,

rather than incidental, to indicate the assumption by the contracting parties of a duty to

compensate him if the benefit is lost.'"  *State of Cal. Pub. Emps. Ret. Sys. v. Shearman &*

*Sterling*, 95 N.Y.2d at 434-35 (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59

N.Y.2d 314, 336 (1983)).  Here, the evidence reflects that the property upon which the Tax Lien

accrued was jointly owned by Plaintiff Boyd and her late husband, Thomas.  (*See* Boyd

Indenture; Boyd Title Report.)  Pursuant to the Forbearance Agreement, Thomas Boyd agreed to

a monthly plan for the payment of the amount owned on the Tax Lien to prevent foreclosure on

this jointly held property.  Thus, even if Plaintiff Boyd was not an original party to the

Forbearance Agreement, it was undeniably intended for her benefit, as it prevented foreclosure

on her property.  *See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, Inc., 66 N.Y.2d 38,

44 (1985) ("Essential to status as an intended beneficiary . . . is . . . that 'performance of the

promise will satisfy an obligation of the promisee to pay money to the beneficiary' or that 'the

circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'" (quoting RESTATEMENT (SECOND) OF CONTRACTS §302 (1981)).

      Although Boyd has demonstrated standing, she has failed to establish a breach of the Forbearance Agreement. The contract expressly contemplates that

> [f]ees and costs of collection may have been incurred if the Tax Lien was referred for foreclosure and such fees and costs of collection, including but not limited to, attorney's fees, title search fees, process server expenses, court filing costs and publication expenses (the "Fees and Costs of Collection"), if any, are owed by the Taxpayer to the Trusts.

After having recognized as such, the parties agreed that "[p]ayment including the initial lump sum payment shall be applied first to the payment of Fees and Costs of Collection *as incurred and actually paid through JER* (emphasis added)." Here, Plaintiffs do not allege that Defendants themselves collected fees and costs not "incurred and actually paid through JER" in violation of the contract.[17] Indeed, in challenging the propriety of the charges, Plaintiffs rely heavily on the invoices and billing records outside counsel submitted to JER – evidence of expenses that were actually incurred by Defendants. Regardless of the propriety of outside counsel's billing practices, Defendants charged Plaintiffs for fees and costs actually incurred by them. As such, no breach occurred.

      Accordingly, as Boyd has failed to establish that Defendants breached the terms of the Forbearance Agreement, and the other Plaintiffs have failed to offer any evidence of the existence of a contract, I respectfully recommend that Your Honor grant Defendants' motions for summary judgment on all of the Plaintiffs' breach of contract claims.

---

[17] In response to Defendants' claim that it is "beyond dispute that defendants did not retain the fees and costs at issue," (JER Mem. at 27), Plaintiffs complain that Defendants "cite to no evidence to support this completely inadmissible hearsay assertion." (Pls.' Mem. at 43.) As far as I am aware, Plaintiffs have not alleged much less plead that Defendants fraudulently retained monies collected from Plaintiffs. I do not interpret Plaintiffs' statement here as such an allegation.

D.      Defendants Are Not Entitled to Summary Judgment on Plaintiffs'
        Claims for Restitution Under the Theory of Unjust Enrichment

Defendants argue that Plaintiffs have failed to establish that they are entitled to restitution

under the theory of unjust enrichment.  "To prevail on a claim of unjust enrichment, a plaintiff

must establish that the defendant benefitted at the plaintiff's expense and that equity and good

conscience require restitution." *Whitman Realty Group, Inc. v. Galano*, 838 N.Y.S.2d 585, 587

(2007) (citing *Kaye v. Grossman*, 202 F.3d 611, 615–16 (2d Cir 2000)).  "The essence of such a

claim is that one party has received money or a benefit at the expense of another." *Kaye v.

Grossman*, 202 F.3d at 616 (citation and quotation marks omitted).

Here, Defendants argue unpersuasively that they were not enriched because they did not

retain the disputed fees and costs, but instead used the monies to satisfy the invoices of outside

counsel who actually prosecuted the foreclosure actions.  (*See* Aff. of John Chilson dated

06/02/11 (Dkt. No. 228) ("Chilson Aff."), at ¶ 59.)  Defendants nonetheless retained the benefit

of having satisfied that debt to outside counsel.  "A person may be unjustly enriched not only

where he receives money or property, but also where he otherwise receives a benefit.  He

receives a benefit where his debt is satisfied or where he is saved expense or loss." *Blue Cross of

Cent. New York, Inc. v. Wheeler*, 461 N.Y.S.2d 624, 626 (4th Dep't 1983) (citing RESTATEMENT

(FIRST) OF RESTITUTION §1 (1937)).  As Defendants were spared an expense they would have

otherwise incurred, they were enriched.

Assuming *arguendo* that they were enriched, Defendants argue that they were not

enriched *at Plaintiffs' expense*.  Relying on *Clark v. Darby*, 751 N.Y.S.2d 622 (3d Dep't 2002),

Defendants argue that Plaintiffs themselves benefitted from the foreclosure settlements, and as

such, Plaintiffs cannot show that Defendants benefitted at their expense. *Id.* at 624 ("Notably, it

is the plaintiff's burden to demonstrate that services were performed *for the defendant* resulting

32

in [the latter's] unjust enrichment . . . .") (citation and quotation marks omitted; emphasis in original).  In *Clark*, the plaintiffs had brought a foreclosure action against defendant's property. During the pendency of the litigation, plaintiffs redeemed the property from an impending sale. The court rejected plaintiffs' claim for restitution under the theory of unjust enrichment, reasoning that

> [a]lthough there can be no question that plaintiffs' payment of real property taxes on the property worked to defendant's benefit by relieving him of that burden, it is equally clear that plaintiff's operated under no mistake of fact but, rather, their sole motivation in making the payment was to protect their own interests . . . .

*Id.* at 633.

The Court finds *Clark* to be distinguishable, but only to a degree.  Inasmuch as Plaintiffs can prove that Defendants recouped from them costs for services billed by outside counsel but not actually performed (as opposed to costs billed in excess of the retainer agreements), Plaintiffs can show that they operated under a mistake of fact to the benefit of Defendants, who in turn used those monies to pay the debt owed to their vendors.  "The principle that a party who pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back . . . ."  *Island Fed. Credit Union v. Smith*, 875 N.Y.S.2d 198, 200 (2d Dep't 2009) (quoting *Mfrs. Hanover Trust Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 708 (1st Dep't 1990)).

Specifically, a reasonable trier of fact could conclude that Plaintiffs paid monies to the outside counsel – through JER – to which outside counsel were not entitled.  For example, Plaintiffs argue that Defendants charged Warters two separate legal fees for "Publication," (*see* Grobman Decl., Exh. DDD), when the docket sheet and billing records indicate that counsel prepared and filed only one order of publication, (*see id.*, Exhs. XX ("Docket Sheet"), EEE

33

("Billing Records").  Similarly, Plaintiffs allege that Defendants charged Taylor a $45.00 motion

filing fee and a $95.00 RJI fee, when the docket sheet indicates that neither filing had occurred.

(*Compare id.*, Exh. UUU ("Taylor Disbursement Summary), at JER2 7063 *with* Exh. HHH

("Taylor Docket sheet").)  Plaintiffs additionally claim that the billing record as to the Jones

foreclosure action contains an internal inconsistency, as counsel logged 6.60 hours work but

billed Defendants $1350, which is the equivalent of 7.14 hours.  (*Compare id.*, Exh. U ("Jones

Billing Record"), at $1350, which is the equivalent of 7.14 hours.  (*Compare id.*, Exh. U ("Jones

Billing Record"), at JER2 07035 *with* Exh. O ("Jones Recoverable Legal Costs").) Finally,

Plaintiffs claim that Defendants collected from Boyd a $255 legal fee for "Judgment Granted,"

(*see id.*, Exh. PP ("Boyd Itemized Costs")), whereas the corresponding docket sheet does not

indicate that judgment was entered (*id.*, Exh. NN.)  While an invoice from outside counsel

reflects a $255 charge to "prepare, send and file notice of discontinuance," (*id.*, Exh. QQ, at

JER2 15319), the record provides no evidence of the hours spent in preparation of the same.  In

light of such evidence, a reasonable trier of fact could infer that Plaintiffs paid expenses for

services that did not in fact occur.

Moreover, Plaintiffs, and arguably Defendants, paid for these expenses under the

mistaken belief that the costs were legitimately incurred.  As distinguished from Plaintiffs' claim

that outside counsel charged them in excess of relevant agreements, in instances where the

underlying services was never rendered, outside counsel have absolutely no claim for such costs.

In other words, although Plaintiffs might dispute the value of the legal services actually

performed and the reasonableness of the costs, such expenses were in fact incurred, albeit at a

rate Plaintiffs now disapprove.  To the extent the evidence proves that outside counsel charged

34

for services not rendered or for costs not incurred, however, there is no basis for Defendants to collect such expenses.

While Defendants might argue that they nonetheless paid these costs to outside counsel, however improper, such an argument is unavailing given the overlying principles of equity and good conscience that underpin the theory of unjust enrichment.  As an equitable remedy, unjust enrichment "takes into account other considerations which may affect the availability of the remedy." *Mfr. Hanover Trust Co. v. Chem. Bank*, 559 N.Y.S.2d at 708.  Here, Plaintiffs never had contact with outside counsel, but dealt only through JER.  Plaintiffs paid monies to JER with the understanding that those fees and costs were in fact borne by Defendants.  To the contrary, Plaintiffs cite to evidence in the record from which a reasonable fact finder could conclude that Defendants collected expenses not in fact incurred by outside counsel.  If such allegations prove to be true, Defendants would have been unjustly enriched at Plaintiffs' expense, as they satisfied their debt owed to outside counsel for these improper expenses.

Thus, I respectfully recommend that Your Honor deny Defendants' motion for summary judgment as to Plaintiffs' claims of unjust enrichment.

E.    The Doctrines of Preclusion, Estoppel, And Voluntary Payment Do Not Bar Plaintiffs' Claim for Recovery Under the Theory of Unjust Enrichment

Defendants argue that Plaintiffs' state law claims are barred by the doctrines of res judicata, estoppel, and voluntary payments because Plaintiffs received the benefit of the settlement by not having the Tax Liens foreclosed.  New York courts have held that the doctrines of collateral estoppel and res judicata are inapplicable to cases disposed of by stipulation of settlement "[b]ecause no order or final judgment was ever entered dismissing the prior action . . . ."  *Gallo v. Teplitz Tri-State Recycling,* 678 N.Y.S.2d 140, 142  (2d Dep't 1998) (citing

35

*Berkshire Nursing Center v. Len Realty Co.*, 562 N.Y.S.2d 716, 717 (2d Dep't 1990); *Dunleavy v. First Am. Tit. Ins. Co. of N.Y.*, 499 N.Y.S.2d 264 (3d Cir. 1986); *Ott v. Barash*, 491 N.Y.S.2d 661, 668 (2d Dep't 1985); *Peterson v. Forkey*, 376 N.Y.S.2d 560, 561-62 (1st Dep't 1975)).  In *Peterson*, the court reasoned the "[t]he settlement of the previous case prior to the entry of judgment operated to finalize the action without regard to the validity of the original claim, and the action was accordingly considered, in contemplation of law, as if it had never been begun." *Id.,* 376 N.Y.S.2d at 562 (citation omitted).  Here, the prior foreclosure actions were terminated by a settlement and discontinuance, and as such, the prerequisite of a final judgment has not been met.  Thus, these doctrines have no preclusive effect on Plaintiffs' state law claims.  *See Ott v. Barash*, 491 N.Y.S.2d at 669 ("It is evident that a general prerequisite to invocation of either res judicata or collateral estoppel is the existence of a final judgment, i.e., a final judicial determination which necessarily decided the very cause of action or issue that a party now seeks to litigate in a subsequent action or proceeding.") (citations omitted).

Nor does the doctrine of voluntary payment, which "bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law," prevent Plaintiffs from seeking recovery under the theory of unjust enrichment.  *Dillon v U-A Columbia Cablevision of Westchester*, 100 N.Y.2d 525, 526 (2003).  Simply put, a reasonable trier of fact could conclude that Plaintiffs did not have full knowledge of the fact that a portion of the monies Defendants' collected from them consisted of costs billed by outside counsel for services not in fact performed.

In light of the foregoing, I respectfully recommend that Your Honor find that the doctrines of res judicata, estoppel, and voluntary doctrine do not bar Plaintiffs from seeking restitution under the theory of unjust enrichment.

**IV.    The Court Should Decline to Exercise Supplemental Jurisdiction over Plaintiffs'
State Law Claims**

If Plaintiffs' FDCPA claims are dismissed, I recommend that Your Honor decline to

exercise supplemental jurisdiction over any remaining state law claims.  Pursuant to 28 U.S.C.

1367(c)(3), district courts may decline to exercise supplemental jurisdiction when the court has

"dismissed all claims over which it has original jurisdiction."  In deciding whether to exercise

supplemental jurisdiction over a matter, " a federal court should consider and weigh in each case,

and at every stage of the litigation, the values of judicial economy, convenience, fairness, and

comity . . . . " *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  The Supreme Court

has advised that "in the usual case in which all federal-law claims are eliminated before trial, the

balance of factors . . . will point toward declining to exercise jurisdiction over the remaining

state-law claims." *Id*. at 350 n.7.  In that regard, the Second Court has recognized that "federal

courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction

when federal claims in a case can be disposed of by summary judgment . . . . " *Walker v. Time

Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (citation omitted.)  While acknowledging its

involved history as a federal action, and Your Honors' familiarity with the facts and the record

given the extensive litigation in this case, neither party has raised "exceptional circumstances" to

warrant retention of federal jurisdiction.

Thus, I respectfully recommend that, in the event Plaintiff Jones' and Boyd's FDCPA

claims are dismissed, Your Honor decline to exercise jurisdiction over Plaintiffs' remaining state

law claims.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that Your Honor grant 1998-1 Trust and JER Defendants' motions for summary judgment as to Plaintiffs Jones' and Boyd's FDCPA claims, as well as the GBL § 349 and breach of contract claims brought by all of the Plaintiffs against all of the Defendants.  Additionally, I recommend that Your Honor deny Defendants' motions for summary judgment as to Plaintiffs' claims for restitution under the theory of unjust enrichment.  Finally, I recommend that Your Honor decline to exercise jurisdiction over Plaintiffs' remaining state law claims pursuant to 28 U.S.C. §1367(c)(3).

Any objections to this Report and Recommendation must be filed with the Clerk of the Court and the Honorable Kiyo A. Matsumoto within fourteen days of receipt hereof.  Failure to file timely objections may waive the right to appeal the District Court's Order.  *See* 28 U.S.C. §636(b)(1); FED. R. CIV. P. 72; *Small v. Sec'y of Health & Human Servs*., 892 F.2d 15, 16 (2d Cir. 1989).


**Dated: August 27, 2012**
        **Brooklyn, New York**


*Ramon E. Reyes Jr.*
        **Ramon E. Reyes, Jr.**
        **United States Magistrate Judge**

38

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

JOAN GRANT BOYD, *ET AL.*,                    **NOT FOR PUBLICATION**

        Plaintiffs,                    **MEMORANDUM AND ORDER**

    -against-                              05-CV-2455 (KAM)(RER)

J.E. ROBERT CO., *ET AL.*,

        Defendants.

------------------------------------X

**MATSUMOTO, United States District Judge:**

        Plaintiffs Joan Grant Boyd, Randa Jones, Sybil Taylor,
and Tonya Warters (collectively, "Plaintiffs") commenced this
action on behalf of themselves and a putative class of others
similarly situated against Defendants J.E. Robert Co., Inc. and
JER Revenue Services, LLC (collectively, the "JER Defendants" or
"JER"), and NYCTL 1996-1 Trust, NYCTL 1997-1 Trust, NYCTL 1998-1
Trust, and NYCTL 1999-1 Trust (collectively, the "Trust
Defendants"), alleging violations of the Fair Debt Collection
Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA") and New York
statutory and common law.  On June 3, 2011, the JER Defendants
and Trust Defendants each filed a motion for summary judgment,
and the court referred those motions to Magistrate Judge Ramon
E. Reyes. (*See* Order dated 2/13/12.)

        On August 27, 2012, Judge Reyes issued a Report and
Recommendation, recommending that Defendants' motions for

summary judgment be granted in part and denied in part. (ECF No.
241, Report and Recommendation dated 8/27/12 ("R&R") at 1.)  The
JER Defendants, Trust Defendants, and Plaintiffs each filed
timely objections to the R&R and subsequently submitted
responses to each other's objections. (*See* ECF No. 243, JER
Defendants' Objections to R&R ("JER Obj."); ECF No. 244, Trust
Defendants' Objections to R&R ("Trust Obj."); ECF No. 245,
Plaintiffs' Objections to R&R ("Pls. Obj."); ECF No. 247,
Plaintiffs' Response to Defendants' Objections ("Pls. Resp. to
Obj."); ECF No. 248, Trust Defendants' Response to Pls. Obj.
("Trust Resp. to Pls. Obj."); ECF No. 249, JER Defendants'
Response to Pls. Obj. ("JER Resp. to Pls. Obj.").)  By Order
dated October 2, 2012, the court sustained Defendants'
objections to Judge Reyes' R&R, adopted in part and modified in
part the R&R, granted Defendants' respective motions for summary
judgment, dismissed Plaintiffs' FDCPA claims, and declined to
exercise supplemental jurisdiction over Plaintiffs' state law
claims. (ECF No. 250, Order Adopting in Part and Modifying in
Part R&R ("10/2/12 Order").)

Presently before the court is Plaintiffs' fully-
briefed motion for reconsideration pursuant to Local Civil Rule

6.3.[1] (ECF No. 252, Plaintiffs' Motion for Reconsideration dated
10/17/12 ("Pls. Mot. for Recon."); ECF No. 257, JER Defendants'
Opposition to Pls. Mot. for Recon. ("JER Opp."); ECF No. 258,
Trust Defendants' Opposition to Pls. Mot. for Recon. ("Trust
Opp."); ECF No. 259, Plaintiffs' Reply ("Pls. Reply."); ECF No.
262, Plaintiffs' Letter Providing Supplemental Authority ("Pls.
Ltr.").)  For the reasons set forth below, Plaintiffs' motion
for reconsideration is denied.

## BACKGROUND

The court foregoes a recitation of the extensive
procedural history and facts of this case, which have been set
forth previously in Judge Reyes' R&R, this court's Order
adopting in part and modifying in part Judge Reyes' R&R, and
this court's prior Order on Defendants' motion to dismiss.
(10/2/12 Order at 3-23; R&R at 2-7; ECF No. 191, Order Adopting
Report and Recommendation dated 2/2/11 ("2/2/11 Order").)

## STANDARD OF REVIEW

"Under Local Civil Rule 6.3, the standard for a motion
for reconsideration is 'strict.'" *Norton v. Town of Islip*, No.
04-CV-3079, 2013 WL 84896, at *3 (E.D.N.Y. Jan. 7, 2013) (citing

---

[1] On November 2, 2012, Plaintiffs timely filed a Notice of Appeal
of the court's October 2, 2012 Order.  (ECF No. 254, Notice of Appeal dated
11/2/12.)  On February 27, 2013, the Second Circuit granted Plaintiffs'
motion to hold the appeal in abeyance pending determination of the instant
motion for reconsideration.  (ECF No. 260, Order of Second Circuit granting
Motion to Hold Appeal in Abeyance.)

*Schrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).

"A motion for reconsideration may be granted only if a court

overlooked (1) factual matters that were put before it on the

underlying motion or (2) controlling legal authority." *Rollins*

*v. N.Y. State Div. of Parole*, No. 03-CV-5952, 2007 WL 539158, at

*2 (E.D.N.Y. Feb. 16, 2007); *see also Virgin Atl. Airways v.*

*Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("The

major grounds justifying reconsideration are an intervening

change of controlling law, the availability of new evidence, or

the need to correct a clear error or prevent manifest

injustice." (internal quotation marks omitted)).  "A motion for

reconsideration is 'not intended as a vehicle for a party

dissatisfied with the Court's ruling to advance new theories

that the movant failed to advance in connection with the

underlying motion.'" *WestLB AG v. BAC Fla. Bank,* 912 F. Supp. 2d

86, 95 (S.D.N.Y. 2012) (quoting *Parrish v. Sollecito*, 253 F.

Supp. 2d 713, 715 (S.D.N.Y. 2003)).  Indeed, "Local Rule 6.3

generally precludes a movant from 'advancing new facts, issues

or arguments not previously presented to the court.'" *Id.*

(quoting *United States v. Tillman*, No. 07-CR-1209, 2009 WL

1270301, at *1 (S.D.N.Y. May 6, 2009)).  Nor is a motion for

reconsideration "a chance for a party to take a 'second bite at

the apple.'" *Id.* (quoting *Rafter v. Liddle*, 288 F. App'x 768, 769 (2d Cir. 2008)).

"It is within the sound discretion of the district court whether or not to grant a motion for reconsideration." *Markel Am. Ins. Co. v. Linhart,* No. 11-CV-5094, 2012 WL 5879107, at *2 (E.D.N.Y. Nov. 16, 2012). In exercising this discretion, the court must be mindful that "a motion for reconsideration 'is not favored and is properly granted only upon a showing of exceptional circumstances.'" *Nakshin v. Holder*, 360 F. App'x 192, 193 (2d Cir. 2010) (quoting *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004)).

## DISCUSSION

Plaintiffs argue that the court committed clear error by granting Defendants' respective motions for summary judgment and therefore request reconsideration of the court's October 2, 2012 Order adopting in part and modifying in part Judge Reyes' R&R and dismissing Plaintiffs' FDCPA claims (the "October 2012 Order"). (Pls. Mot. for Recon. at 1-2.) Plaintiffs specifically maintain that the court erred by (1) finding that the New York City Tax Liens, which included charges for municipal water and sewer services, were not "debts" within the meaning of the FDCPA and (2) determining that Defendants' efforts to enforce and foreclose on the Tax Liens did not

5

**SPA44**

constitute debt collection activities actionable under the FDCPA.  (*Id.* at 2-23.)  Upon review of the relevant case law and statutory authority, the court finds no clear error in its October 2012 Order and therefore denies Plaintiffs' motion for reconsideration, which fails to identify any controlling legal authority or facts overlooked by the court and instead merely attempts to relitigate and rehash arguments already considered and rejected by the court.

I.    **The Court's October 2012 Order**

A brief review of this court's October 2012 Order is necessary before addressing the arguments raised in Plaintiffs' motion for reconsideration.

First, in its October 2012 Order, this court held that the Tax Liens on the Jones and Boyd Properties were not debts subject to the FDCPA because the mandatory tax, water, and sewer obligations levied on those properties did not arise from the type of consumer "transaction" contemplated by the FDCPA.  (*See* 10/2/12 Order at 29-30 (citing *Beggs v. Rossi*, 145 F.3d 511 (2d Cir. 1998) (per curiam)).)  Specifically, the court reasoned that, similar to municipal taxes, the municipal water and sewer charges imposed upon Plaintiffs were levied upon Plaintiffs as an incident to property ownership and did not arise from a consensual transaction, where parties negotiate or contract for

6

consumer services or goods, as contemplated by the FDCPA. (*Id.* at 28-34 (citing *Beggs*, 145 F.3d at 512; *Turner v. Cook*, 362 F.3d 1219, 1227 (9th Cir. 2004); *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1371 (11th Cir. 1998).)  In support of this conclusion, the court explained that Plaintiffs "Jones and Boyd did not negotiate or enter into any contract or agreement with the City with respect to the utility charges" and that the "properties owned by Jones and Boyd were required by the New York City Administrative Code to be connected to City water and sewage mains and supplied with water at rates provided by the City." (*Id.* at 32 (citing N.Y.C. Admin. Code § 27-2024).)

Furthermore, the court determined that because "New York City's 'water and sewer infrastructure is funded by revenue it collects through water and sewer rates' from the City's property owners," the municipal water and sewer charges, like taxes, "are imposed upon New York City property owners to fund a public service: maintenance of the City's water and sewer infrastructure." (*Id.* at 34 (quoting N.Y.C. Environmental Protection, "About DEP Water Rates," http://home.nyc.gov/html /dep/html/water_rates/index.shtml (last visited 9/21/13)).) The court therefore concluded that the relationship between the City and Plaintiffs with respect to the water and sewer charges "resembles more the relationship between taxpayer and taxing

7

authority than it does the consensual, transactional 'pro tanto exchange' between parties envisaged by the statutory definition of debt." (*Id.* at 34 (citing *Beggs*, 145 F.3d at 512).)

Moreover, the court noted that the municipal statutory scheme further supported the court's conclusion that the water and sewer charges imposed on Plaintiffs were more akin to taxes than consumer debts under the FDCPA. (*Id.* at 34-35.) In particular, the court explained that Section 1045-j(5) of the City's Public Authority Law — which provides that unpaid water and sewer charges shall constitute a lien upon the premises served, which lien "shall bear interest at the same rate as would unpaid taxes" and "may be foreclosed against the lot of building served in the same manner as a lien for such taxes," N.Y. Pub. Auth. Law § 1045-j(5) — strongly reinforces the court's finding that "water and sewer charges are to be treated in the same manner as taxes," under the FDCPA. (10/2/12 Order at 34-35.)

Finally, the court rejected Plaintiffs' contention that the unpaid water charges on the Boyd Property were debts because such charges were metered based on water usage. (*See id.* at 35-36.) In rejecting Plaintiffs' argument, the court reasoned that "[t]hough metered usage arguably may be one factor in determining the nature of a lien, no court has held that it

8

**SPA47**

is the determinative factor." (*Id.*)  In addition, the court explained that Plaintiffs proffered no evidence that "Boyd even requested water and sewer services from the City after . . . a negotiation or business dealing or any form of exchange with the City." (*Id.* at 36.)  Instead, the court noted, "Boyd was required to avail herself of City resources and pay concomitant charges for those resources as she used them, irrespective of the method by which the charges were determined by the City." (*Id.*)  Accordingly, the court concluded that the water charges imposed on the Boyd Property, although metered, did not arise from a consensual transaction and therefore do not constitute debts under the FDCPA. (*Id.* at 36-37 (citing *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1326 (7th Cir. 1997).)

Second, the court alternatively found that Defendants' efforts to enforce and foreclose on the Tax Liens constituted the enforcement of security interests rather than debt collection practices under the FDCPA. (*Id.* at 42-43.)  In support of this determination, the court cited to authority from several other federal courts finding that the enforcement of a security interest through the foreclosure process is not debt collection under the FDCPA where, as here, no monetary judgment is sought against the debtor in enforcing a lien on property.

9

(*See id.* at 42-46 (citing cases).)  Finding this precedent persuasive, the court held that "because the judicial foreclosures against the Jones and Boyd Properties did not seek monetary judgments against individual debtors, those foreclosure actions . . . are not debt collection activities under §§ 1692e and 1692f of the FDCPA."  (*Id.* at 54.)

After dismissing Plaintiffs' FDCPA claims, the court declined to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and granted Defendants' respective motions for summary judgment.  (*Id.* at 54-55.)

## II.  The Tax Liens Are Not "Debts" Under the FDCPA.

In their motion for reconsideration, Plaintiffs first urge the court to abandon its previous determination that the Tax Liens are not debts within the meaning of the FDCPA.  (Pls. Mot. for Recon. at 2-14.)  To that end, Plaintiffs contend that the court's previous Order misconstrued controlling authority regarding the meaning of the statutory terms "debt" and "transaction" and, at the very least, incorrectly held that the water charges on the Boyd Property, which were metered based on usage, were not debts under the FDCPA.  (*Id.*)  As discussed in further detail below, Plaintiffs' arguments are unavailing and fail to demonstrate any exceptional circumstances warranting reconsideration of this court's October 2012 Order.

Accordingly, as this court previously found, the Tax Liens on the Jones and Boyd Properties are not debts within the meaning of the FDCPA.

### A.    Controlling Second Circuit Authority

Plaintiffs claim that the court's October 2012 Order "fundamentally misconstrues" the Second Circuit's per curiam opinion in *Beggs v. Rossi*, 145 F.3d 511 (2d Cir. 1998). (Pls. Mot. for Recon. at 3-9).  Plaintiffs maintain that, contrary to this court's reasoning, *Beggs* does not require a debt to arise from a *consensual* transaction, whereby parties negotiate or contract for consumer-related goods.  (*Id.* at 5-6.)  Plaintiffs argue that *Beggs* instead held that a debt is subject to the FDCPA if it "'has arisen as a result of the rendition of a service or purchase of property or other item of value.'"  (*Id.* at 4 (quoting *Beggs*, 145 F.3d at 512).)  In Plaintiffs' view, this court ran afoul of the Second Circuit's clear guidance in *Beggs* by requiring that a debt arise from a *consensual* transaction.[2]  (*Id.* at 5-8.)

_____

[2]    As further support for their reading of *Beggs* and their concomitant interpretation of the statutory term "transaction," Plaintiffs cite to *Karpova v. Snow*, 402 F. Supp. 2d 459 (S.D.N.Y. 2005), a non-FDCPA case in which the Southern District of New York discussed the meaning of the term "transaction" in the context of Iraqi Sanctions Regulations.  (Pls. Mot. for Recon. at 8-9).  The Southern District's interpretation of the regulatory term "transaction" in *Karpova* provides scant guidance in the FDCPA context, and Plaintiffs provide no compelling reason why *Karpova*'s interpretation of "transaction" is persuasive in the consumer protection context.  Plaintiffs' reliance on *Karpova* is therefore unavailing.

11

Plaintiffs' argument rests on a misguided view of the facts and the law, which "fundamentally misconstrues" and mischaracterizes the Second Circuit's holding in *Beggs*.  In *Beggs*, the Second Circuit, relying upon the Third Circuit's decision in *Staub v. Harris*, held that "'*at a minimum*, the [FDCPA] contemplates that the debt has arisen as a result of the rendition of a service or purchase of property or other item of value.'" 145 F.3d at 512 (emphasis added) (quoting *Staub v. Harris*, 626 F.2d 275, 278 (3d Cir. 1980)).  By arguing that *Beggs* "simply requires that the 'debt' arise in connection with 'the rendition of [such] a service or purchase of property" to be subject to the FDCPA, (Pls. Mot. for Recon. at 5 (alteration in original) (quoting *Beggs*, 145 F.3d at 512)), Plaintiffs conveniently disregard the phrase "at a minimum" and consequently misinterpret *Beggs* as setting forth an exhaustive definition of the statutory term "transaction."  Contrary to Plaintiffs' mistaken assertion, *Beggs* did not hold that the FDCPA applies so long as a debt arises out of a rendition of a service or a purchase of a consumer good.  (Pls. Mot. for Recon. at 5-8.)  To the contrary, *Beggs* held that the FDCPA does *not* apply if the purported "debt" does not arise out of a rendition of a service or a purchase of a consumer good.  Stated differently, *Beggs* stands for the simple and unremarkable

12

proposition that the FDCPA requires, at the very least, the rendition of a service or a purchase of a consumer good.[3]

Applying this principle, the Second Circuit in *Beggs* determined that an automobile tax was not a debt because such automobile taxes were levied "upon the ownership of the vehicle by the citizen," rather than "upon the purchase or registration of the vehicle *per se*," and therefore did not involve a rendition of a service or purchase of a consumer good.  145 F.3d at 512.  In so holding, the *Beggs* court concluded that the "relationship between taxpayer and taxing authority does not encompass that type of *pro tanto* exchange which the statutory definition envisages."  *Id*.  *Beggs* is therefore fully consistent with this court's holding that the statutory definition of debt "contemplates a *consensual* transaction, where parties 'negotiate or contract' for consumer services or goods."  (10/2/12 Order at 30-31 (citing *Turner*, 362 F.3d at 1227).)  Consequently, Plaintiffs' incorrect claim that this court's October 2012 Order misconstrued controlling Second Circuit precedent is respectfully rejected.

---

[3] Notably, in *Staub*, the case which the Second Circuit found dispositive in *Beggs*, the Third Circuit stated that it "need not decide whether 'transaction' as used in the FDCPA always connotes the existence of an underlying contractual relationship." *Staub*, 626 F.2d at 278.  Thus, notwithstanding Plaintiffs' erroneous suggestion to the contrary, *Staub*, and by extension *Beggs,* did not set forth an exhaustive definition of the statutory term "transaction" or preclude this court's holding that the FDCPA contemplates a consensual transaction.

Beyond misinterpreting the Second Circuit's holding in
*Beggs*, Plaintiffs also fail to address this court's conclusion
that, under New York City's statutory and administrative regime,
the municipal water and sewer charges are more analogous to
taxes than consumer debts.  (*See* 10/2/12 Order at 32-35.)
Plaintiffs do not dispute that the Jones and Boyd properties
were required by the New York City Administrative Code to be
connected to municipal water and sewage mains and supply their
properties with water at rates determined unilaterally by the
City.  N.Y.C. Admin. Code § 27-2024; N.Y. Pub. Auth. Law
§§ 1045-j(1), (4).  Nor do Plaintiffs dispute that New York
City's water and sewer infrastructure "is funded by revenue it
collects through water and sewer rates" from City property
owners.  "About DEP Water Rates," http://home.nyc.gov/html/dep/
html/water_rates/index.shtml (last visited 9/23/13).  Plaintiffs
further concede that Section 1045-j(5) of the City's Public
Authority Law provides that unpaid sewer and water obligations
constitute a lien on the property that "shall bear interest at
the same rate as would unpaid taxes" and "may be foreclosed
against [the property] in the same manner as a lien for such
taxes."  N.Y. Pub. Auth. Law § 1045-j(5).  Finally, in their
opposition to summary judgment, Plaintiffs themselves argue that
the unpaid water and sewer charges should be treated as taxes

14

and insist that "state laws covering the collection of city taxes apply to the collection of the payments at issue." (ECF No. 230, Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, at 37.)

These undisputed findings — all of which remain unaddressed in Plaintiffs' motion for reconsideration — elucidate two key points. First, these findings demonstrate that the unpaid water and sewer charges did not arise from a consensual transaction and therefore do not constitute debts under the FDCPA. (*See* 10/2/10 Order at 32-34.) Second, these findings amply support the court's ultimate conclusion that, under *Beggs*, the water and sewer charges are less analogous to consumer debts and more comparable to taxes and thus fall outside the protective ambit of the FDCPA. (*Id.* at 34-35.) As in *Beggs*, the relationship between the City and Plaintiffs in this case resembles more the "relationship between taxpayer and taxing authority" than it does the "type of *pro tanto* exchange which the statutory definition [of debt] envisages." 145 F.3d at 512. The court is therefore unconvinced that its October 2012 Order misconstrued or overlooked controlling precedent.

Plaintiffs next accuse this court of overlooking out-of-circuit decisions finding that condominium assessments and common charges constitute debts within the meaning of the FDCPA.

15

(Pls. Mot. for Recon. at 7 & n.5 (citing cases).)  These cases do not alter the court's conclusion that the Tax Liens in this case do not qualify as debts under the FDCPA.  As a preliminary matter, these out-of-circuit cases are not controlling precedent and therefore do not warrant granting Plaintiffs' motion for reconsideration.[4]  *Rollins*, 2007 WL 539158, at *2.  In any event, the cases cited by Plaintiffs can be reconciled with this court's reasoning that the water and sewer charges levied mandatorily upon New York City property owners do not constitute debts under the FDCPA.  Indeed, the cases cited by Plaintiffs involved voluntary transactions whereby condominium assessments were imposed upon property owners pursuant to consensual or negotiated agreements between the property owners and the condominium/homeowners associations of which the owners were members: put simply, the condominium assessments were a byproduct of business dealings, and not mandatory charges imposed under municipal law.  *See, e.g., Newman v. Boehm,*

---

[4] Moreover, at least some courts have held that condominium assessments and common charges do *not* constitute debts under the FDCPA.  *See Mediterranean Villas Condo. Ass'n, Inc. v. Moors Master Maint.*, No. 11-23302, 2012 WL 882508, at *4 (S.D. Fla. Mar. 14, 2012) ("Maintenance fees assessments applied to all unit owners for costs of maintenance of common areas are generally not 'debts' within the meaning of the FDCPA."); *Azar v. Hayter*, 874 F. Supp. 1314, 1318-19 (N.D. Fla. 1995), *aff'd* 66 F.3d 342 (11th Cir. 1995); *Bryan v. Clayton*, 698 So.2d 1236, 1237 (Fla. Dist. Ct. App. 1997), *review denied by* 707 So.2d 1123 (Fla. 1998).  The court finds that this split in authority weakens the persuasive force of Plaintiffs' argument that, like condominium assessments, the water and sewer charges here should be treated as debts.

*Pearlstein & Bright, Ltd.*, 119 F.3d 477, 481 (7th Cir. 1997)
("By paying the purchase price and accepting title to their
home, the Riters became bound by the Declaration of Covenants,
Conditions, and Restrictions of their homeowners association,
which required the payment of regular and special assessments
imposed by the association."). Such negotiated and consensual
transactions are conspicuously absent in the instant case. As
earlier noted, Jones and Boyd were required to utilize municipal
water and sewer services and to pay for such services at rates
determined by the City. And it is undisputed that the municipal
statutory scheme treats unpaid water and sewer charges like
unpaid taxes. N.Y. Pub. Auth. Law § 1045-j(5). Furthermore,
Plaintiffs offer no compelling reason why this court should
treat the municipal water and sewer charges like condominium
assessments. As such, the court is not persuaded by Plaintiffs'
reliance on out-of-circuit cases finding that condominium
assessments, which are factually distinct from the mandatory
statutory municipal sewer and water charges here, constitute
debts under the FDCPA.

Equally as unpersuasive is Plaintiffs' claim that this
court's October 2012 Order conflicts with the FTC Staff
Commentary relied upon in *Beggs*. (Pls. Mot. for Recon. at 9-
10.) Plaintiffs argue that the FTC Staff Commentary excludes

17

unpaid taxes as debts but does not "include water or sewer charges among the obligations that are excluded from the 'debts' subject to the FDCPA." (Pls. Mot. for Recon. at 10.)  Contrary to Plaintiffs' unsubstantiated assumption, the FTC Staff Commentary does not purport to provide an exhaustive list of all obligations excluded from the FDCPA.  Indeed, the Introduction to the FTC Staff Commentary expressly clarifies that the "Commentary should be used in conjunction with the statute . . . and is not intended as a substitute for the statutory text" and that the "Commentary should be not considered as a reflection of all court rulings under the FDCPA."  Federal Trade Commission, "Statements of General Policy or Interpretation," Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097, 50102 (Dec. 13, 1988).  Consequently, the absence of "water and sewer charges" from the Staff Commentary's illustrative and non-exhaustive list of exclusions does not necessarily render such municipal utility charges "debts" within the meaning of the FDCPA.  To the contrary, the FTC Staff Commentary reinforces this court's conclusion that the water and sewer charges, which resemble municipal taxes rather than consumer debts, fall outside the purview of the FDCPA.  (*See* 10/2/12 Order at 32-35.)

18

### B.   Boyd's Metered Water Usage

Plaintiffs contend that, at the very least, this court committed clear error by finding that the metered water usage on the Boyd Property did not constitute a debt under the FDCPA. (Pls. Mot. for Recon. at 10-12.)  Plaintiffs specifically take issue with this court's finding that "'no court has held that [metered usage] is the determinative factor'" in resolving whether the water and sewer charges are debts under the FDCPA. (*Id.* at 11 (quoting 10/2/12 Order at 36).)  According to Plaintiffs, the Third Circuit in *Piper* expressly held that a payment obligation arising from metered water usage is a consensual transaction subject to the FDCPA.  (*Id.* at 11-12 (quoting *Piper v. Portnoff Law Assocs.*, 396 F.3d 227, 233 n.8 (3d Cir. 2005).)

In *Piper*, the Third Circuit provided the following analysis with respect to the unpaid water service fees in that case:

> It is true, as [defendant] stresses, that a property owner in Pennsylvania may incur an obligation to pay a water service fee even though he has not connected his property to the municipal water system, but that is not the situation before us.  Nor does this fact render erroneous the *Pollice [v. Nat'l Tax Funding, L.P.*, 225 F.3d 379 (3d Cir. 2000), Court's characterization of normal water/sewer fees in Pennsylvania as arising from a "consensual . . . transaction."  It

19

> is apparent from the Pipers' account with
> the City that their service was metered in
> the normal fashion and that the amount of
> their obligation to pay was based on the
> amount of water they chose to use. The
> consensual nature of the transaction
> distinguishes the situation before us from
> tax assessments which *Pollice* held to not be
> debts within the meaning of the FDCPA.

396 F.3d at 233 n.8 (internal citation omitted). Seizing upon

this language in *Piper*, Plaintiffs argue that the water charges

on the Boyd Property likewise arose from a consensual

transaction because they were metered according to usage. (Pls.

Mot. for Recon. at 11-12.)5

     In pursuing this argument, however, Plaintiffs ignore

the critical distinction between the municipal scheme in *Piper*

and the municipal water and sewer regime in the City of New

York. Unlike in *Piper*, Boyd did not, and could not,

"voluntarily elect[] to avail [her]self of municipal water/sewer

services," *Piper*, 396 F.3d at 233 n.8; rather, Boyd was required

to do so by New York City municipal law. As this court

previously noted in its October 2012 Order, Plaintiffs fail to

demonstrate that the administrative regime for water and sewer

services in the City of Pittsburgh is comparable to the

_____

     5 The court has also received and considered Plaintiffs'
unauthorized letter, dated September 25, 2013, in which Plaintiffs bring to
the court's attention the recent decision, *Reilly v. Northeast Revenue
Servs.*, No. 12-CV-02312, 2013 U.S. Dist. LEXIS 108554 (M.D. Pa. Aug. 1,
2013).

administrative regime in the City of New York.  In fact, Plaintiffs concede that, unlike in New York City, where the municipal water board serves as the sole water and sewage provider, private companies serve the water and sewage needs of property owners in the City of Pittsburgh and serve as an alternative to municipal public utilities.  (10/2/12 Order at 40 & n.16 (citing Pennsylvania American Water Company, http://www.amwater.com/ paaw/about-us/page9704.html (last visited 9/23/13)).)  This fact lends credence to the court's determination that water users in *Piper* exercised a level of consent not present in the instant case.  Plaintiffs therefore fail to establish any similarity between the "normal water/sewer fees in Pennsylvania" in *Piper* and the mandatory water and sewer charges imposed by New York City in this case.[6]

Finally, to the extent that *Piper* holds that metered usage alone gives rise to a consensual transaction under the FDCPA, this court declines to adopt such reasoning where, as here, property owners have no choice in determining whether or not to use municipal water services.  Irrespective of whether Boyd's water charges were metered based on usage, Boyd was

---

[6] Significantly, Plaintiffs do not contest this court's finding that the bundled Tax Liens are unique and distinguishable from the municipal liens in *Pollice* and *Piper*, which, unlike the Tax Liens, were not composed of mixed obligations bundled into one instrument.  (10/2/12 Order at 40-41.) This distinction likewise renders *Pollice* and *Piper* inapposite.

required by law to connect her property to municipal water mains and pay for such water at rates determined by the City or face foreclosure of a lien on their properties for unpaid water and sewer charges.  Given these facts, it simply cannot be said that the water charges on the Boyd Property — metered or not — arose from a consensual transaction.

Because Plaintiffs have failed to identify any facts or controlling precedent overlooked by the court in its October 2012 Order, reconsideration is not warranted with respect to the court's finding that the Tax Liens do not constitute debts within the meaning of the FDCPA.

### III. The FDCPA Does Not Apply to the Enforcement of Security Interests Against Property.

Plaintiffs additionally challenge this court's alternative holding that Defendants' efforts to foreclose on the Tax Liens constituted the enforcement of security interests rather than debt collection practices subject to the FDCPA. (Pls. Mot. for Recon. at 14-19.)  Plaintiffs maintain that unauthorized amounts collected during foreclosure are subject to the FDCPA and argue that this court mistakenly held that "defendant's *actual collection* of the allegedly improper amounts did not constitute the '*collection or attempt to collect a debt*' subject to § 1692(f)(1) because it occurred during a

22

foreclosure." (Pls. Mot. for Recon. at 15.) In Plaintiffs'
view, the court's decision is at odds with the weight of
decisional authority as well as the position adopted by the
Consumer Financial Protection Bureau ("CFPB") in a recent amicus
brief. (*Id.* (citing cases[7]).)

Plaintiffs' argument is flawed in several respects.
First and foremost, Plaintiffs misrepresent the scope of this
court's holding in the October 2012 Order. Contrary to
Plaintiffs' broad mischaracterization, this court did not find
that Defendants' actions fell outside of the FDCPA "because [the
challenged collection activities] *occurred during* foreclosure."
(*Id.*) (emphasis added). Instead, the court held that the
foreclosure actions as to the Tax Liens did not seek monetary
judgments against Plaintiffs and were therefore not debt
collection activities for purposes of the FDCPA, but, rather,
constituted the enforcement of Defendants' security interests in
property. (10/2/12 Order at 42, 54.) Central to this court's
holding was the undisputed fact that the foreclosure complaints
did not request deficiency judgments against Jones or Boyd and

---

[7] Plaintiffs cite to decisions from numerous federal Courts of
Appeals in support of their argument. *See, e.g., Glazer v. Chase Home Fin.
LLC*, 704 F.3d 453, 459-64 (6th Cir. 2013); *Wallace v. Washington Mut. Bank,
F.A.*, 683 F.3d 323, 328 (6th Cir. 2012); *Birster v. Am. Home Mortg. Serv.,
Inc.*, 481 F. App'x 579 (11th Cir. 2012); *Reese v. Ellis, Painter, Ratterree &
Adams, LLP*, 678 F.3d 1211, 1217-18 (11th Cir. 2012); *Wilson v. Draper &
Goldberg*, 443 F.3d 373, 376 (4th Cir. 2006); *Kaltenbach v. Richards*, 464 F.3d
524, 527 (5th Cir. 2006); *Piper*, 396 F.3d at 234-35.

instead proceeded solely against the Jones and Boyd Properties, both of which were subject to Tax Liens. (*Id.* at 47-48.)   The court rejects Plaintiffs' attempt to assign error in this court's October 2012 Order by misconstruing the court's holding.

In any case, to the extent that the appellate court cases and the CFPB amicus brief cited by Plaintiffs support the proposition that the enforcement of security interests through lien foreclosure constitutes debt collection,[8] the court declines to follow the misguided reasoning in these non-controlling cases.   As this court previously found, the enforcement of a security interest through foreclosure proceedings that do not seek monetary judgments against debtors is not debt collection for purposes of the FDCPA.   In so holding, the court respectfully parts ways with the federal appellate courts that have held to the contrary and instead joins the many federal district courts, including at least one in the Second Circuit, that have determined that foreclosure activities do not constitute debt collection under the FDCPA.   *See, e.g., Proa v. Wells Fargo Bank, N.A.*, No. 13-CV-759, 2013 WL 4508364, at *5

---

[8] JER Defendants persuasively argue that many of appellate cases cited by Plaintiffs do not fully support the proposition that the foreclosures on property liens constitute debt collection activities particularly where, as here, no deficiency judgments have been sought; to that end, JER Defendants provide several reasons why these Circuit Court cases are distinguishable on their facts and, in any event, not controlling. (JER Opp. at 7-8.)   Although the court finds merit in JER Defendants' argument, the court need not distinguish these cases because, as set forth *infra*, the reasoning adopted by these cases is tenuous.

n.2 (S.D. Cal. Aug. 22, 2013) ("[T]he acts Defendants took to

enforce a security interest do not qualify as debt collection

within the scope of § 1692e."); *DeMoss v. Peterson, Fram &*

*Bergman*, No. 12-CV-2197, 2013 WL 1881058, at *2 (D. Minn. May 6,

2013) ("[T]his court has previously held that foreclosure

activities do not constitute debt collection under the FDCPA.");

*Lara v. Aurora Loan Servs. LLC*, No. 12-CV-904, 2013 WL 1628955,

at *7 (S.D. Cal. Apr. 16, 2013)("[N]umerous district courts,

including several in the Ninth Circuit, have also held that the

activity of foreclosing on [a] property pursuant to a deed of

trust is not collection of a debt within the meaning of the

FDCPA." (internal quotation marks omitted) (alterations in

original)); *Derisme v. Hunt Leibert Jacobson P.C.*, 880 F. Supp.

2d 311, 325 (D. Conn. 2012) ("[I]t appears that a majority of

courts who have addressed this question have also concluded that

foreclosing on a mortgage does not qualify as debt collection

activity for purposes of the FDCPA."); *Kangas v. Kieffer*, No.

12-CV-8, 2012 WL 1424388, at *5 (D.N.D. Apr. 24, 2012) ("[T]he

Court finds that Kieffer and Gray & Associates are not subject

to the Fair Debt Collection Practices Act in this case because

their foreclosure activities in this particular case do not

constitute debt collection."), *aff'd*, 495 F. App'x 749 (8th Cir.

2012); *Zhang v. Countrywide Home Loans, Inc.*, No. 11-CV-03475,

2012 WL 1245682, at *11 (N.D. Cal. Apr. 13, 2012) ("The question
of whether a foreclosure constitutes debt collection under the
FDCPA has not been decided by the Ninth Circuit, but district
courts throughout the Ninth Circuit have concluded that it does
not." (internal quotation marks omitted)); *Meyer v.
Citimortgage, Inc.*, No. 11-CV-13432, 2012 WL 511995, at *7 (E.D.
Mich. Feb. 16, 2012) ("To the extent plaintiffs' various,
unspecified FDCPA claims concern the enforcement of the
mortgage, these claims fail because the FDCPA are not applicable
to the enforcement of a security interest, because the FDCPA
does not consider foreclosure to be debt collection."); *Bray v.
Bank of Am.*, No. 09-CV-75, 2011 WL 30307, at *7 (D.N.D. Jan. 5,
2011) ("In *Gray,* the district court concluded foreclosure
activities are not debt collection, as contemplated by the Fair
Debt Collection Practices Act."), *appeal dismissed*, 435 F. App'x
571 (8th Cir. 2011) and *aff'd*, 497 F. App'x 685 (8th Cir. 2013);
*Speleos v. BAC Home Loans Serv., L.P.*, 824 F. Supp. 2d 226, 232
(D. Mass. 2011) ("The statute itself, however, distinguishes
debt collection from security interest enforcement in its
definition of a 'debt collector.'"); *Geist v. OneWest Bank*, No.
10-C-1879, 2010 WL 4117504, at *3 (N.D. Cal. Oct. 19, 2010)
("Although the Ninth Circuit has not yet addressed whether a
foreclosure action constitutes 'debt collection' under the

Case 12-4422, Document 64, 12/23/2013, 1121541, Page68 of 134

FDCPA, district courts throughout the Ninth Circuit have concluded that it does not." (collecting cases)); *Odinma v. Aurora Loan Servs.*, No. 09-C-4674, 2010 WL 2232169, at *11 (N.D. Cal. June 3, 2010) ("[F]oreclosure is not debt collection under the federal Fair Debt Collection Practices Act."); *Aniel v. T.D. Serv. Co.,* No. 10-C-3185, 2010 WL 3154087, at *1 (N.D. Cal. Aug. 9, 2010) ("Plaintiffs' allegations relating to the FDCPA claim relate to foreclosure proceedings and courts throughout this circuit have concluded that foreclosure does not constitute 'debt collection' under the FDCPA."); *Jozinovich v. JP Morgan Chase Bank, N.A.,* No. 09-C-3326, 2010 WL 234895, at * 6 (N.D. Cal. Jan. 14, 2010) ("[T]he activity of foreclosing on [a] property pursuant to a deed of trust is not the collection of a debt within the meaning of the FDCPA." (alterations in original) (internal quotation marks omitted)); *Siegel v. Deutsche Bank Nat'l. Trust Co.*, No. 08-CV-517, 2009 WL 3254491, at *4 (D. Neb. Oct. 8, 2009) ("A mortgage foreclosure is not a debt collection activity."), *aff'd*, 409 F. App'x 975 (8th Cir. 2011); *Landayan v. Washington Mut. Bank,* No. 09-C-916, 2009 WL 3047238, at *3 (N.D. Cal. Sept. 18, 2009) ("A claim cannot arise under FDCPA based upon the lender enforcing its security interest under the subject deed of a trust because foreclosing on a mortgage does not constitute an attempt to collect a debt for purposes of the

FDCPA."); *Salazar v. Tr. Corps.*, No. 08-CV-2142, 2009 WL 690185, at *6 (S.D. Cal. Mar. 12, 2009) ("The Court accordingly finds that the foreclosure on plaintiff's home is not the collection of a debt within the meaning of the FDCPA."); *Gray v. Four Oak Court Ass'n, Inc.*, 580 F. Supp. 2d 883, 888 (D. Minn. 2008) ("[T]he enforcement of a security interest, including a lien foreclosure, does not constitute the 'collection of any debt.'"); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 924 (N.D. Ind. 2004) ("Security enforcement activities fall outside the scope of the FDCPA because they aren't debt collection practices."); *Hulse v. Ocwen Fed. Bank, FSB*, 195 F. Supp. 2d 1188, 1204 (D. Or. 2002) ("Foreclosing on a trust deed is distinct from the collection of the obligation to pay money. . . . Payment of funds is not the object of the foreclosure action. Rather, the lender is foreclosing its interest in the property."); *cf. Glazer v. Chase Home Fin., LLC*, 704 F.3d 453, 460 (6th Cir. 2013) ("The view adopted by a majority of district courts, and the one followed below, is that mortgage foreclosure is not debt collection. This view follows from the premise that the enforcement of a security interest, which is precisely what mortgage foreclosure is, is not debt collection." (citing but disagreeing with district court cases)).

In this court's view, the prevailing approach among federal district courts is correct and based upon a proper reading of the FDCPA's statutory language.  The district court in *Gray v. Four Oak Court Association* provides the following analysis to support the conclusion that the enforcement of security interests is distinct from debt collection under the FDCPA:

> The FDCPA does not define "the collection of any debt."  However, the statute's definition of a "debt collector" clearly reflects Congress's intent to distinguish between "the collection of any debts" and "the enforcement of security interests." 15 U.S.C. § 1692a(6).  The first sentence of that definition defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." *Id.* § 1692a(6).  The third sentence of § 1692a(6) provides that for purposes of § 1692f(6), a debt collector is also "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests." If a party satisfies the first sentence, it is a debt collector for purposes of the entire FDCPA.  If a party satisfies only the third sentence, its debt collector status is limited to § 1692f(6). However, if the enforcement of a security interest was synonymous with debt collection, the third sentence would be surplusage because any business with a principal purpose of enforcing security

> interests would also have the principal
> purpose of collecting debts. Therefore, to
> avoid this result, the court determines that
> the enforcement of a security interest,
> including a lien foreclosure, does not
> constitute the "collection of any debt."

580 F. Supp. 2d at 887-88 (footnote and citation omitted); *see
also Armacost v. HSBC Bank USA*, No. 10-CV-274, 2011 WL 825151,
at *5-6 (D. Idaho Feb. 9, 2011) (adopting statutory
interpretation of *Gray*), *adopted by* 2011 WL 809166 (D. Idaho
Mar. 2, 2011); *Jara v. Aurora Loan Servs., LLC, et al.*, No. 11-
C-419, 2011 WL 6217308, at *5 (N.D. Cal. Dec. 14, 2011) (finding
statutory interpretation of *Armacost* persuasive).

The court is persuaded by the statutory interpretation
set forth in *Gray* and fully adopts its reasoning. As the *Gray*
court aptly observed, construing the enforcement of security
interests as debt collection under the FDCPA renders superfluous
some of the statutory text. 580 F. Supp. 2d at 887-88. "It is
well-settled that courts should avoid statutory interpretations
that render provisions superfluous: 'It is our duty to give
effect, if possible, to every clause and word of a statute.'"
*State Street Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 139
(2d Cir. 2003) (quoting *Duncan v. Walker*, 533 U.S. 167, 174
(2001)); *see also United States v. Aleynikov*, 676 F.3d 71, 81
(2d Cir. 2012) (rejecting interpretation as "inconsistent with

one of the most basic interpretative canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (internal quotation marks omitted)).  The canon against surplusage therefore militates strongly in favor of *Gray*'s statutory interpretation.

The Sixth Circuit recently rejected the interpretive approach adopted by *Gray*.  *See Glazer*, 704 F.3d at 463-64. Specifically, the Sixth Circuit explained that the FDCPA does not "except from debt collection the enforcement of security interests" but rather "operates to *include* certain persons under the Act (though for a limited purpose); it does not *exclude* from the Act's coverage a method commonly used to collect a debt." *Id.* (citing *Piper*, 396 F.3d at 236).  In reaching this determination, the *Glazer* court asserted that "[o]ther than repossession agencies and their agencies, we can think of no others whose only role in the collection process is the enforcement of security interests.  A lawyer principally engaged in mortgage foreclosure does not meet this criteria, for he must communicate with the debtor regarding the debt during the foreclosure proceedings." *Id.* at 464.  Repossession agencies, the Sixth Circuit reasoned, do not have to communicate with

debtors because they "typically 'enforce' a security interest . . . when the debtor is not present." *Id.*

Glazer's reasoning is unconvincing and has been rejected elsewhere. *See Natividad v. Wells Fargo Bank, N.A.*, No. 12-CV-3646, 2013 WL 2299601, at *6-7 (N.D. Cal. May 24, 2013) (rejecting the reasoning and analysis of *Glazer*). For example, the district court in *Natividad* has recently identified several of *Glazer*'s flaws:

> Nothing in the [FDCPA] supports *Glazer*'s conclusion that an entity cannot be considered an enforcer of security interests if there are communications between it and the debtor. An entity, such as a trustee, is enforcing a security interest when it pursues nonjudicial foreclosure as much as a repossession agency is enforcing a security interest when it takes possession of a vehicle. That entities pursuing nonjudicial foreclosure must provide statutorily mandated communications to debtors — such as a notice of default — does not automatically deprive them of their role as enforcers of security interests. In addition, *Glazer* appears to assume that the third sentence only includes repossessors, as opposed to also excluding repossessors from the other provisions of the Act. However, under the broad definition of "debt collection" articulated by the [*Glazer*] court, the activities of repossessors, as the activities of persons pursuing mortgage foreclosure, could fall within that definition. After all, [according to the *Glazer* court's own reasoning,] the ultimate goal of repossessing a vehicle is to pay down an outstanding debt — just as the ultimate goal of foreclosing on a mortgage

> is to satisfy the loan amount. Thus, for
> the purpose of determining what actions
> comprise collecting debt, and therefore who
> qualifies as a "debt collector" under the
> Act, the actions of repossessors are not
> distinguishable from the actions of persons
> pursuing mortgage foreclosure.

*Id.* at *7. The FDCPA by its own terms contemplates a

distinction between the "collection of any debts" and "the

enforcement of security interests." 15 U.S.C. § 1692a(6). The

*Glazer* court overlooks this basic statutory distinction and

engages in statutory interpretation that this court declines to

follow.[9] *Speleos*, 824 F. Supp. 2d at 232 ("The statute itself,

however, distinguishes debt collection from security interest

enforcement in its definition of a 'debt collector.'").

　　　The court therefore concludes — as it did in its

October 2012 Order — that where, as here, no monetary judgment

------

[9] The *Glazer* court also relies upon 15 U.S.C. § 1692i(a)(1) to
support its holding that the enforcement of security interests constitutes
debt collection under the FDCPA. 704 F.3d at 462. Section 1692i(a)(1) is a
venue provision that requires a debt collector who brings a legal action
against a consumer "to enforce an interest in real property securing the
consumer's obligation" to file the action in the judicial district where the
property is located. 15 U.S.C. § 1692i(a)(1). This provision, the *Glazer*
court argues, suggests that "filing *any* type of mortgage foreclosure action,
even one not seeking a money judgment on the unpaid debt, is debt collection
under the Act." *Id.* This is not so. Although § 1692i is a venue provision
that, by its terms, applies to only "debt collectors," the *Glazer* court
erroneously assumes that these debt collectors are debt collectors *because* of
their mortgage foreclosure activities, rather than because of other
activities that qualify as debt collection under the FDCPA. There is nothing
in the text of § 1692i to support the *Glazer* court's assumption. *See
Natividad*, 2013 WL 2299601, at *8 ("[T]he [*Glazer*] court's conclusion fail[s]
to recognize that the entire FDCPA can apply to a party whose principal
business is enforcing security interests but who nevertheless fits
§ 1692(a)(6)'s general definition of a debt collector.").

is sought against a debtor, the enforcement of a security
interest through lien foreclosure does not constitute debt
collection for purposes of the FDCPA.[10]

* * *

At bottom, Plaintiffs' motion for reconsideration is a
thinly veiled attempt to obtain a second bite at the apple by
relitigating issues already considered by the court.  Even if
Plaintiffs' motion raised some meritorious arguments, which it
does not, Plaintiffs fail to identify any clear error or
controlling precedent or facts overlooked in this court's
October 2012 Order.  Having failed to do so, Plaintiffs are not
entitled to reconsideration.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion
for reconsideration is denied.  The parties shall inform the
Second Circuit of the disposition of this motion, transmit a

---

[10] Plaintiffs conclude their motion for reconsideration by arguing
that the sole inquiry under § 1692f(1) is whether defendants collected
unauthorized amounts.  (Pls. Mot. for Recon. at 20-22.)  Plaintiffs thus
argue that "the Court's finding that 'defendant's judicial foreclosures did
not attempt to collect money from the debtor' is not only irrelevant for
purposes of § 1692f(1), but logically inconsistent as well."  (*Id.* at 23.)
This argument misses the mark.  To be liable under § 1692f(1), a debt
collector must "collect or attempt to collect [a] debt."  15 U.S.C. § 1692f.
Thus, this court's finding that Defendants' judicial foreclosures did not
attempt to collect monetary judgments from Plaintiffs is of central relevance
to determining whether Defendants' actions in enforcing the Tax Liens against
the Jones and Boyd Properties constitute debt collection activities for
purposes of § 1692f(1).  In any event, Plaintiffs have pointed to no
controlling legal authority or facts that this court overlooked and therefore
are not entitled to reconsideration on this, or any other, issue.

34

copy of this Memorandum and Order to the Second Circuit, and
file an affidavit in this docket confirming such transmittal no
later than October 1, 2013.

> **SO ORDERED.**

Dated:     September 27, 2013
           Brooklyn, New York

                                 _____/s/_____
                                 **KIYO A. MATSUMOTO**
                                 United States District Judge
                                 Eastern District of New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

JOAN GRANT BOYD, *ET AL.*,                    **NOT FOR PUBLICATION**

          Plaintiffs,                     **ORDER ADOPTING IN**
                                          **PART AND MODIFYING**
   -against-                              **IN PART REPORT**
                                          **AND RECOMMENDATION**
J.E. ROBERT CO., *ET AL.*,

          Defendants.                     05-CV-2455 (KAM)(RER)

--------------------------------------X

**MATSUMOTO, United States District Judge:**

      Plaintiffs Joan Grant Boyd ("Boyd"), Randa Jones

("Jones"), Sybil Taylor ("Taylor"), and Tonya Warters

("Warters") (collectively, "Plaintiffs") commenced this action

on behalf of themselves and a putative class of others similarly

situated against Defendants J.E. Robert Co., Inc. and JER

Revenue Services, LLC (collectively, the "JER Defendants" or

"JER"), and NYCTL 1996-1 Trust (the "1996-1 Trust"), NYCTL

1997-1 Trust (the "1997-1 Trust"), NYCTL 1998-1 Trust (the

"1998-1 Trust"), and NYCTL 1999-1 Trust (the "1999-1 Trust")

(collectively, the "Trust Defendants"), alleging violations of

the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et*

*seq.* ("FDCPA") and New York statutory and common law.  After

extensive motion practice directed at the sufficiency of

Plaintiffs' complaint, the following claims remain: (1) Boyd's

and Jones' FDCPA claims against the JER Defendants and the

1998-1 Trust; (2) Plaintiffs' statutory claims pursuant to New York General Business Law § 349 ("GBL") against all Defendants; (3) Plaintiffs' breach of contract claims against all Defendants; and (4) Plaintiffs' unjust enrichment claims against all Defendants.  On November 23, 2011, the JER Defendants and Trust Defendants each filed a motion for summary judgment on the remaining claims, and the court referred those motions to Magistrate Judge Ramon E. Reyes for a Report and Recommendation. (*See* Order dated 2/13/12.)

Presently before the court is the Report and Recommendation issued by Judge Reyes on August 27, 2012 recommending that Defendants' motions for summary judgment be granted in part and denied in part. (ECF No. 241, Report and Recommendation dated 8/27/12 ("R&R") at 1.)  Specifically, Judge Reyes recommended granting summary judgment on the FDCPA, GBL § 349, and breach of contract claims but recommended denying summary judgment on the unjust enrichment claims. (*Id.* at 38.) Finally, Judge Reyes recommended that the court decline to exercise supplemental jurisdiction over Plaintiffs' state law claims if the court dismissed the FDCPA claims. (*Id.* at 37.)

The JER Defendants, Trust Defendants, and Plaintiffs each filed timely objections to the R&R and subsequently submitted responses to each other's objections.  (*See* ECF No.

2

243, JER Defendants' Objections to Judge Reyes' R&R ("JER
Obj."); ECF No. 244, Trust Defendants' Objections to Judge
Reyes' R&R ("Trust Obj."); ECF No. 245, Plaintiffs' Objections
to Judge Reyes' R&R ("Pls.' Obj."); ECF No. 247, Plaintiffs'
Response to Defendants' Objections ("Pls.' Resp. to Obj."); ECF
No. 248, Trust Defendants' Response to Plaintiffs' Objections
("Trust Resp. to Obj."); ECF No. 249, JER Defendants' Response
to Plaintiffs' Objections ("JER Resp. to Obj.").)  In light of
the parties' timely objections, the court has undertaken a *de
novo* review of the full record including the applicable law, the
underlying record, the parties' submissions on the instant
motions along with accompanying affidavits, the R&R, the
parties' objections to the R&R, and the parties' respective
responses to those objections.  *See* 28 U.S.C. § 636(b)(1).  For
the reasons set forth below, the court respectfully adopts in
part and modifies in part Judge Reyes' R&R and grants
Defendants' motions for summary judgment.

### BACKGROUND

The detailed facts and procedural history of this case
have been set forth previously in Judge Reyes' R&R and this
court's prior Order on Defendants' motion to dismiss. (*See* R&R
at 2-7; ECF No. 191, Order Adopting Report and Recommendation
dated 2/2/11 ("2/2/11 Order").)  Accordingly, to the extent

3

established in the submissions regarding the Defendants' motions

for summary judgment, the court repeats the relevant facts here

only as necessary for the analysis below.  The court has

considered whether the parties have proffered admissible

evidence in support of their positions and has viewed the facts

in the light most favorable to the nonmoving party.[1]

I.    **Statement of Facts**

A. **The New York City Tax Liens**

As an incident of property ownership in New York City

("the City"), the City imposes upon commercial and residential

property owners property taxes, water and sewer charges,[2] and

other statutory charges, all of which give rise to a New York

City Tax Lien ("Tax Lien") against the property to secure such

amounts if not paid. N.Y.C. Admin. Code § 11-301; (See ECF No.

227, JER Defendants' Statement of Material Facts Pursuant to

Local Rule 56.1 dated 6/3/12 ("JER 56.1 Stmt.") ¶ 3; ECF No.

235, Plaintiffs' Response to JER Defendants' Rule 56.1 Statement

---

[1] Unless otherwise noted, these facts are established by admissible evidence and are undisputed by admissible contrary evidence.

[2] Water and sewer charges are typically determined based on the physical characteristics of property, such as the building width and the number of stories, dwelling units, and fixtures. (See ECF No. 220, Trust Defendants' Rule 56.1 Statement dated 6/3/11 ("Trust 56.1 Stmt.") ¶ 1; ECF No. 234, Plaintiffs' Response to Trust Defendants' Rule 56.1 Statement dated 10/5/11 ("Pls.' Resp. to Trust 56.1 Stmt.") ¶ 1.)  The water and sewer charges were adjusted according to the number of showers, baths, or other fixtures. (ECF No. 233, Exh. YYY, Deposition of Steven Lawitts ("Lawitts Dep.") at 46:13-16.)  The water and sewer charges on Boyd's home, however, were metered based on water use. (See JER 56.1 Stmt. ¶ 13; Lawitts Dep. at 26:11-17.)  Additionally, water services could be terminated as a result of lack of payment. (See Lawitts Dep. at 49-52.)

4

dated 10/5/11 ("Pls.' Resp. to JER 56.1 Stmt.") ¶ 3.)  The New
York City Administrative Code mandates in relevant part: "[t]he
owner of a dwelling shall provide and maintain a supply of . . .
water sufficient in quantity and at sufficient pressure to keep
all plumbing fixtures adequately supplied for their sanitary
maintenance.  Where water mains are available in the street,
every dwelling shall be supplied with water from such mains."
N.Y.C. Admin. Code § 27-2024.  Liens that remain unpaid for one
year are deemed delinquent and may be foreclosed. *See* N.Y.C.
Admin. Code §§ 11-354, 11-404(a).  The City may sell these
delinquent liens, and the buyers of such liens are authorized to
collect interest at the rate of 18%, a 5% surcharge, and
attorneys' fees accrued during any action to foreclose upon such
liens. *See* N.Y.C. Admin. Code §§ 11-319, 11-332, 11-335.

Plaintiffs Boyd, Jones,[3] Taylor, and Warters claim to
have an interest in real property subject to Tax Liens that
secured amounts owed for real estate taxes, water and sewer
charges, and other statutory charges. (*See* JER 56.1 Stmt. ¶ 3.)
Those properties include the following: (A) 480 Quincy Street,

_____

[3] Defendants contend that, contrary to Jones' testimony, Jones did
not own the Jones Property at the time the charges accrued.  According to
Trust Defendants, Jones took title to the property by deed dated October 31,
2002, which Jones admits. (Trust 56.1 Stmt. ¶ 15; Pls.' Resp. to Trust 56.1
Stmt. ¶ 15.) Jones, however, asserts that she acquired certain equitable and
statutory rights prior to the October 31, 2002 deed. (*See* Pls.' Resp. to
Trust 56.1 Stmt. ¶ 15.)  This fact is not material to any of the parties'
objections now before the court, and neither party appears to attach any
significance to this fact in their objection papers.

Brooklyn, New York (the "Jones Property"); (B) 1459 Carroll

Street, Brooklyn, New York (the "Boyd Property")[4]; (C) 1152

Wheeler Avenue, Bronx, New York (the "Taylor Property"); and (D)

128-39 Inwood Street, Queens, New York (the "Warters Property").

(JER 56.1 Stmt. ¶ 8; Pls.' Resp. to JER 56.1 Stmt. ¶ 8.)   In

1996, the City sold the Tax Liens on each of these four

properties to the Trust Defendants, who in turn retained JER

Defendants to service the Tax Liens and assist in collecting the

amounts secured by those Tax Liens. (See JER 56.1 Stmt. ¶ 1;

Pls.' Resp. to JER 56.1 Stmt. ¶ 1.)

     Although the amounts secured by the Tax Liens on each

property varied, the Tax Liens were predominantly composed of

real property taxes and water and sewer surcharges.  The Jones

Property, for example, was subject to a Tax Lien of $15,676.41,

including $4,210.17 in real property taxes, $10,678.89 in water

and sewer charges, a statutory surcharge of $746.50, and a

$40.85 advertising charge. (ECF No. 220, Trust Memorandum in

Support of Motion for Summary Judgment ("Trust Mem.") at 5; JER

56.1 Stmt. ¶ 19; Pls.' Resp. to JER 56.1 Stmt. ¶ 19.)

Similarly, the Boyd Property was subject to a Tax Lien of

$12,217.85, including $8,046.01 in real property taxes,

---

[4] The Boyd Property was jointly owned by Joan Boyd and former
Plaintiff Thomas Boyd. (See ECF No. 233, Exh. CC, Boyd Indenture, at JER2
00332.)

$2,403.04 in water and sewer charges, a $1,146.15 sidewalk
repair charge, a statutory surcharge of $581.80, and a $40.85
advertising charge. (Trust Mem. at 6-7; JER 56.1 Stmt. ¶ 19;
Pls.' Resp. to JER 56.1 Stmt. ¶ 19.)  The Taylor Property was
subject to three separate Tax Liens, each composed of unpaid
real property taxes and water and sewer charges. (Trust 56.1
Stmt. ¶ 30; Pls.' Resp. to Trust 56.1 Stmt. ¶ 30.)  The Warters
Property was subject to two separate Tax Liens, each composed of
unpaid real property taxes and water and sewer charges. (Trust
56.1 Stmt. ¶ 36; Pls.' Resp. to Trust 56.1 Stmt. ¶ 36.)
Notably, Plaintiffs do not dispute any of the principal amounts
alleged to be due and owing under the foregoing Tax Liens. (JER
56.1 Stmt. ¶ 19; Pls.' Resp. to JER 56.1 Stmt. ¶ 19.)

   **B.    The Foreclosure Actions**

        On each of these Tax Liens, JER Defendants managed
collection efforts, maintained records, and accounted for the
amounts collected. (JER 56.1 Stmt. ¶ 7; Pls.' Resp. to JER 56.1
Stmt. ¶ 7.)  JER Defendants also entered into retainer
agreements with outside counsel to foreclose upon the delinquent
Tax Liens in New York state court, and Plaintiffs concede that
they were not parties to any of these retainer agreements. (JER
56.1 Stmt. ¶ 67; Pls.' Resp. to JER 56.1 Stmt. ¶ 67.)
Plaintiffs further concede that they are not signatories to any

7

SPA81

contract with any of the Defendants in this action. (JER 56.1 Stmt. ¶¶ 20-23; Pls.' Resp. to JER 56.1 Stmt. ¶¶ 20-23.)

In accordance with those retainer agreements, JER's outside counsel commenced foreclosure actions against the four properties subject to the delinquent Tax Liens. (*See* ECF No. 233, Exh. H, Foreclosure Complaint Against Jones Property ("Jones Foreclosure Compl."); Exh. EE, Foreclosure Complaint Against Boyd Property ("Boyd Foreclosure Compl."); Exh. SS, Foreclosure Complaint Against Warters Property ("Warters Foreclosure Compl."); Exh. JJJ, Foreclosure Complaint Against Taylor Property ("Taylor Foreclosure Compl.").) Plaintiffs, with the exception of Boyd, indicated in their interrogatories that they retained counsel to represent them "with respect to the relevant tax lien or any foreclosure with respect thereto." (ECF No. 227, Exh. 4, Plaintiffs' Responses to Interrogatories ("Pls.' Resp. to Def. Interrog.") 5.).[5] Boyd later indicated that during the pendency of the foreclosure action, she was represented by counsel in the refinancing of her home, a transaction which required the payoff of amounts owed to resolve the foreclosure of the Tax Lien. (JER 56.1 Stmt. ¶ 30; Pls.' Resp. to JER 56.1 Stmt. ¶ 30.) In addition, Boyd testified that

_____

[5] Plaintiffs' Responses to Interrogatory 5 contain two sets of questions and two sets of answers, the second of which relate to Plaintiffs' representation by counsel during the foreclosure actions.

her attorney, Michael Bennett, Esq., requested a payoff quote

from the JER Defendants in the Boyd Property foreclosure action.

(ECF No. 227, Exh. 2, Deposition of Joan Boyd ("Boyd Dep.") at

53:6-20.)

### C. Attorneys' Fees, Litigation Costs, and Expenses Associated with the Foreclosure Actions

In each of the foreclosure actions, JER's outside

counsel sought to foreclose the liens, sell the properties, and

thereby recover amounts due on the Tax Liens along with

interest, costs, allowances, disbursements, attorneys' fees, and

expenses of the sale that JER incurred and paid to foreclosure

counsel. (*See* Jones Foreclosure Compl. at JER2 07098; Boyd

Foreclosure Compl. at 7; Warters Foreclosure Compl. at JER2

07289; Taylor Foreclosure Compl. at JER2 10432.)  Moreover, each

foreclosure action gave rise to various costs including filing

fees, title searches, service of process fees, and attorneys'

fees. (*See* JER 56.1 Stmt. ¶ 55; ECF No. 228, Affidavit of John

Chilson ("Chilson Aff.") ¶ 19.)[6]

---

[6] Plaintiffs object to the admissibility of Mr. Chilson's
affidavit on the basis that his assertions related to the delinquent Tax
Liens, JER's communications and correspondence with Plaintiffs, and costs
incurred by JER's outside counsel are unsupported by personal knowledge. (*See
generally* Pls.' Resp. to JER 56.1 Stmt.)  Plaintiffs, however, posit no
reasoned explanation for this objection, which is peppered repeatedly
throughout their Response to JER's 56.1 Statement.  In fact, Mr. Chilson
testified to his supervisory authority at JER Revenue Services, LLC as a
former Senior Vice President and current Managing Director of the firm.
(Chilson Aff. ¶ 2.)  Furthermore, Mr. Chilson averred that his testimony was
based upon "personal knowledge and the regularly maintained business records

9

Notably, none of the foreclosure actions sought
monetary relief against any individual and instead sought the
foreclosure and sale of the relevant property to recover the
amounts due under the Tax Liens.  Further, none of the
foreclosure complaints sought a deficiency, if necessary,
against any individual. (Chilson Aff. ¶ 16; *see also* Jones
Foreclosure Compl.; Boyd Foreclosure Compl.; Warters Foreclosure
Compl; Taylor Foreclosure Compl.)

Plaintiffs challenge the accuracy and propriety of
legal fees and costs charged by JER Defendants' outside counsel,
which legal fees and costs were represented by the JER
Defendants to be "estimates" in response to inquiries from
Plaintiffs' counsel for payoff figures.  Specifically,
Plaintiffs assert that outside counsel's billing records are

---

of JER." (*Id.* ¶ 3.) In the Second Circuit, the test for determining a
witness' personal knowledge is "whether a reasonable trier of fact could
believe the witness had personal knowledge." *Folio Impressions, Inc. v. Byer
California*, 937 F.2d 759, 764 (2d Cir. 1991).  In light of Mr. Chilson's
managerial position, supervisory authority, and familiarity with the
regularly maintained business records of his firm, a reasonable trier of fact
could find that he had personal knowledge of the status and nature of Tax
Liens serviced by his firm, proceedings connected to those Tax Liens, the
interactions with parties participating in those proceedings, and the
expenses incurred by outside counsel hired by his firm to foreclose the Tax
Liens. In any event, Plaintiffs fail to provide any specific reason to
question Mr. Chilson's personal knowledge of the facts contained in his
affidavit and do not contend that it is based upon conjecture or hearsay.
Furthermore, Plaintiffs rely upon Mr. Chilson's affidavit in their objection
to Judge Reyes' R&R. (*See, e.g.*, Pls.' Obj. at 28.)  The court is not
persuaded by Plaintiffs' challenge to the admissibility of a document upon
which they selectively rely.  Thus, the cited facts from Mr. Chilson's
affidavit are considered to the extent that they constitute admissible
evidence sufficient to support JER's Rule 56.1 Statement.

SPA84

riddled with inconsistencies and inaccuracies. First, JER
Defendants purportedly charged Warters two separate legal fees
for "Publication" when the docket sheet in the foreclosure
action and billing records indicate that outside counsel
prepared and filed only one order of publication. (*Compare* ECF
No. 233, Exh. DDD, Legal Fees for Warters Property Foreclosure
("Warters Legal Fees"), *with* Exh. XX, Docket Sheet of Warters
Foreclosure Action ("Warters Docket"), *and* Exh. EEE, Billing
Records for Warters Property Foreclosure ("Warters Billing
Records"), at JER2 07028.) Second, Defendants allegedly billed
Taylor a $45 filing fee and $95 RJI fee, when the foreclosure
docket sheet demonstrates that neither filing occurred. (*Compare*
ECF No. 233, Exh. UUU, Taylor Disbursement Summary, at JER2
7063, *with* Exh. HHH, Docket Sheet of Taylor Foreclosure Action
("Taylor Docket").) Third, Plaintiffs allege that outside
counsel's billing records for the Jones foreclosure action
include inconsistencies because outside counsel logged 6.60
hours of work but billed Defendants for 7.14 hours of work.
(*Compare* ECF No. 233, Exh. U, Jones Billing Record, at JER2
07035, *with* Exh. O, Jones Recoverable Legal Costs, at JER2
00241.) Finally, Defendants purportedly collected a $225 legal
fee from Boyd for "Judgment Granted" despite the Boyd
foreclosure's discontinuance prior to entry of judgment.

11

(*Compare* ECF No. 233, Exh. PP, Boyd Itemized Costs, *with* Exh. NN, Docket of Boyd Foreclosure in King County Court ("Boyd Docket").)

As set forth herein, Plaintiffs received refunds from the defendants for overpaid amounts once the JER Defendants received the billings from outside counsel and reconciled the estimated payments of fees and costs. The refunds from the JER Defendants were sent to Plaintiffs' counsel, as required.

**D.   Plaintiffs' Requests for Payoff Quotes**

The parties agree that taxpayers or their counsel may inquire as to the amounts necessary to discharge the Tax Liens on their respective properties and resolve the foreclosure actions, and JER Defendants were available to respond to such inquiries with payoff quotes. (JER 56.1 Stmt. ¶¶ 60-62; Pls.' Resp. to JER 56.1 Stmt. ¶¶ 60-62.) For instance, Jones' attorney, William Simms, Esq., and Jones' title insurance company, Home Abstract, contacted JER Defendants on Jones' behalf to request a payoff quote, which JER Defendants subsequently provided via fax.[7] (ECF No. 233, Exh. K, Payoff

---

[7] Plaintiffs assert that there are references in the Communications History to letters that may have been sent directly to Jones. (*See* Pls.' Resp. to JER 56.1 Stmt. ¶ 37; Jones Communication History, at JER2 00279.) However, Jones testified that she does not recall talking to, or receiving correspondence from, anyone affiliated with JER Defendants. (ECF No. 227, Exh. 3, Deposition of Randa Jones dated 12/3/09 ("Jones Dep.") at 18:12-19:15.)

Quote Request Fax dated 10/24/02, ("10/24/02 Jones Payoff Quote
Request"); Exh. C, Jones Communication History, at JER2 0281-
82.)  As Judge Reyes correctly discerned, the record does not
contain a copy of the October 24, 2002 Payoff Quote.

Likewise, Boyd alleges that on May 20, 2002, she and
her late husband, Thomas Boyd, requested a payoff quote for the
Boyd Property, which JER Defendants subsequently provided. (ECF
No. 233, Grobman Declaration ("Grobman Decl.") ¶ 67; ECF No.
233, Exh. AA, Thomas Boyd Communication History, at JER2 00385;
Exh. FF, Boyd Payoff Quote dated 5/20/2002 ("5/20/02 Boyd Payoff
Quote.")  The May 20, 2002 Boyd Payoff Quote enumerated a tax
lien balance of $14,612.42, an estimate of legal fees and costs
of $4,100.00, and a total amount due of $18,712.42. (5/20/02
Boyd Payoff Quote at P00246.)  The payoff quote indicated that
"an estimate of legal fees and costs is included" and that
"[a]ctual legal fees and costs may be different than the
estimate." (Id.)

After receipt of the May 20, 2002 Payoff Quote that he
requested, Thomas Boyd entered into a Forbearance Agreement with
Bank of New York as Trustee, Collateral Agent, and Custodian of
the 1998-1 Trust. (JER 56.1 Stmt. ¶ 24; ECF No. 233, Exh. GG,
Forbearance Agreement Between Thomas Boyd and Bank of New York
("Forbearance Agreement") at P00290-91.)  Thereafter, all

13

payments made from an attorney trust account against the Tax

Lien on the Boyd Property proceeded under the terms of the

Forbearance Agreement. (Chilson Aff. ¶ 29; JER 56.1 Stmt. ¶ 33;

Pls.' Resp. to JER 56.1 Stmt. ¶ 33.)  Plaintiff Boyd was not a

signatory of the Forbearance Agreement, signed by her husband as

the "Taxpayer," which contained the following relevant

provisions:

> Fees and costs of collection may have been
> incurred if the Tax Lien was referred for
> foreclosure and such fees and costs of
> collection, including [but] not limited to,
> attorney's fees, title search fees, process
> server expenses, court filing costs, and
> publication expenses (the "fees and Costs of
> Collection"), if any, are owed by the
> Taxpayer to the Trusts . . . .
>
> [ . . . ]
>
> WAIVER OF DEFENSES. The Taxpayer hereby
> waives any and all defenses, counterclaims
> and setoffs, whether known or unknown,
> including but not limited to contesting the
> amount owed, to any current or future
> foreclosure action on the Tax Lien. The
> Taxpayer shall not defend or oppose any
> current or future foreclosure action on the
> Tax Lien.

(Chilson Aff. ¶ 30; Forbearance Agreement, at P00290.)

On April 4, 2003, attorney Michael Bennett, Esq.,

advising that he was retained by the Boyds in connection with

refinancing the Boyd Property, requested an updated payoff quote

on the Boyd Property on behalf of the Boyds. (*See* JER 56.1 Stmt.

14

¶¶ 30-31; Boyd Dep. at 52:15-53:21; Pls.' Resp. to JER 56.1
Stmt. ¶¶ 30-31; ECF No. 233, Exh. HH, Attorney Michael Bennett's
Request for Updated Payoff Quote dated 4/4/03 ("4/4/03 Bennett
Request"), at JER2 00304; Thomas Boyd Communication History, at
JER2 00390.) In response, JER Defendants subsequently faxed the
updated payoff quote to Bennett. (JER 56.1 Stmt. ¶ 32; Pls.'
Resp. to JER 56.1 Stmt. ¶ 32.) Although the record contains no
copy of the updated Boyd payoff quote, the Tax Lien was
subsequently paid and the foreclosure discontinued. (See Chilson
Aff. ¶ 20; JER 56.1 Stmt. ¶ 17; Pls.' Resp. to JER 56.1 Stmt.
¶ 17.)

     Plaintiffs Taylor and Warters, through counsel, also
requested and received payoff quotes from JER Defendants. (See
JER 56.1 Stmt. ¶¶ 43-45, 49-50; Pls.' Resp. to Def. Interrog.
5(d); Pls.' Resp. to JER 56.1 Stmt. ¶¶ 43-45, 49-50; ECF No.
233, Exh. VV, Warters Payoff Quote dated 6/22/04 ("6/22/04
Warters Payoff Quote"); Exh. PPP, Taylor Payoff Quote dated
11/21/03 ("11/21/03 Taylor Payoff Quote").) The Warters Payoff
Quote enumerated a tax lien balance of $37,070.49, an estimate
of legal fees and costs of $13,210.66, and a total amount due of
$50,281.15. (6/22/04 Warters Payoff Quote, at 12.) Similarly,
the Taylor Payoff Quote enumerated a tax lien balance of
$17,225.83, an estimate of legal fees and costs of $7,509.40,

15

and a total amount due of $24,735.23. (11/21/03 Taylor Payoff
Quote, at JER2 01282.)  Like the May 20, 2002 Boyd Payoff Quote,
both the Warters and Taylor Payoff Quotes indicated that "[i]f a
foreclosure has already been commenced, an estimate of legal
fees and costs is included" and that "[a]ctual legal fees and
costs may be different than the estimate." (6/22/04 Warters
Payoff Quote, at 12; 11/21/03 Taylor Payoff Quote, at JER2
01282.)

### E.    Foreclosure Discontinuances & Overpayment Refunds

Eventually, the payoff amounts identified in the
respective payoff letters were paid, thereby redeeming the
delinquent Tax Liens on each property and resolving the
foreclosure actions. (Chilson Aff. ¶ 20; JER 56.1 Stmt. ¶ 17;
Pls.' Resp. to JER 56.1 Stmt. ¶ 17.)  Consequently, the
remaining foreclosure actions on the four properties were
discontinued prior to entry of judgment in the state courts.[8]
(See JER 56.1 Stmt. ¶ 17; Pls.' Resp. to JER 56.1 Stmt. ¶ 17.)
Defendants maintain that the foreclosures were discontinued in
reliance on the payoff for the Tax Liens. (JER 56.1 Stmt. ¶¶ 34,
41, 47, 52; Chilson Aff. ¶¶ 20, 35, 49, 52.)

---

[8] The Taylor Property was subject to three separate Tax Liens and
three respective foreclosure actions on each of those liens. One of the
foreclosure actions on the Taylor Property went to judgment, and in that
action, attorneys' fees were awarded by the state court. (Chilson Aff. ¶ 50.)

The record before this court includes the Notice of Discontinuance of the foreclosure on the Jones Property but contains no corresponding notices for the other three properties. The Jones Property Notice of Discontinuance includes the following relevant provisions:

> 2. This action was commenced to foreclose a certain tax lien certificate originally in the sum . . . $18,283.20 . . . as of June 1, 2001, with interest thereon at a rate of 18% compounded daily affecting property located at 480 Quincy Street, Brooklyn, New York.
>
> [ . . . ]
>
> [I]t is hereby stipulated and agreed that the within foreclosure action be marked discontinued and the Notice of Pendency filed herein on June 6, 2002 be canceled of record.

(ECF No. 233, Exh. N, Notice of Discontinuance of Foreclosure on Jones Property ("Jones Property Notice of Discontinuance"), at JER2 07085.)

The payoff amounts that were remitted to JER upon discontinuance of the foreclosure actions included amounts that JER thereafter determined were overpayments, and JER subsequently refunded the overpaid amounts without interest to Plaintiffs or their counsel. (*See* JER 56.1 Stmt. ¶ 62; Pls.' Responses to JER 56.1 Stmt. ¶ 62.) Jones received a $295.00 refund; former plaintiff Thomas Boyd received a $663.85 refund;

17

Warters received a $5,250.21 refund; and Taylor received a $2,382.86 refund. (*See* ECF No. 233, Exh. W, Refund Letter from JER Defendants to Attorney of Plaintiff Jones ("Jones Refund Letter"), at JER2 00243; Exh. RR, Refund Letter from JER Defendants to Title Insurer of Thomas Boyd ("Boyd Refund Letter"), at JER2 00301; Exh. CCC, Refund Letter from JER Defendants to Attorney of Plaintiff Warters ("Warters Refund Letter"), at JER2 01291; Exh. XXX, Refund Letter from JER Defendants to Attorney of Plaintiff Taylor ("Taylor Refund Letter"), at JER2 01279.)

On November 12, 2008, Plaintiffs filed their Second Amended Complaint alleging violations of FDCPA §§ 1692e and 1692f as to Plaintiffs Boyd and Jones and claims as to all Plaintiffs under New York's GBL § 349 and New York common law. (*See* ECF No. 83, Second Amended Complaint dated 11/12/08 ("Compl.") ¶ 1.) Following discovery, JER Defendants and Trust Defendants separately moved for summary judgment, and their motions were referred to Judge Reyes for report and recommendation. (Order dated 2/13/12.)

## II.   **Judge Reyes' Report and Recommendation**

On August 27, 2012, Judge Reyes issued an R&R recommending dismissal of all of Plaintiffs' claims with the exception of Plaintiffs' unjust enrichment claims. (R&R at 38.)

18

Judge Reyes further recommended that the court decline to exercise supplemental jurisdiction over any of Plaintiffs' remaining state law claims should the court accept his recommendation to dismiss the FDCPA claims of Plaintiffs Jones and Boyd. (*Id.*)

**A. The FDCPA Claims**

Judge Reyes first rejected Jones' and Boyd's claims under §§ 1692e and 1692f of the FDCPA. (*Id.* at 9-23.) With respect to the § 1692e claims, Judge Reyes found that Plaintiffs Jones and Boyd abandoned those claims by failing to "directly address Defendants' substantive challenges to their § 1692e claims" and neglecting to "defend the merits of such claims." (*Id.* at 11.)

Moreover, Judge Reyes determined that, even assuming Plaintiffs preserved their § 1692e claims, the claims failed on the merits in light of the Second Circuit's *dicta* in *Kropelnicki v. Siegel*, 290 F.3d 118 (2d Cir. 2002). (*See* R&R at 13.) Applying *Kropelnicki*, Judge Reyes determined that § 1692e was inapplicable to purported misrepresentations directed solely to a debtor's attorney and thus recommended dismissal of Plaintiffs' § 1692e claims. (*Id.* at 14.) Additionally, relying upon this court's February 2, 2011 Order, Judge Reyes concluded that any communications initiated by Plaintiffs and/or their

19

attorneys were not actionable under the FDCPA. (*Id.* at 14-15
(citing 2/2/11 Order at 15-16).) Finally, Judge Reyes noted
that Plaintiffs did not submit supporting evidence to establish
that Defendants ever initiated direct correspondence with Jones
and Boyd, and that Plaintiffs did not assert that any of the
communications resulted in substantive violations of § 1692e,
and in any event, Plaintiff Jones testified that she had no
recollection of talking with or receiving correspondence from
JER or its affiliates. (*Id.* at 15.) For these reasons, Judge
Reyes recommended dismissing Jones' and Boyd's § 1692e claims.
(*Id.*)

With respect to the § 1692f claims, Judge Reyes
recommended dismissal based upon the following three
conclusions: first, Defendants did not violate the FDCPA because
they collected attorneys' fees and costs that were "permitted by
law" under N.Y.C. Admin. Code § 11-335 and the N.Y.C.P.L.R.;
second, such fees and costs were collected pursuant to
settlement agreements between JER Defendants and Plaintiffs Boyd
and Jones and were therefore authorized by the FDCPA; and third,
JER Defendants are not liable under the FDCPA for failure to pay
interest on overcharges refunded to Plaintiffs. (*Id.* at 16-23.)

Because Judge Reyes recommended dismissal of
Plaintiffs' FDCPA claims, he further recommended that the court

20

decline to exercise supplemental jurisdiction over Plaintiffs'
remaining state law claims. (*Id.* at 37.)  Despite his
recommendation regarding the state law claims, Judge Reyes
nevertheless took care to issue detailed recommendations on the
merits of Plaintiffs' state law claims.

### B.  State Law Claims

Judge Reyes found that Plaintiffs' GBL § 349 claims
failed as a matter of law. (*Id.* at 26.)  As a threshold matter,
Judge Reyes concluded that Plaintiffs lacked standing to bring
any claims "based on the content of the retainer agreements"
between JER Defendants and outside counsel. (*Id.* at 24.)
Specifically, Judge Reyes reasoned that Plaintiffs were neither
parties to, nor third party beneficiaries of, the retainer
agreements between JER Defendants and outside counsel. (*Id.* at
24-25.)  Additionally, Judge Reyes further rejected Plaintiffs'
GBL § 349 claims on the merits because Plaintiffs failed to
establish that Defendants' conduct was consumer-oriented,
deceptive, or materially misleading. (*Id.* at 26-29.)

Additionally, Judge Reyes recommended dismissal of
Plaintiff's breach of contract claims. (*Id.* at 26.)  First,
Judge Reyes noted that Plaintiffs were not parties to any
contract for legal fees between Defendants and outside counsel
and, thus, could not base any breach of contract claim on those

retainer agreements. (*Id.*)  Second, although Judge Reyes found that Plaintiff Boyd had standing to bring a breach of contract claim under the Forbearance Agreement as a third party beneficiary, Judge Reyes ultimately determined that Plaintiffs failed to establish a breach of that agreement. (*Id.* at 30-31.) Specifically, Judge Reyes found that because Plaintiff Boyd failed to present evidence that JER Defendants collected and retained legal fees and costs not actually incurred, she could not establish a breach of the Forbearance Agreement as a matter of law. (*Id.* at 31.)

In contrast, Judge Reyes recommended denying summary judgment on Plaintiffs' unjust enrichment claims, but only to the extent that Plaintiffs could prove "that outside counsel charged for services not rendered or for costs not incurred." (*Id.* at 34-35.)  Judge Reyes first decided that Defendants were enriched because they retained the benefit of satisfying their debt to outside counsel. (*Id.* at 32.)  Furthermore, Judge Reyes found unpersuasive Defendants' contention that, because Plaintiffs benefitted from the discontinuances of the foreclosures, Defendants were not enriched "at Plaintiffs' expense" under *Clark v. Darby*, 751 N.Y.S.2d 622 (N.Y. App. Div. 3d Dep't 2002). (*Id.* at 32-33.)  Judge Reyes noted that Plaintiffs could show that they operated under a mistake of fact

to the benefit of the Defendants, who used Plaintiffs' payoff amounts to pay debts owed to outside counsel. (*Id.* at 33.) To that end, Judge Reyes listed several amounts paid by Plaintiffs to outside counsel (through JER Defendants) to which outside counsel were not entitled. (*Id.* at 33-34.) Because "Plaintiffs cite[d] to evidence in the record from which a reasonable fact finder could conclude that Defendants collected expenses not in fact incurred by outside counsel," Judge Reyes declined to dismiss Plaintiffs' unjust enrichment claims. (*Id.* at 35.)

Finally, Judge Reyes summarily rejected Defendants' assertion that Plaintiffs' state law claims – including the unjust enrichment claims – were barred by the doctrines of *res judicata*, estoppel, and voluntary payments. (*Id.* at 35-36.) Finding these defenses inapplicable, Judge Reyes ultimately recommended that Plaintiffs' unjust enrichment claims should survive summary judgment. (*Id.*)

## STANDARDS OF REVIEW

### I.   Review of a Report and Recommendation

Where, as here, a party makes specific and timely objections to a magistrate judge's findings or recommendations, the district court must apply a *de novo* standard of review to the portions of the R&R to which the objection is made. *See* 28 U.S.C. § 636(b)(1); *Mazzei v. Abbott Labs. & Co.*, No. 10-CV-

23

SPA97

1011, 2012 WL 1101776, at *1 (E.D.N.Y. Apr. 2, 2012) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010)). Upon such *de novo* review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Where no objection to the R&R has been filed, however, the district court "'need only satisfy itself that there is no clear error on the face of the record.'" *Urena v. New York*, 160 F. Supp. 2d 606, 609-10 (S.D.N.Y. 2001) (quoting *Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)).

## II. __Summary Judgment__

"One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477

24

U.S. 242, 248 (1986).

Thus, the court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). The moving party carries the initial burden of demonstrating an absence of evidence to support the nonmoving party's case. *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citing *Celotex*, 477 U.S. at 323). The nonmoving party then "must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted) (emphasis in original). To defeat a summary judgment motion, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

SPA99

## **DISCUSSION**

In light of the parties' timely objections, the court has reviewed *de novo* Judge Reyes' R&R. JER Defendants raise two threshold objections, challenging the applicability of the FDCPA that, if granted, render moot many of Plaintiffs' objections. For this reason, the court first addresses Defendants' threshold objections regarding the FDCPA's applicability to this case and thereafter discusses Plaintiffs' objections only as necessary.

## I.   **JER Defendants' Objections**[9]

Despite their agreement with the overall result reached by Judge Reyes, JER Defendants object to the R&R "to the extent that it failed to decide [two threshold] issues, each of which would constitute an alternate ground for granting summary judgment in favor of the Defendants" on Jones' and Boyd's FDCPA claims. (JER Obj. at 1.) Mindful that Judge Reyes found it unnecessary to reach these two issues to dispose of the FDCPA claims, the court nevertheless considers both objections upon *de novo* review. After careful consideration, the court finds Defendants' objections to have merit and modifies Judge Reyes' R&R accordingly.

---

[9] Trust Defendants adopt and incorporate by reference the objections submitted by JER Defendants but advance no additional objections to the R&R. (*See* Trust Obj. at 1.)

26

### A.   Objection One: The City Tax Liens at Issue Are Not "Debts" Under the FDCPA.

Defendants contend that Jones' and Boyd's respective FDCPA claims fail as a threshold matter because the Tax Liens do not constitute "debts" covered by the FDCPA. (JER Obj. at 2.) The FDCPA defines the term "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5). Defendants submit that a debt must arise out of a consensual, negotiated transaction involving "an exchange for a service or property." (JER Obj. at 3 (citing *Beggs v. Rossi*, 145 F.3d 511 (2d Cir. 1998) (per curiam)).)   According to Defendants, the Tax Liens did not arise from consensual, negotiated transactions because the real property taxes, water charges, and sewer charges secured under the Tax Liens are mandatorily imposed as an incident to real property ownership in New York City and are therefore more analogous to compulsory taxes, which fall outside the FDCPA's protective ambit. (*Id.* at 4-5 (citing *Beggs*, 145 F.3d at 512).)   The court agrees and therefore sustains Defendants' first objection to the R&R.

27

**SPA101**

The protections afforded consumers under the FDCPA

prohibit conduct intended to harass, oppress, abuse, deceive, or

mislead any person in connection with the collection of a

"debt." *See* 15 U.S.C. §§ 1692d, 1692e.  Consequently, "[a]s a

threshold matter, a suit brought under the FDCPA must involve a

'debt' within the meaning of the statute." *Patisso v. Law*

*Offices of Bruce E. Baldinger, LLC*, No. 11-CV-1996, 2011 WL

5117604, at *2 (E.D.N.Y. Oct. 24, 2011); *Shmerkocvich v. RMC*

*Consulting Group LLC*, No. 09-CV-5490, 2011 WL 887871, at *4

(E.D.N.Y. Jan. 31, 2011), *adopted by* 2011 WL 900850 (E.D.N.Y.

Mar. 14, 2011).  Although the FDCPA does not define the

statutory term "transaction" used in the FDCPA's definition of a

"debt," the "consensus judicial interpretation is reflected in

the Seventh Circuit's ruling that the statute is limited in its

reach 'to those obligations to pay arising from consensual

transactions, where parties negotiate or contract for consumer-

related goods or services.'" *Turner v. Cook,* 362 F.3d 1219, 1227

(9th Cir. 2004) (*quoting Bass v. Stolper, Koritzinsky, Brewster*

*& Neider, S.C.,* 111 F.3d 1322, 1326 (7th Cir.1997)); *see also*

*Beggs*, 145 F.3d at 512 (holding that mandatorily imposed taxes

do not arise from a consensual exchange and thus do not

constitute debts under the FDCPA); *Beal v. Himmel & Bernstein,*

28

*LLP*, 615 F. Supp. 2d 214, 216 (S.D.N.Y. 2009) (citing *Turner*, 362 F.3d at 1227).

The only "debts" alleged by Plaintiffs in this action are the New York City Tax Liens composed of mandatory property tax, water, and sewer obligations. (*See* Compl. ¶ 146.) Accordingly, at issue here is whether those Tax Liens constitute debts subject to the FDCPA. The parties concede, as they must, that property tax obligations are not debts under the FDCPA. *See, e.g.*, *Beggs*, 145 F.3d at 512; *Staub v. Harris*, 626 F.2d 275, 278-79 (3d Cir. 1980) (holding that the FDCPA "does not apply to practices occurring in the course of collection of taxes"). The parties disagree, however, on the issue of whether the mandatory water and sewer charges that are included in and treated as Tax Liens under the New York City Administrative Code qualify as debts falling under the protection of the statute. The FDCPA's text and legislative history are bereft of explicit guidance on the issue, and the Second Circuit has had no occasion to address this narrow question. Nevertheless, the Second Circuit and other federal courts of appeals have provided considerable interpretive guidance in determining the type of "transaction" necessary to qualify as a debt under the FDCPA.

In *Beggs*, the Second Circuit held that taxes mandatorily imposed on automobiles by the defendant municipality

29

did not qualify as debts under the FDCPA. 145 F.3d at 512. In
so holding, the Second Circuit reasoned that the automobile tax
"is not levied upon the purchase or registration of the vehicle
*per se*, but rather upon the ownership of the vehicle by the
citizen." *Id.* The Second Circuit thus determined that there was
"simply no 'transaction' . . . of the kind contemplated by
statute." *Id.* Central to the Second Circuit's holding was the
conclusion that the "'relationship between taxpayer and taxing
authority does not encompass that type of *pro tanto* exchange
which the statutory definition envisages.'" *Id.* (quoting *Staub*,
626 F.2d at 278). Under *Beggs*, an obligation levied upon a
citizen as an incident to property ownership does not arise from
a "transaction" and thus does not qualify as a debt under the
FDCPA. *See id.*

Other federal courts of appeals confirm the Second
Circuit's interpretive approach in *Beggs* and further clarify
that the statutory definition of "debt" contemplates a
*consensual* transaction, where parties "negotiate or contract"
for consumer services or goods. *Turner*, 362 F.3d at 1227
(citations omitted); *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d
1367, 1371 (11th Cir. 1998) ("[A]t a minimum, a 'transaction'
under the FDCPA must involve some kind of business dealing or
other consensual obligation."); *Bass*, 111 F.3d at 1326 ("[T]he

FDCPA limits its reach to those obligations to pay arising from
consensual transactions, where parties negotiate or contract for
consumer-related goods or services.").[10]

Indeed, the Eleventh Circuit's analysis in *Hawthorne*
is particularly instructive:

> The ordinary meaning of "transaction"
> necessarily implies some type of business
> dealing between parties. *See Webster's New
> Collegiate Dictionary* 1230 (1979) (defining
> "transaction" as "a business deal"); *Bass*, 111
> F.3d at 1325 (citing *Webster's New World
> Dictionary* 1509 (2d ed. 1986)). In other
> words, when we speak of "transactions," we
> refer to consensual or contractual
> arrangements . . . . While we do not hold
> that every consensual or business dealing
> constitutes a "transaction" triggering
> application of the FDCPA (such a holding would
> be contrary to the plain language of the
> statute limiting applicability to specified
> transactions, as well as to other portions of
> the statute not relevant to this analysis,
> which require the existence of other

---

[10] Numerous district courts similarly interpret "debt" as
requiring a consensual, negotiated transaction or a business dealing. *See,
e.g., Bell v. Providence Cmty. Corr., Inc.*, No. 3:11-CV-00203, 2011 WL
2218600, at *4 (M.D. Tenn. June 7, 2011)("A 'transaction' is not defined in
the FDCPA, but it has been held to connote a business deal between the
parties and a consensual obligation."); *Reid v. Am. Traffic Solutions, Inc.*,
No. 10-CV-204, 2010 WL 5289108, at *4 (S.D. Ill. Dec. 20, 2010) ("Implicit in
the understanding of a transaction for FDCPA purposes is that the business
deal or agreement is consensual and that the parties have negotiated or
contracted for consumer goods or services."); *Graham v. ACS State & Local
Solutions, Inc.*, No. 06-CV-2708, 2006 WL 2911780, at *1 (D. Minn. Oct. 10,
2006) ("At a minimum, the transaction must involve a business dealing or
other consensual consumer obligation."); *Williams v. Allocated Bus. Mgmt.,
LLC*, No. 10-CV-1711, 2010 WL 2330371, at *2 (N.D. Ill. June 8, 2010); *Durso
v. Summer Brook Pres. Homeowners Ass'n*, 641 F. Supp. 2d 1256, 1263-64 (M.D.
Fla. 2008); *Betts v. Equifax Credit Info. Servs., Inc.*, 245 F. Supp. 2d 1130,
1133-34 (W.D. Wash. 2003) ("The impoundment of one's vehicle and statutory
liability that necessarily attaches are not akin to even a broad
interpretation of a contractual, business, or otherwise consensual
arrangement for services rendered.").

> conditions before the FDCPA applies), at a
> minimum, a "transaction" under the FDCPA must
> involve some kind of business dealing or other
> consensual obligation. Because Hawthorne's
> alleged obligation to pay Mac Adjustment for
> damages arising out of an accident does not
> arise out of any consensual or business
> dealing, plainly it does not constitute a
> "transaction" under the FDCPA.

140 F.3d at 1371 (citation omitted).

Here, as in *Hawthorne*, Plaintiffs can point to no such consensual, negotiated transaction or business dealing giving rise to the water and sewer obligations secured by the Tax Liens. Jones and Boyd did not negotiate or enter into any contract or agreement with the City with respect to the utility charges.[11] Nor could they. Instead, the properties owned by Jones and Boyd were required by the New York City Administrative Code to be connected to City water and sewage mains and be supplied with water at rates provided by the City. *See* N.Y.C. Admin. Code § 27-2024.[12] The payment by property owners of the water and sewer charges associated with that mandatory

---

[11] In fact, the record is devoid of evidence that Joan or Boyd ever communicated at all with the City regarding their water and sewer obligations prior to the accrual of those obligations.

[12] Section 27-2024 of the New York City Administrative Code provides that "[t]he owner of a dwelling shall provide and maintain a supply of pure and wholesome water sufficient in quantity and at sufficient pressure to keep all plumbing fixtures adequately supplied for their sanitary maintenance. Where water mains are available in the street, every dwelling shall be supplied with water from such mains." N.Y.C. Admin. Code § 27-2024. Although the Administrative Code only obligates use of city water mains where those mains are available in the street, Plaintiffs do not argue or present evidence that the Jones or Boyd Properties are located in areas where water mains are unavailable.

connection did not arise from a consensual consumer transaction or any other type of business dealing, as required to invoke the FDCPA. *See Hawthorne*, 140 F.3d at 1371. To the contrary, the City levied water and sewer charges "as an incident to property ownership." (ECF No. 230, Plaintiffs' Opposition to Defendants' Motions for Summary Judgment ("Pls.' Opp."), at 2.) Stated differently, the City established an administrative scheme for the disbursement of public utilities to its inhabitants and does not bargain for or enter into agreements with citizens to determine their water and sewer obligations. Owners of real property in New York City are required to utilize available New York City water mains to supply their sewer service and water, payment for which is determined by terms imposed by the City, based on street frontage or water meters. *See* N.Y. Pub. Auth. Law §§ 1045-j(1),(4).[13]

Consequently, as in *Beggs*, where the defendant municipality's automobile tax was "not levied upon the purchase or registration of the vehicle *per se*, but rather upon the ownership of the vehicle by the citizen," 145 F.3d at 512, the

---

[13] This conclusion applies with equal force to both the Jones Property, where water and sewer charges were calculated as "frontage charges" predicated upon the physical attributes of the property, such as the width of the building frontage or number of dwelling units, and the Boyd Property, which had a water meter to measure usage. (Trust 56.1 Stmt. ¶ 1.; Pls.' Resp. to Trust 56.1 Stmt. ¶ 1.) Thus, Plaintiff Boyd's argument that her water meter brings the charges within the FDCPA's definition of a debt is unavailing.

33

water and sewer charges imposed on Jones and Boyd in this case
were mandatorily imposed upon their ownership of property as
homeowners.  Indeed, according to the New York City Department
of Environmental Protection, New York City's "water and sewer
infrastructure is funded by revenue it collects through water
and sewer rates" from the City's property owners. *See* N.Y.C.
Environmental Protection, "About DEP Water Rates,"
http://home.nyc.gov/html/dep/html/water_rates/index.shtml (last
visited Oct. 2, 2012).  Thus, the water and sewer obligations,
like taxes, are imposed upon New York City property owners to
fund a public service: maintenance of the City's water and sewer
infrastructure.  Despite Plaintiffs' protestations to the
contrary, the relationship between the City and Plaintiffs here
resembles more the relationship between taxpayer and taxing
authority than it does the consensual, transactional "pro tanto
exchange" between parties envisaged by the statutory definition
of debt. *See Beggs*, 145 F.3d at 512.

 Moreover, the city ordinance regulating the imposition
of sewer and water charges reinforces this conclusion.  Section
1045-j(5) of the City's Public Authority Law provides in
relevant part with respect to sewer and water charges:

> [s]uch fees, rates, rents or other charges,
> if not paid when due, shall constitute a
> lien upon the premises served . . . , which

34

> lien . . . shall bear interest at the same
> rate as would unpaid taxes of the city. Such
> lien . . . may be foreclosed against the lot
> or building served *in the same manner as a
> lien for such taxes.*

N.Y. Pub. Auth. Law § 1045-j(5) (emphasis added). This

ordinance confirms that water and sewer charges are to be

treated in the same manner as taxes, further supporting the

court's determination that water and sewer charges at issue in

this action are more analogous to property taxes than to

consumer debts. *See id.* Like taxes, water and sewer fees are

non-negotiable charges mandatorily levied upon citizens for

public utilities or services provided by the City to the general

public.[14]

That the Boyd Property was metered based on rates and

parameters dictated by the City for water usage does not alter

the court's analysis. Though metered usage arguably may be one

factor in determining the nature of a lien, no court has held

---

[14]Moreover, as Defendants correctly observe, Plaintiffs rely on
N.Y. Pub. Auth. Law § 1045-j, among other tax ordinances, in their underlying
opposition papers to support their argument that Jones and Boyd have a right
to interest on refunded overpayments under the FDCPA. (Pls.' Opp. at 37.) In
fact, Plaintiffs insist that "state laws covering the collection of city
taxes apply to the collection of the payments at issue," including the water
and sewer charges included in the Tax Liens. (*Id.*) In essence, Plaintiffs
have requested that the court treat the underlying obligations as taxes that
bear interest in this litigation, acknowledging that the utility charges
secured under the Tax Liens are not debts. Additionally, in the October 24,
2002 Jones Payoff Quote Request, the form submitted on behalf of Jones
identifies the amount of estimated legal fees and also contains a blank space
for the "Taxpayer Name." (10/24/02 Jones Payoff Quote Request, at JER2
00240.) At the very least, this suggests that the Tax Lien was recognized as
a tax rather than a debt.

that it is the determinative factor, and the facts before the
court warrant no such finding.  Furthermore, Plaintiffs cite no
authority holding that metered water or sewer charges are *per se*
debts under the FDCPA.  The City's method of calculating the
water and sewer rates and obligations imposed upon the Boyd
Property does not transform the City's mandatory charges into
consensual transactions based on negotiations or business
dealings.  Significantly, there is no evidence in the record
that Boyd even requested water and sewer services from the City
after such a negotiation or business dealing or any form of
exchange with the City.  It is undisputed that, as a property
owner, Boyd was required to avail herself of City resources and
pay concomitant charges for those resources as she used them,
irrespective of the method by which the charges were determined
by the City.  *See* N.Y.C. Admin. Code § 27-2024 (requiring New
York City property owners to connect their property to City
water mains).

    The record confirms that Jones and Boyd did not enter
into any contract with the City regarding the water and sewer
obligations, and Plaintiffs point to no evidence from which a
reasonable trier of fact could determine that Jones and Boyd
entered into any consensual transactions with the City for
utility services.  Accordingly, the court finds that the water

36

and sewer obligations secured by the Liens do not arise from a consensual transaction and thus do not constitute debts under the FDCPA. *See Bass*, 111 F.3d at 1326 ("[T]he FDCPA limits its reach to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services.").

Plaintiffs' reliance upon the Third Circuit's reasoning in *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379 (3d Cir. 2000) is unavailing. Although the court acknowledges that *Pollice* addressed whether Pittsburgh's municipal water and sewer obligations qualified as debts under the FDCPA, *Pollice* is inapposite in light of the distinct facts of this case. In *Pollice*, the Third Circuit held that Pittsburgh's municipal tax liens, composed of water and sewer obligations, qualified as debts under the FDCPA. *Id.* at 400. The Third Circuit reasoned that these obligations constituted debts because "homeowners ('consumers' of water and sewer services) had an 'obligation . . . to pay money' to the government entities which arose out of a 'transaction' (*requesting water and sewer service*) the subject of which was 'services . . . primarily for personal, family, or household purposes.'" *Id.* (emphasis added). Furthermore, the Third Circuit acknowledged that property taxes, unlike water or sewer obligations, did not constitute debts because the

37

SPA111

"relationship between taxpayer and taxing authority does not encompass the type of pro tanto exchange which the statutory definition [of 'debt'] envisages." *Id.* at 401 (quoting *Staub*, 626, F.2d at 278). *Pollice,* however, is distinguishable from the factual record presented here.

The *Pollice* court determined that the water and sewer obligations arose from a transaction because there was a "request[]" for water and sewer services. *Id.* at 400. The Third Circuit found essential the consensual nature of the transaction between the homeowners and the City of Pittsburgh regarding the provision of water and sewer services. *See id.* A "transaction" existed, in the Third Circuit's view, because there was a voluntary request for resources provided by the City of Pittsburgh. *See id.* As explained above, no such transaction exists with respect to the Jones and Boyd Tax Liens because there is no evidence in the record that either Jones or Boyd made any "request" to connect to the City's water and sewer mains in order to avail themselves of the City's water and sewer services; rather, they were required by law to do so and to pay the City accordingly.[15]

---

[15] Additionally, in Pittsburgh, unlike in New York City, it appears that homeowners who wished to use municipal utilities "applied" for water and sewer services. *See Piper v. Portnoff Law Assocs., Ltd.*, 396 F.3d 227, 233 n.8 (3d Cir. 2005) (discussing *Pollice* and the City of Pittsburgh's water charges). This supports the court's conclusion that *Pollice* involved a

38

Subsequent cases interpreting *Pollice* support this
analysis.  For example, in *Piper v. Portnoff Law Assocs.*, *Ltd.*,
396 F.3d 227 (3d Cir. 2005), the Third Circuit expounded upon
*Pollice*, opining that they "think it clear from *Pollice* that
whenever a homeowner *voluntarily elects to avail himself* of
municipal water/sewer services . . . and thereby incurs an
obligation to pay for such services, there is the kind of *pro
tanto* exchange contemplated by the FDCPA."  396 F.3d at 233 n.8
(quoting *Pollice*, 225 F.3d at 401).  *Pollice* and *Piper* therefore
reflect the consensus view that a transaction must be a
"consensual" endeavor in which the parties enter into a
contract, business dealing, or negotiation regarding services
primarily for household purposes. *See Turner*, 362 F.3d at 1227.

Unlike Plaintiffs in *Pollice* or *Piper*, Jones and Boyd
did not "*voluntarily elect*[]" to avail themselves of municipal
water or sewer services, *Piper*, 396 F.3d at 233 n.8; they were
required to do so by municipal law.  Moreover, as Defendants
correctly observe, Plaintiffs have not demonstrated that the
administrative regime for water and sewer services in the City
of Pittsburgh is in any way similar to the administrative regime

_____

consensual transaction in which the plaintiff property owners voluntarily
entered into agreements with the Pittsburgh municipal water authority. The
record lacks any evidence that such an analogous application process exists
in New York City.  To the contrary, it is undisputed that Boyd and Jones were
required to use City water mains for water and sewage purposes.

in the City of New York.[16]  Thus, *Pollice* is inapplicable here

because New York City leaves no room for a voluntary or

consensual transaction between parties regarding the provision

of water and sewer services.[17]

Finally, unlike the Tax Liens on the Jones and Boyd

Properties, the liens in *Pollice* do not appear to be bundled

liens composed of tax and utility obligations.  *See Pollice*, 225

F.3d at 385-86, 400-01 (discussing the water claims as distinct

from the tax claims).  This distinction demonstrates two key

points.  First, the New York City Tax Liens in this case

explicitly included unpaid taxes and sewage and water charges as

mandated by the New York City Administrative Code, and thus are

different, and more tax-like, in nature than the Pittsburgh

---

[16] In New York City, the municipal water board appears to serve as the sole water and sewage provider; however, the same is not true for the City of Pittsburgh, where private companies also serve the water and sewage needs of property owners and serve as an alternative to municipal public utilities. *See, e.g.*, Pennsylvania American Water Company, http://www.amwater.com/paaw/about-us/page9704.html (last visited Oct. 2, 2012).  Plaintiffs offer no evidence showing that there were alternative water or sewer suppliers for New York City property owners or that New York City property owners had the ability to negotiate rates or seek the services of other providers.

[17] It is of no moment that the Servicing Agreement between the Trust Defendants and JER Defendants provided that "the servicing of the water and sewer component of Tax Liens on certain residential Properties *may* require special procedures to assure that the actions of the Servicer in servicing such Liens do not violate the federal Fair Debt Collection Practices Act." (ECF No. 233, Exh. D, Servicing Agreement Between Trust Defendants and JER Defendants ("Servicing Agreement"), at 16, § 2.02(c) (emphasis added).)  Through this statement, Defendants merely expressed caution regarding the potential relevance of the FDCPA in connection with servicing portions of the Liens on certain properties, without conceding its applicability or agreeing that the Tax Liens are debts.  Moreover, Plaintiffs have not argued to the contrary.

municipal liens at issue in *Pollice*. In *Pollice*, the Third
Circuit subjected the water and sewer liens to FDCPA analysis
while excluding the tax liens from similar scrutiny; the *Pollice*
court did not consider or rule on liens with mixed obligations
bundled into one instrument, which includes substantial tax
obligations. *See id.* Thus, *Pollice* is not persuasive here.
Second, with respect to the Boyd Property, only approximately
twenty percent of the Tax Lien constituted delinquent utility
charges. (Trust Mem. at 6-7; JER 56.1 Stmt. ¶ 19; Pls.' Resp. to
JER 56.1 Stmt. ¶ 19.) Even assuming, without concluding, that
the water and sewer charges in this case were transactional in
nature, the Boyd Tax Lien would still not constitute a debt
under the FDCPA because a debt must arise out of a transaction
the subject of which is "*primarily* for personal, family, or
household purposes." 15 U.S.C. § 1692a(5) (emphasis added). No
reasonable trier of fact could find that the Boyd Tax Lien,
eighty percent of which was real estate tax arrearage, involved
a transaction the subject of which is primarily for personal,
family, or household use. *Cf. Bloom v. I.C. Sys., Inc.*, 972 F.2d
1067, 1068 (9th Cir. 1992) (stating that courts should "examine
the transaction as a whole" in determining the nature of a debt
obligation). Thus, the Boyd Tax Lien is not covered by the
FDCPA for this reason as well.

In sum, the court holds that the Jones and Boyd Tax Liens are not debts within the meaning of the FDCPA. In doing so, the court notes the limited nature of this narrow holding. Specifically, a New York City tax lien that consists of delinquent mandatory utility charges and property taxes does not constitute a debt within the meaning of the FDCPA. Thus, the court sustains Defendants' first objection to Judge Reyes' R&R and dismisses Jones' and Boyd's FDCPA claims in their entirety.

**B. Objection Two: The FDCPA Does Not Apply to the Enforcement of Security Interests Against Property.**

Defendants further object to the R&R to the extent that it did not consider their alternative ground for summary judgment. (JER Obj. at 7.) Defendants maintain that even assuming that the Tax Liens constitute debts within the meaning of the FDCPA, Defendants' efforts to enforce and foreclose on those Tax Liens constitute the "mere enforcement of [a] security interest[] against property," as opposed to debt collection activities subject to §§ 1692e and 1692f of the FDCPA. (*Id.*) To support this contention, Defendants rely upon *Montgomery v. Huntington Bank*, 346 F.3d 693 (6th Cir. 2003) and numerous other district court cases for the proposition that the enforcement of a security interest is not debt collection activity under the FDCPA. (JER Obj. at 7-8.) In light of such authority,

42

Defendants urge the court to dismiss the remaining FDCPA claims because "the settled property foreclosures involved the enforcement of security interests represented by the tax liens," for which FDCPA §§ 1692e and 1692f provide no protection. (*Id.* at 8.)

The court finds that the foreclosure actions on liens against Plaintiffs' interests in their properties, including any fees and costs arising directly from and solely because of the foreclosures, did not seek monetary judgments against debtor-property owners and consequently were not debt collection activities actionable under §§ 1692e and 1692f. Rather, Defendants acted to enforce their security interests through foreclosures of the Tax Liens and sale of the properties, from which proceeds Defendants would obtain the tax lien amounts and attorneys' fees and legal costs that arose from the foreclosures.[18] The court therefore sustains Defendants' second objection and dismisses Defendants' FDCPA claims for this reason as well.

The parties do not dispute that Defendants are "debt collectors" under the FDCPA in their objection papers. Rather,

---

[18] The court notes that the attorneys' fees and costs at issue in this case are part and parcel of JER Defendants' attempts to foreclose on the Tax Lien. It is undisputed that but for the imposition of the Tax Lien and Defendants' actions to foreclose on those liens, the attorneys' fees and costs would not have accrued.

43

at issue here, apart from whether the Tax Liens are debts, is the separate question of whether Defendants' enforcement of the Tax Liens – by commencing foreclosures against properties as opposed to civil actions against property owners seeking money judgments – constitutes debt collection activity subject to §§ 1692e and 1692f of the FDCPA. *See Kaltenbach v. Richards*, 464 F.3d 524, 529 (5th Cir. 2006) ("Whether a debt collector's specific action qualifies as the collection of a debt . . . is a separate inquiry from whether the party meets the general statutory definition of a debt collector."); *Gray v. Four Oak Court Ass'n, Inc.*, 580 F. Supp. 2d 883, 886-87 (D. Minn. 2008). Sections 1692e and 1692f of the FDCPA prohibit a debt collector from making false or misleading representations or using unfair means when collecting a debt. *See* 15 U.S.C. § 1692e (prohibiting false or misleading representation "in connection with the collection of any debt"); 15 U.S.C. § 1692f (prohibiting the use of unfair or deceptive means "to collect or attempt to collect any debt").

Plaintiffs mistakenly rely on *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605 (2010) in asserting that "the U.S. Supreme Court recently held that a law firm was subject to FDCPA liability for a misrepresentation made in a Complaint filed in an Ohio mortgage foreclosure action."

44

(Pls.' Resp. to Obj. at 6.)  In *Jerman*, however, the Supreme

Court did not explicitly consider the applicability of the FDCPA

to a mortgage foreclosure action but, instead, considered

whether the *bona fide* error defense in the FDCPA (§ 1692k(c))

applied to the lawyers' actions. 130 S. Ct. at 1609.[19]  Although

both Defendants asserted this affirmative defense in their

Answers, they did not move for summary judgment on this basis.

In any event, the majority of federal courts have clarified

that, unless a monetary judgment is sought against the debtor,

the "enforcement of a security interest through the foreclosure

process is not debt collection for purposes of the Act." *Warren*

*v. Countrywide Home Loans, Inc.,* 342 F. App'x 458, 460 (11th

Cir. 2009); *see, e.g., Montgomery*, 346 F.3d at 700 ("[A]n

enforcer of a security interest, such as a repossession agency,

falls outside the ambit of the FDCPA for all purposes, except

for the purposes of § 1692f(6)." (internal quotation marks

omitted))[20]; *Diaz v. Florida Default Law Group, P.L.*, No. 3:09-CV-

---

[19] Significantly, the threshold issue of whether a mortgage foreclosure is subject to the FDCPA was not a question upon which certiorari was granted by the Supreme Court.
[20] Section 1692f(6)(A) of the FDCPA, which applies to the "[t]aking or threatening to take nonjudicial action to effect dispossession . . . of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest," serves as an exception to this rule.  That FDCPA provision is not applicable here because the record is devoid of any evidence that Defendants have threatened to take nonjudicial action to dispossess property over which there is no present right of possession claimed as collateral through an enforceable security interest.  Moreover, Plaintiffs do not invoke § 1692f(6)(A) and have not

45

524, 2011 WL 2456049, at *2 (M.D. Fla. Jan. 3, 2011); *Gray*, 580
F. Supp. 2d at 888; *Acosta v. Campbell*, No. 6:04-CV-761, 2006 WL
3804729, at *4 (M.D. Fla. Dec. 22, 2006), *aff'd*, 309 F. App'x
315 (11th Cir. 2009); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 924
(N.D. Ind. 2004); *Heinemann v. Jim Walter Homes, Inc.*, 47 F.
Supp. 2d 716, 722 (N.D.W. Va. 1998), *aff'd*, 173 F.3d 850 (4th
Cir. 1999).  As such, the weight of legal authority supports the
proposition that non-judicial foreclosure proceedings generally
do not constitute debt collection activities covered by the
FDCPA.[21]

 In response, Plaintiffs argue that *judicial*
foreclosure proceedings like those commenced by Defendants are
subject to the FDCPA because of the possibility of obtaining a
deficiency monetary judgment against the property owner,
rendering the foreclosure proceeding an attempt to collect a
debt from the property owner. (*See* Pls.' Resp. to Obj. at 5-6.)
As Plaintiffs correctly observe, "several district courts have
distinguished between judicial and non-judicial foreclosures and

---

alleged any facts to support liability under this provision.
 [21] Citing to *Wilson v. Draper & Goldberg, P.L.L.C.,* 443 F.3d 373,
376 (4th Cir. 2006), Plaintiffs contend that the "clear weight of authority
demonstrates that the FDCPA *does* apply to parties enforcing security
interests" even in the non-judicial foreclosure context. (Pls.' Resp. to Obj.
at 5 n.3.)  This is not so.  "Although Plaintiffs point to a case from the
Fourth Circuit holding that foreclosure can be debt collection (*see Wilson v.
Draper & Goldberg,* 443 F.3d 373, 376-77 (4th Cir.2006)), the weight of
authority is to the contrary." *Odinma v. Aurora Loan Servs.*, No. 09-CV-4674,
2010 WL 2232169, at *12 (N.D. Cal. June 3, 2010); *see also* cases cited *supra*.

concluded the FDCPA applies to the former but not the latter."
*Maynard v. Cannon*, 401 F. App'x 389, 394 (10th Cir. 2010)
(citing cases). Although acknowledging this distinction, the
court does not find it to be dispositive and declines to apply a
categorical rule finding that judicial foreclosures in New York
*per se* constitute debt collection activities under the FDCPA.
In *Maynard*, the Eleventh Circuit explained that, in
distinguishing judicial from non-judicial foreclosures, courts
"have relied heavily on one principal distinction between the
two types of foreclosure – the presence or absence of a personal
judgment against the mortgagor. In other words, these courts
have found non-judicial foreclosures are not debt collections,
because they do not require the consumer to pay any money at
all." *Id.* (citing *McDaniel v. South & Assocs.*, 325 F. Supp. 2d
1210, 1217 (D. Kan. 2004)). Thus, the fundamental distinction
between judicial and non-judicial foreclosures is that "a
*typical* judicial foreclosure *usually* does involve seeking a
personal judgment against the debtor for a deficiency and hence
would likely amount to debt collection." *Fouche' v. Shapiro &
Massey L.L.P.*, 575 F. Supp. 2d 776, 786 (S.D. Miss. 2008)
(emphasis added).

Here, the foreclosure complaints did not request
monetary judgments against any of the plaintiffs for any

47

deficiencies and instead proceeded solely against the respective
properties subject to the Tax Liens. (Chilson Aff. ¶ 16; *see
also* Jones Foreclosure Compl.; Boyd Foreclosure Compl.; Warters
Foreclosure Compl; Taylor Foreclosure Compl.)  Indeed, a
deficiency was highly unlikely, given the relatively small
amount of the unpaid taxes, water, and sewer charges and
estimated fees and costs, all of which would have been paid from
the proceeds of a foreclosure judgment sale.  It is well-settled
that, in New York, "the action to enforce [a] lien remains
equitable, not legal, in nature." *Salerno Painting & Coating
Corp. v. Nat'l Neurolabs, Inc.*, 842 N.Y.S.2d 81, 82 (N.Y. App.
Div. 2d Dep't 2007).  Thus, the distinction between judicial and
non-judicial foreclosures is immaterial in this case because
Defendants' judicial foreclosures did not attempt to collect
money from the debtor with respect to the underlying tax, water,
and sewage charges or the fees, disbursements, and costs that
arose from the foreclosures.  *See McDaniel*, 325 F. Supp. 2d at
1217 ("Foreclosure . . . is not the enforcement of the
obligation because it is not an attempt to collect funds from
the debtor.").  The FDCPA's purpose is "to protect consumers
from debt collectors attempting to collect funds, not attempts
to foreclose interests in property." *Id.*  Thus, the FDCPA's

48

consumer protection purpose was not triggered by the foreclosures here.

The Second Circuit's holding in *Romea v. Heiberger & Assocs.*, 163 F.3d 111 (2d Cir. 1998) – which Plaintiffs do not cite – does not command a different result. In *Romea*, the Second Circuit held that a defendant law firm's letter to the plaintiff-tenant prior to the initiation of a possessory *in rem* action to recover the client landlord's premises constituted a communication protected by the FDCPA. *Id.* at 116. The Second Circuit rejected the defendant's contention that the letter was not subject to FDCPA protection because it was a "statutory condition precedent" to commencing summary eviction. *Id.* The *Romea* court held that because the letter "conveyed information regarding a debt" to another person, it was a "communication" as defined by the FDCPA. *Id.* Because defendant "ma[de] no attempt to deny that its aim in sending the letter was at least in part to induce [plaintiff] to pay the back rent she allegedly owed," the court ultimately concluded that the delivery of the letter constituted debt collection activity. *Id.*

*Romea* is distinguishable from the facts presented here and is therefore not controlling. First, unlike in *Romea* where the defendant initiated contact with the plaintiff to induce the plaintiff to pay her back rent, JER Defendants here were merely

49

responding to requests for payoff quotes initiated by Plaintiffs
to resolve the foreclosure actions. *See id.* Second, in contrast
to *Romea*, where the communications occurred prior to summary
*eviction* proceedings, Defendants here responded to Plaintiffs'
requests during the pendency of *foreclosure* proceedings. *See id.*
Far from a communication intending to induce Plaintiffs to pay
the underlying obligations, the payoff quotes transmitted by JER
Defendants were sent to provide Plaintiffs with information
necessary to facilitate Plaintiffs' desire to discontinue the
foreclosure actions. Third, in *Romea*, the Second Circuit did
not purport to rule on whether a lien foreclosure, as opposed to
an eviction proceeding, constituted the enforcement of a
security interest or whether payoff letters sent to resolve a
foreclosure process constituted debt collection activities. *See
id. Romea* is therefore inapposite.

Moreover, the Second Circuit's reasoning in *Romea* did
not preclude the District of Connecticut from recently holding
that filing a foreclosure action in state court was not
actionable under the FDCPA because "a foreclosure action is not
a legal action to enforce a debt but rather an equitable action
to enforce a security interest rather than a debt collection."
*Derisme v. Hunt Leibert Jacobson P.C.*, No. 3:10-CV-244, 2012 WL
3000398, at *14 (D. Conn. July 23, 2012). The district court

50

concluded that "an enforcer of a security interest is only subject to § 1692f(6) and not any other section of the FDCPA." *Id.* at *19 (citing cases). Finally, the district court concluded that because the defendant "has not filed a motion for a deficiency judgment it has not engaged in conduct related to the collection of money and consequently the provisions of [the FDCPA] are not applicable to its conduct." *Id.* at *20. Similarly here, Defendants have not sought a deficiency judgment, but instead proceeded solely against the Jones and Boyd Properties in an equitable action to foreclose the Tax Liens. Consequently, Defendants' actions constitute the enforcement of a security interest not subject to the protections of the FDCPA. *See id.*

In a final attempt to salvage their claims, Plaintiffs argue that even if the foreclosure proceedings were not subject to the FDCPA, Defendants' correspondence with Plaintiffs demanding attorney's fees and expenses at unspecified points before, during, and after the foreclosures were debt collection activities within the bounds of the FDCPA. (Pls.' Resp. to Obj. at 6.) Plaintiffs cite to no evidence in the record that Defendants initiated direct correspondence with Plaintiffs Boyd and Jones to demand payment or attorneys' fees and costs. Plaintiffs instead rely on *Rousseau v. Bank of N.Y.*, No. 08-CV-

51

205, 2009 U.S. Dist. LEXIS 90163, at *23-25 (D. Colo. Sept. 29, 2009), in which the district court noted that "if a defendant seeks to collect money apart from the foreclosure process, such action would come within the bounds of the [FDCPA]."

Plaintiffs' argument is flawed. Plaintiffs have not alleged in their complaint or otherwise that Defendants sought to collect attorneys' fees and costs apart from the foreclosure process.[22] Nor could they. The attorneys' fees and costs sought by JER Defendants were created by, and inextricably intertwined with, the ongoing foreclosure process. Plaintiffs have not established that absent the foreclosure process, any attorneys' fees and costs would have accrued and subsequently been charged to Plaintiffs. Thus, the record is devoid of evidence that any attorneys' fees and costs accrued apart from the enforcement of the Tax Liens through foreclosure actions.

_____

[22] Boyd and Jones have not alleged that Defendants' correspondence with Plaintiffs prior to the foreclosure actions give rise to any FDCPA claims. (*See* Compl. ¶¶ 30-63, 145-57.) Jones only alleges that JER began to service the Tax Lien after its sale to the Trust Defendants but does not allege any impropriety associated with that pre-foreclosure servicing. (*Id.* ¶¶ 52-53.) Plaintiffs assert the existence of correspondence with Boyd and Jones "before . . . the foreclosure actions"; however, Plaintiffs do not cite to any admissible evidence that Defendants requested fees and costs prior to the commencement of the foreclosure actions. Rather, Plaintiffs concede that their claims are predicated upon Defendants' purported demands for attorneys' fees and costs and Defendants' allegedly improper collection of those fees and costs, both of which occurred after the commencement of foreclosure actions in response to requests initiated by Plaintiffs' counsel. (Pls.' Obj. at 10; Pls.' Opp. at 8.)

Furthermore, the supposed "demands" for attorneys'
fees were not demands at all; rather, in response to inquiries
initiated by Plaintiffs or their counsel, the JER Defendants
provided Plaintiffs with what JER explicitly designated to be
"estimates" of legal fees and costs that arose solely because of
the foreclosure actions. (JER 56.1 Stmt. ¶¶ 60-62; Pls.' Resp.
to JER 56.1 Stmt. ¶¶ 60-62; Jones Communication History, at JER2
0281-82; Thomas Boyd Communication History, at JER2 00385;
5/20/02 Boyd Payoff Quote.)  Plaintiffs have not presented
evidence to establish that Defendants provided the payoff quotes
to induce Boyd and Jones to pay the obligations secured under
the Tax Liens.  Moreover, in the context of existing foreclosure
actions in which the properties would have been sold, and the
tax liens, costs, and disbursements would have been paid from
the proceeds of the sale, Plaintiffs sought payoff quotes that
were necessary to consummate the sales or refinance their
properties.  Consequently, by providing estimates of attorneys'
fees and costs at the request of Plaintiffs, Defendants were not
seeking "to collect money apart from the foreclosure process,"
*Rousseau*, 2009 U.S. Dist. LEXIS 90163 at *23; Defendants were
responding to Plaintiffs' inquiries on the amounts necessary to
resolve and discontinue the ongoing foreclosure actions.  In
responding to those inquiries, Defendants provided "estimated"

quotes for attorneys' fees and costs connected with the foreclosure actions, the payment of which would resolve the actions to foreclose the Liens. Plaintiffs belatedly attempt, without evidentiary support in the record, to characterize the JER Defendants' responses to settlement inquiries as Defendants' demands for payments of the delinquent Tax Liens and interrelated legal fees and costs.

Accordingly, because the judicial foreclosures against the Jones and Boyd Properties did not seek monetary judgments against individual debtors, those foreclosures actions, including Defendants' responses to Plaintiffs' payoff inquiries, are not debt collection activities under §§ 1692e and 1692f of the FDCPA. The court therefore sustains Defendants' second objection to Judge Reyes' R&R and dismisses Jones' and Boyd's FDCPA claims on this independent basis as well.

## II. **Plaintiffs' Objections**

Plaintiffs lodge numerous objections to the R&R, challenging Judge Reyes' detailed recommendations on both the federal and state law claims. In light of the court's dismissal of Plaintiffs' FDCPA claims, the court finds it unnecessary to reach Plaintiffs' objections on the merits of those claims and need not adopt Judge Reyes' recommendations on those claims at this point in time.

Furthermore, the court adopts Judge Reyes'
recommendation to decline exercising supplemental jurisdiction
over Plaintiffs' remaining state law claims, rendering
Plaintiffs' objections on those claims moot. (R&R at 37.)
Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline
to exercise supplemental jurisdiction over state law claims when
the court has "dismissed all claims over which it has original
jurisdiction."  Moreover, the Second Circuit has instructed
that "federal courts, absent exceptional circumstances, should
abstain from exercising pendent jurisdiction when federal claims
in a case can be disposed of by summary judgment." *Walker v.
Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986).  There
are no exceptional circumstances warranting retention of federal
jurisdiction over the state law claims in this case.  Having
dismissed all claims over which the court has original
jurisdiction, the court declines to exercise supplemental
jurisdiction over Plaintiffs' remaining state law claims.  *See*
28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the reasons set forth above, Judge Reyes' Report
and Recommendation is adopted in part and modified in part.
Accordingly, Defendants' respective motions for summary judgment
are granted on the FDCPA claims, and the court declines to

exercise supplemental jurisdiction on the remaining state law

claims.  The Clerk of the Court is respectfully requested to

enter judgment in favor of Defendants and against Plaintiffs in

accordance with this decision and to close this case.

**SO ORDERED.**

Dated:       October 2, 2012
             Brooklyn, New York

                                   _____/s/_____
                                   KIYO A. MATSUMOTO
                                   United States District Judge
                                   Eastern District of New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOAN GRANT BOYD, RANDA JONES, SYBIL          :        Case No. 05-2455
TAYLOR, and TONYA WARTERS, on behalf of                 (KAM/RER)
themselves and all others similarly situated,      :

               Plaintiffs,      :        **NOTICE**
                                                            **OF APPEAL**
      -- against --      :

J.E. ROBERT CO., INC; JER REVENUE SERVICES,      :
LLC; NYCTL 1996-1 TRUST; NYCTL 1997-1 TRUST;
NYCTL 1998-1 TRUST; NYCTL 1999-1 TRUST,      :

          Defendants.      :

                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     Notice is hereby given that Plaintiffs Joan Grant Boyd, Randa Jones, Sybil Taylor and

Tonya Warters appeal to the United States Court of Appeals for the Second Circuit from the

Order granting summary judgment dismissing the Complaint dated October 2, 2011 and entered

on October 3, 2012.

                            Respectfully submitted,

Dated: November 2, 2012                    PAUL S. GROBMAN, ESQ.

                            By:_____//ss//_____
                              PAUL. S. GROBMAN

                             555 Fifth Avenue, 17th floor
                             New York, New York 10017
                             212-983-5880

                             *Attorneys for Plaintiffs*

SPA131

1

**CERTIFICATE OF SERVICE**

2

The undersigned hereby declares:

3

I am over the age of 18 years and not a party to or interested in the within entitled cause

4

of action. On the date state below, I served a true copy of:

5

**PLAINTIFFS' NOTICE OF APPEAL**

6

By Overnight Mail to:

7

8  Stephen Kitzinger, Esq.
   New York City Law Department

9  100 Church Street
   New York, NY 10007-2601

10 Fax: (212) 788-8877

11
   Jonathan D. Elliot

12 Zeldes, Needle & Cooper
   1000 Lafayette Blvd.

13 P.O. Box 1740
   Bridgeport, Ct. 06601-1740

14

15  I declare under penalty of perjury, under the laws of the State of California that the
    foregoing is true and correct, and that this declaration was executed at New York, New York on

16 November 2, 2012.

17

18

19                                          ss/

20                              PAUL GROBMAN

21

22

23

24

25

26

27

28

NOTICE OF APPEAL
CR-98-40003-PJH