# 12-4422-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤ ◄◄

THOMAS BOYD, HUMBERTO MENESES,

*Plaintiffs,*

*and*

JOAN GRANT BOYD, SYBIL TAYLOR, RANDA JONES, TONYA WARTERS,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants,*

*v.*

J.E. ROBERT CO., INC., JER REVENUE SERVICES, LLC,
NYCTL 1996-1 TRUST, NYCTL 1997-1 TRUST, NYCTL 1997-2 TRUST,
NYCTL 1998-1 TRUST, NYCTL 1999-1 TRUST,

*Defendants-Appellees.*

―――――――――

*On Appeal from the United States District Court
for the Eastern District of New York (Brooklyn)*

## BRIEF FOR PLAINTIFFS-APPELLANTS

PAUL STUART GROBMAN, ESQ.
555 Fifth Avenue, 17th Floor
New York, New York 10017
212-983-5880

LAW OFFICES OF
  CURTIS V. TRINKO, LLP
16 West 46th Street, 7th Floor
New York, New York 10036
212-490-9550

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ……………………………………...……………… iii

Preliminary Statement …………………………………………………………... 1

STATEMENT OF JURISDICTION ……………………………………………… 4

ISSUES PRESENTED …………………………………………………………… 4

STANDARDS OF REVIEW ……………………………………………………... 4

STATEMENT OF FACTS ………………………………………………………... 5

    A.  THE PROVISION OF WATER AND SEWER SERVICES BY NEW YORK CITY …………………………………………………………………… 5

    B.  THE APPELLANTS PURCHASE OF WATER AND SEWER SERVICES AND THE SALE OF THE RESULTING LIENS …………………………... 6

        i.        Appellant Joan Grant Boyd …………………………………….. 6

        ii.       Appellant Randa Jones …………………………………………. 6

    C.  THE TRUSTS ARRANGEMENT WITH JER REVENUE AND THE LAW FIRMS ………………………………………………………………… 7

    D.  THE FORECLOSURE ACTIONS AGAINST APPELLANTS AND THE PAYMENT OF THE LIENS …………………………………………….. 8

        i.    Joan Boyd …………………………………………………….. 8

        ii.  Randa Jones …………………………………………………… 10

    E.  THE COMMENCEMENT OF THE ACTION BELOW ………………………. 10

    F.  DISCOVERY UNCOVERS EVIDENCE OF RESPONDENTS' ASSESSMENT OF ILLEGAL FEES AND EXPENSES ……………………... 11

    G.  THE MAGISTRATE'S REPORT & RECOMMENDATION ON RESPONDENTS' MOTION FOR SUMMARY JUDGMENT ………………... 14

    H.  THE DISTRICT COURT DECISION AT ISSUE ……………………………. 16

Page

1. The Lower Court Rules That There Was No "Debt" Under The FDCPA Because The Water And Sewer Services Purchase By Appellants Were Not Negotiated For ……………………………………………….. 17

2. The Court Rules That Illegal Amounts Collected by a Debt Collector While A Foreclosure Is Pending Are Not Subject To the FDCPA ……….. 20

I. THE MOTION FOR RECONSIDERATION …………………………………... 20

ARGUMENT ……………………………………………………………….. 21

POINT I - THE COURT COMMITTED ERROR IN CONCLUDING THAT CHARGES FOR NEW YORK CITY WATER AND SEWER CHARGES ARE NOT 'DEBTS' SUBJECT TO THE FDCPA ……………………………………….. 21

A. The Court's Interpretation of "Transaction" Is At Odds With Its Ordinary Meaning ………………………………………………………………... 22

B. The Court's Interpretation of "Transaction" Conflicts With The Interpretation By Authorities Construing The FDCPA ……………………………………….. 27

C. The Court's Interpretation Also Conflicts With The Interpretation By The FTC ………………………………………………………………….. 37

POINT II
THE COURT COMMITTED CLEAR ERROR IN FINDING THAT APPELLANT BOYD'S METERED WATER USAGE WAS NOT SUBJECT TO THE FDCPA …... 38

A. Boyd's Metered Water Usage Was Clearly A 'Transaction' …………………... 38

B. The Order Is Clearly Erroneous In Finding That Boyd's Water And Sewer Usage Wasn't Primarily For Personal, Family Or Household Use …………….. 41

POINT III
THE COURT COMMITTED CLEAR ERROR IN CONCLUDING THAT THE FEES AT ISSUE ARE NOT SUBJECT TO THE FDCPA BECAUSE THEY WERE COLLECTED WHILE A FORECLOSURE WAS PENDING ………..……… 44

A. Amounts Collected During Foreclosure Are Subject To The FDCPA ………… 45

B. Whether Defendants Collected Unauthorized Amounts Is The Sole Inquiry Under §1692f(1) …………………………………………………. 52

CONCLUSION …………………………………………………………… 56

CERTIFICATE OF COMPLIANCE …...……………………………………… 57

ii

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                            **Page**

<u>Abby v. Windy Pointe Homeowners Ass.</u>, 2011 U.S. Dist. Lexis 36175 (S.D. Fla. 2011) ………………………………………………………………………  33

<u>Allen v. LaSalle Bank, N.A.</u>, 629 F.3d 364 (3rd Cir. 2011) …………………… Passim

<u>Aurelius Capital Partners, LP v. Republic of Argentina</u>, 584 F.3d 120 (2d Cir. 2009) ……………………………………………………………………  4, 14

<u>Bass v. Stolper, Koritzinsky, Brewster & Neider</u>, 111 F.3d 1322, 1325 (7th Cir. 1997) ………..  27, 28, 36

<u>Beal v. Himmel & Bernstein, LLP</u>, 615 F.Supp.2d 214 (E.D.N.Y. 2009) ……..  29

<u>Beggs v. Rossi</u>, 145 F.3d 511 (2d Cir. 1997) …………………………………..  Passim

<u>Berman v. GC Services Ltd. Partnership</u>, 146 F.3d 482 (7th Cir. 1998) ……….  27, 28

<u>Birster v. American Home Mortgage Servicing</u>, (11th Cir. 2012) …………….  48, 51

<u>Blum v. Bacon</u>, 457 U.S. 132 (1982) …………………………………………….  51

<u>Caron v. Maxwell</u>, 48 F.Supp.2d 932 (D. Ariz. 1999) ………………………….  33

<u>Cervantes-Ascencio v. INS</u>, 326 F.3d 83 (2d Cir. 2003) ………………………  36

<u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147 (2d Cir. 2002) ………………...  4

<u>Chase Bank USA, N.A. v. McCoy</u>, 131 S. Ct. 871 (2011) …………………….  51

<u>Clay v. Mechionne</u>, 2000 WL 1838368 (D. Conn. 2000) ……………………...  34

<u>Ehlrich v. Rapid Recovery Solutions, Inc.</u>, 680 F.Supp.2d 443 (E.D.N.Y. 2010) ………………………………………………………………………………  29

<u>Ferrell v. Community Mgmt. Services, LLC</u>, 2011 U.S. Dist. Lexis 48818 (D. Del. 2011) ……………………………………………………………………….  54

<u>Glazer v. Chase Home Finance, LLC</u>, _ F.3d (6th Cir. 2012) …………………  47, 48

<u>Gross v. FBL Fin. Servs. Inc.</u>, 556 U.S. 167 (2009) …………………………..  22

<u>Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC</u>, 698 F.3d 290 (6th Cir. 2012)                          …………………………………………………….  32, 42, 43 44

**Cases**                                                                                    **Page**

Hamilton v. United Healthcare of La., Inc., 310 F. 3d 385 (5th Cir. 2002) …….      28

Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367 (11th Cir. 1998) …………      27, 28

Hensley v. Eckerhart, 103 S.Ct. 1933 (1983) …………………………………..      16

In re Rahmey, 460 N.Y.S.2d 350 (2nd Dep't 1983) …………………………….      16

In Time Products, Ltd. v. Avi Arad & Assoc., 38 F.3d 660 (2d Cir. 1994) ……      16

Jerman v. Carlisle, 559 U.S. 573 (2010) ……..…………………………..      36, 37

Kaltenbach v. Richards, 464 F.3d 524 (5th Cir. 2006) …………………………      47

Karpova v. Snow, 402 F. Supp.2d 459 (S.D.N.Y. 2005) ………………………      25, 26

Karpova v. Snow, 497 F.3d 262 (2d Cir. 2007) …………………………………      26

Keahou Homeowners Ass. v. County of Hawaii, 87 P.3d 883 (Haw. Sup. Ct.
2004) …………………………………………………….……………..      35

Ladick v. Van Gemert, 146 F.3d 1205 (10th Cir. 1998) ………………………      32

Menashe v. Baum. 2011 U.S. Dist. Lexis 111082 (E.D.N.Y. 2011) …………..      55

Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, 214 F.3d 872 (7th Cir.
2000) ………………………………………………………………………      42

McCollough v. Johnson, Rodenberg & Lauinger, 637 F.3d 939
(9th Cir. 2011) ………………………………………………………………      1

Montgomery v. Huntington Bank………………………………….……….      48

Moore v. New York Cotton Exchange, 270 U.S. 593 (1926) …………………      23

Natividad v. Wells Fargo Bank, N.A., 2013 U.S. Dist. Lexis 74067 (N.D. Cal.
2013) …………………………………………………………………………      49, 50

N.C. Freed v. Bd. Of Governors of Fed. Reserve Sys., 473 F.2d 1210 (2d Cir.
1973) …………………………………………………………………………      22

iv

| **Cases** | **Page** |
|---|---|
| Newman v. Boehm, 119 F.3d 477 (7th Cir. 1997) ……………………………... | 32, 33 |
| Ottovich Revocable Trust v. Wash. Mut., Inc., 2010 U.S. Dist. Lexis 99161 (N.D. Cal. 2010) …………………………………………………………….. | 50 |
| Owen v. Hellmuth & Johnson, PLLC, 550 F.Supp2d 1060 (D. Minn. 2008) …. | 33 |
| Patisso v. Law Offices of Baldinger, 2011 U.S. Dist. Lexis 123140 (E.D.N.Y. 2011) …………………………………………………………………….. | 29 |
| Piper v. Portnoff Law Ass., 396 F.3d (3rd Cir. 2005) ………………………….. | Passim |
| Pollice v. National Tax Funding, L.P., 225 F.3d 379 (3rd Cir. 2000) …….…….. | Passim |
| Reese v. Ellis, Painter, Rattterree & Adams, LLP, _ F.3d _ (11th Cir. May 1, 2012) ……………………………………………………………..…. | 46 |
| Reilly v. Northeast Revenue Services, LLC, 2013 U.S. Dist. Lexis 108554 (M.D. Pa. Aug. 1, 2013) …………………………………………….…….. | 39 |
| Schindler Elevator Corp. v. U.S., 131 S. Ct. 1885 (2011) …………………….. | 22 |
| Schuh v. Druckman & Sinel, L.L.P., 602 F.Supp.2d 454 (S.D.N.Y. 2009) …… | 55 |
| Sharfarz v. Goguen, 691 F.3d 62 (1st Cir. 2012) ………………………………. | 26 |
| Shmerkovich v. RMC Consulting Group LLC, 2011 U.S. Dist. Lexis 30615 (E.D.N.Y. 2011) …………………………………………………………….. | 29 |
| Speleos v. BAC Home Loans Servicing, L.P., 824 F.Supp.2d 226 (D. Mass. 2011) …………………………………………………………………….. | 50 |
| Staub v. Harris, 626 F.2d 275 (3rd Cir. 1980) ………………………………….. | 29, 30, 31 |
| Taylor v. Mount Oak Homeowners Ass., Inc., 11 F.Supp.2d 753 (D. Md. 1998) …………………………………………………………………….. | 33 |
| Thies v. Law Offices of Wyman, 969 F. Supp. 604 (S.D. Cal. 1997) …………. | 33 |
| Turner v. J.V.D.B. & Assocs., Inc., 330 F.3d 991 (7th Cir. 2003) ………….…. | 45, 53 |
| Turner v. Cook, 362 F.3d 1219 (9th Cir. 2004) …………………………………... | 28 |
| United States v. Mead Corp., 533 U.S. (2001) ………………………………… | 52 |

| **Cases** | **Page** |
|---|---|
| U.S. v. Desposito, 2013 U.S. App. Lexis 881, *11 (2d Cir. 2013)…………… | 19 |
| U.S. v. Maneri, 353 F.3d 165 (2d Cir. 2003) …………………………………….. | 24, 25 |
| Vincent v. Money Store, Inc., 2013 U.S. App. Lexis 22880, *25 (2d Cir. 2013) | 22, 35 |
| Wilson v. Draper & Goldberg, 443 F.3d 373 (4th Cir. 2006) ………………… | 47, 48 |

## Statutes

| | |
|---|---|
| 15 U.S.C. §1692a…………………………………………………………… | 1 |
| 15 U.S.C. §1692c…………………………………………………………… | Passim |
| 15 U.S.C. §1692e…………………………………………………………… | 20, 44, 46, 52 |
| 15 U.S.C. §1692f…………………………………………………………… | 20, 44, 52, 53 |
| 28 U.S.C. §1292a…………………………………………………………… | Passim |
| 28 U.S.C. §1367(c) ………………………………………………………… | 34 |
| 53 Fed.Reg. 50097 (Dec. 13, 1988) ……………………………………… | 37, 38 |
| New York Public Authority Law §1045-j(5) ……………………………… | 19 |
| CPLR § 8301(3) …………………………………………………………… | 12 |
| NYC Admin Code, §11-312…………………………………………………… | 33 |
| NYC Admin Code, §11-313…………………………………………………… | 33 |
| NYC Admin. Code, §11-319…………………………………………………… | 5 |
| NYC Admin. Code, §11-320…………………………………………………… | 5 |
| NYC Admin. Code, §11-335…………………………………………………… | 5 |
| NYC Admin. Code, § 11-354…………………………………………………… | 45 |
| NYC Admin. Code, § 11-404[a]……………………………………………… | 5 |
| N.Y.C. Admin. Code § 27-202………………………………………………… | 17 |

## <u>Other Authorities</u>

<u>Black's Law Dictionary,</u> 1496 (6th Ed. 1990)…………………………………… 23, 26

<u>Webster's Third New International Dictionary</u> ………………………………… 23

## Preliminary Statement

This appeal involves allegations that various trusts created by the City of New York (the "City") to collect delinquent water and sewer charges owed by City residents routinely overcharge for attorneys' fees and expenses when those liens go into foreclosure proceedings.

It is well-settled that "the pursuit of unauthorized attorney's fees in a collection suit violates both §1692f(1) and 1692e(2) of the FDCPA." <u>McCollough v. Johnson, Rodenberg & Lauinger, LLC</u>, 637 F.3d 939, 949 (9th Cir. 2011). In this case, the Magistrate Judge's Report & Recommendation on Respondents' motion for summary judgment (hereinafter "the R&R") concluded that the evidence supported a finding that Appellants – City residents who owed certain amounts for water and sewer services provided to their homes – were charged for attorneys' fees and expenses "to which outside counsel were not entitled." (Order, Special Appendix (hereinafter "SPA _") at SPA33, SPA96). In fact, the R&R specifically found that "a reasonable trier of fact could infer that Plaintiffs paid expenses for services that did not in fact occur." (SPA34).

Despite this conclusion, the lower court granted summary judgment on the Appellants' claims that Respondents violated §1692f(1) of the Fair Debt Collection Practices Act (hereinafter "the FDCPA") by collecting amounts which were not "authorized by the agreement creating the debt or permitted by law." 15 U.S.C.

§1692f(1).   The Court reached this decision based upon two sweeping legal

conclusions.

> (i) the lower court found that amounts owed for New York City water
> and sewer services do not constitute a "debt" under the FDCPA
> because an FDCPA "debt" must arise from a consensual transaction,
> and New York residents are required to purchase water and sewer
> services from the City (SPA100);and

> (ii)  the court found that the amounts collected from Appellants were
> not covered by the FDCPA because fees collected while a foreclosure
> action is pending are not subject to the statute.  (SPA116).

With these determinations, the lower court became the first court in the

country to find that a homeowner's payment for water and sewer services does not

constitute a "transaction" subject to the FDCPA.   In fact, to the best of Appellant's

knowledge, no other federal court has found that a debt obligation arising out of

the purchase of goods and services for a home is not an FDCPA "transaction."

Every other court which has considered the issue – including the Third

Circuit in both <u>Pollice v. National Tax Funding, L.P.</u>, 225 F.3d 379, 400 (3rd Cir.

2000), and <u>Piper v. Portnoff Law Ass.,</u> 396 F.3d 227, 236 (3rd Cir. 2005) – has held

that the purchase of water and sewer services by a homeowner is subject to the

FDCPA.  The lower court attempts to distinguish these other cases by arguing that

a homeowner's hookup to water and sewer services in New York is 'mandatory',

while the city residents in those cases could choose from among several utilities.

The lower court raised this argument *sua sponte,* and the so-called "evidence" it

cited in its opinion – a webpage which the lower court accessed on the internet – provides absolutely no support for the judicial conclusion that residents of Pittsburgh and Bethlehem, Pennsylvania had water and sewer options that New York residents did not. Even if such evidence existed, the lower court does not even attempt to explain why Congress would want the FDCPA to protect water and sewer users in Pittsburgh and Bethlehem from abusive debt collection practices on this basis, but not protect water and sewer users in New York City.

In its second determination, the lower court also creates an entirely new exception to §1692f(1)'s prohibition against collecting improper legal fees and expenses, concluding that -- as long as the illegal amounts were collected while a foreclosure action was pending -- they are immune from FDCPA scrutiny. In reaching this conclusion, the lower court ignored the opposite determinations made by each of the five federal Courts of Appeals that have considered this issue, as well as the stated position of the U.S. Consumer Financial Protection Bureau, the federal agency tasked with interpreting the FDCPA.

In sum, in multiple respects, the legal determinations reached by the court below are completely at odds with the accepted meanings of the relevant terms set forth in the FDCPA, the purpose of the statute itself, and the overwhelming weight of controlling authority.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §1292(a)(1) since

Plaintiffs appeal from a final decision dismissing and/or granting summary

judgment on all their claims. The Notice of Appeal was filed on November 2, 2012

in accordance with F.R.A.P. 4(a)(1).

## ISSUES PRESENTED

1.     Did the lower court correctly conclude that the purchase of water
       and sewer services by New York City residents is not a
       "transaction" within the meaning of the FDCPA?

2.     Did the lower court correctly conclude that 15 U.S.C. §1692F(1) OF
       the FDCPA does not apply to amounts collected from a consumer
       while foreclosure proceedings are pending?

## STANDARDS OF REVIEW

This Court's standard of review for appeals from both motions for summary

judgment is *de novo*. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.

2002).  A district court abuses its discretion "if it applies legal standards

incorrectly, relies on clearly erroneous findings of fact, or proceeds on the basis of

an erroneous view of the applicable law." Aurelius Capital Partners, LP v.

Republic of Argentina, 584 F.3d 120, 129 (2d Cir. 2009).

## STATEMENT OF FACTS

### A. THE PROVISION OF WATER AND SEWER SERVICES BY NEW YORK CITY

As do most municipalities, New York City provides water and sewer services to its residents within the boundaries of the City.  The City charges for this water and sewer use in one of two ways.  Homes with installed meters are charged an amount at several times throughout the year based upon the actual consumption of water in the home.   Homes without installed meters are charged a set fee based upon factors including the frontage of the home and the number of toilets, sinks and other water-using fixtures in the subject residence.  (Appendix (hereinafter "A_ ") 163, ¶¶6-7).

The New York City Administrative Code (hereinafter, the "Admin. Code") provides that water and sewer charges constitute a lien on the subject premises. (Admin. Code, §11-301). Water and sewer bills which remain unpaid for more than one year are deemed delinquent, and the subject residence may be foreclosed upon by the City.  (Admin. Code §§ 11-354, 11-404[a]).  In addition, the City may also sell unpaid water and sewer liens to third parties pursuant to a public sale. (Admin. Code §§11-319, 11-320).   Following such a sale, the buyers of the water and sewer liens are entitled to collect interest at the default rate of 18% per annum, along with a 5% surcharge, (Admin. Code §11-319), and may foreclose upon such liens if they continue to remain unpaid.  (Admin. Code §11-335).

5

## B. THE APPELLANTS' PURCHASE OF WATER AND SEWER SERVICES AND THE SALE OF THE RESULTING LIENS

### i. Appellant Joan Grant Boyd

Each of the Appellants owned homes which purchased water and sewer services from the City. Water and sewer services were supplied by the City to the home of Appellant Joan Grant Boyd ("Boyd") and her late husband at 1459 Carroll Street in Brooklyn. Water usage was measured by a meter, with the amount the Boyds paid based on the amount of water used.

In the late 1990s, Mr. Boyd became sick, and Appellant and her husband fell behind on their water and sewer payments. As of early 2001, the Boyds owed some $2,403.04 to the City for the provision of water and sewer services dating back several billing periods. (A482-86). The Boyds also separately owed some $8,000 in property taxes assessed upon the subject residence. (A488).

In 2001, the City combined the water and sewer and separate property tax liens filed against Boyd's property and offered them for sale to third parties. On June 1, 2001, the City sold the combined liens (hereinafter "the Boyd Lien") along with liens on hundreds of other properties to the Respondent NYCTL 1998-1 Trust (hereinafter "the 1998-1 Trust"). (A160, ¶8).

### ii. Appellant Randa Jones

Appellant Randa Jones ("Jones") lived with her extended family at 480 Quincy Street in Brooklyn in a home originally owned by her grandmother.

(A208-214)  Water and sewer services were provided by the City, with the cost measured by the amount of the home's street frontage, as well as the number of sinks and toilets located in the home.  (A163)

In the late 1990s, Jones' family fell behind on their payments for water and sewer services.  As of early 2001, Jones and her family owed some $10,678.89 in water and sewer charges dating back several years, and separately owed $4,210.17 in overdue property taxes on the home.  (A160, ¶7).

At some point thereafter, the City combined the property tax liens and the water and sewer liens on Jones' property, and offered the liens for sale.  On June 1, 2001, the City sold the combined liens on Jones' home (hereinafter "the Jones Lien") to the 1998-1 Trust.   (A160, ¶7).

### C. THE TRUSTS' ARRANGEMENT WITH JER REVENUE AND THE LAW FIRMS

To collect on the above-described liens, the 1998-1 Trust had a Servicing Agreement with Respondent JER Revenue Services, LLC (hereinafter "JER") under which JER obligated itself to collect upon the liens owned by the Trust.[1]

---

[1] Under the Servicing Agreement, JER expressly recognized that the water and sewer charges may be subject to the FDCPA:

> The Servicer acknowledges that the servicing of the water and sewer component of Tax Liens on certain residential Properties may require special procedures to assure that the actions of the Servicer in servicing such Liens do not violate the federal Fair Debt Collection Practices Act …" (A305).

7

(A285). To carry out that task, JER entered into form Retainer Agreements with law firms to represent the 1998-1 Trust in instituting foreclosure proceedings to recover the amounts owed on the liens. Among the law firms retained on behalf of the Trust were Buchanan Ingersoll, P.C. (hereinafter "Buchanan") and Konner, Teitelbaum & Gallagher (hereinafter "Konner"). (A350, A499).

### D. THE FORECLOSURE ACTIONS AGAINST APPELLANTS AND THE PAYMENT OF THE LIENS

#### i. Joan Boyd

In April 2002, the Konner firm commenced a foreclosure action against the Boyds on behalf of the 1998-1 Trust to recover the amounts owed on the Boyd Lien, as well as related costs, expenses and attorneys' fees. (A529). The complaint alleged that attorneys' fees and expenses were authorized by §11-335 of the Admin. Code, which states in relevant part that:

> A plaintiff in an action to foreclose a tax lien shall recover reasonable attorneys' fees for maintaining such action. Except as otherwise provided in this chapter, an action to foreclose a tax lien shall be regulated by the provisions of the civil practice law and rules and by all other provisions of law, and rules of practice applicable to actions to foreclose mortgages on real property. . .

(A378)

After the complaint was served, the Boyds contacted JER about paying off the lien. In May 2002, Respondents provided a Payoff Quote to the Boyds, which

8

indicated that $8,712.42 was due and owing on the lien, including $4,100.00 in "legal fees and costs." (A537).

In June 2002, the Boyds entered into a Forbearance Agreement providing for the payoff of the amount purportedly due and owing, including the related attorneys' fees and expenses. (A539). Thereafter, the Boyds made monthly payments to the 1998-1 Trust toward the amount allegedly owed.

In April 2003, an attorney representing the Boyds in the refinancing of their home requested a final Payoff Quote from Respondents. (A542). On April 17, 2003, the Boyds refinanced their home, using part of the proceeds to pay the $8,544.93 allegedly owed at the time to the 1998-1 Trust, which amount included some $1,700.00 in purported legal fees, and $1,219.50 in legal expenses. (A543, A546, A547).

After receiving the complete payoff of the lien, the 1998-1 Trust discontinued the foreclosure action brought against the Boyds' property. (A549). No defendant or its counsel had appeared in the Boyd action, and no court had rendered a foreclosure judgment or an Order awarding attorneys' fees or disbursements under the Administrative Code or the CPLR.

Four months after paying the entire amount demanded, the Respondents told the Boyds that they had been overcharged by $663.80, and refunded that amount without interest. (A558).

### ii. **Randa Jones**

In June 2002, the Buchanan firm commenced a foreclosure action on behalf of the 1998-1 Trust to recover the amounts purportedly owed on the Jones Lien (hereinafter "the Jones foreclosure"). (A372, 377).

Following service of the Complaint, an attorney representing Appellant Jones contacted JER to request a Payoff Quote of the amount necessary to fully satisfy the lien. (A282, line 183). In response, the 1998-1 Trust provided a Payoff Quote, which included $3,397.20 in purported legal fees, expenses, and costs. (A379, A381, A385). On November 5, 2002, Jones paid off the lien based on the amount demanded by Appellants in the Payoff Quote. (A380-381).

Following Jones' satisfaction of the Lien, the foreclosure action was discontinued. (A382-383). No defendant had appeared in the action, and there had been no judgment of Foreclosure, nor any Order awarding attorneys' fees, expenses, or other disbursements under the Administrative Code or the CPLR. (A383, ¶4)

### E.  **THE COMMENCEMENT OF THE ACTION BELOW**

In May 2005, Appellants and three other City residents who were charged various attorneys' fees and expenses to redeem liens against their homes commenced a prospective class action against the Respondents and several other Trusts. Appellants alleged that Respondents and the other Trusts had violated the

FDCPA by routinely demanding and collecting substantial attorneys' fees and expenses which were in excess of the amounts actually owed.

Appellants' claim that they had been charged improper attorneys' fees and expenses had two primary bases. First, Appellants alleged that the Trusts had no statutory right to collect any costs and disbursements under Admin. Code §11-335, or claim that such items were due and owing, until a judgment had been rendered and the costs and expenses had been awarded. Second, even if *arguendo* §11-335 gave Respondents that right, Appellants alleged that the Trusts routinely charged (i) for disbursements which were not among those allowed to be assessed by the New York Civil Practice Law and Rules (hereinafter "the CPLR"), and (ii) for attorneys' fees and expenses which were in excess of the amounts the law firms were allowed to charge under their Retainer Agreements with the Trusts.

### F. DISCOVERY UNCOVERS EVIDENCE OF RESPONDENTS' ASSESSMENT OF ILLEGAL FEES AND EXPENSES

After Respondents' motions to dismiss the FDCPA claims were denied, discovery commenced, providing evidence that a significant amount of the attorneys' fees, costs, and expenses collected from Appellants were palpably improper.

For instance, as demonstrated by the Buchanan firm's timesheets, the firm did only *6.60* hours of work on the Jones' foreclosure, entitling it to only *$1,062.00* in legal fees. (A472). Despite this, defendants charged Jones for *7.14* hours of

work, and *$1,350.00* in attorneys' fees.  (A472)   Indeed, even the $1,062.00

amount was grossly inflated, since the Buchanan attorneys and paralegals billed

their services at rates far above the hourly rate they were permitted to charge under

their Retainer Agreement.  For instance, Buchanan's timesheets in the action

indicated that its lawyers were billing at $240.00 per hour, (A471-72), even though

the Retainer Agreement only allowed them to bill at a rate of $185.00 per hour.

(A365)  .Similarly, Buchanan paralegals were billing at $140.00 per hour (A471-

72), while the Retainer Agreement only allowed them to charge for their services

at $80.00 per hour.  (A365).

The amount of fees, costs, and expenses charged to Jones could not be

explained based upon the "fixed fee" arrangement between Respondents and

Buchanan in the Retainer Agreement.  In the Jones foreclosure, Jones was charged

$650.00 for the Trust's attorneys purportedly obtaining an Order of Publication in

the foreclosure action.  (A469, A410).  While the Retainer Agreement permitted

Buchanan to charge $650.00 if it received an Order of Publication (A355, A365),

Respondents never received any such Order from the court, and court records

demonstrate that no such motion for publication was ever filed.  (A470).[2]

---

[2] Under CPLR § 8301(3), the recovery of "legal fees for publication" requires not only that a motion for publication be filed, but also that the "publication is directed pursuant to law."  CPLR § 8301(3).

Similarly, the $1,752.20 in expenses collected from Appellant Jones also included blatant overcharges.  For instance, despite the fact that the Buchanan Retainer Agreement limited copying costs to ten cents per page (A357), Respondents collected twenty cents per page from Jones for each photocopy made by the firm. (A473, at 5/21/2002 and 5/22/2002, )[3]  Similarly, Respondents had no explanation as to why Ms. Jones was charged twice for service of process, an expense totaling $1,010.00 (A479; A445, A447-48), or $525.00 for title fees, when the Retainer Agreement limited such title fees to $500.00.  (A351, A385.)

In the Boyd foreclosure, defendants collected $1,112.50 in legal fees (A550), which included $255.00 for future services purportedly associated with the time needed to "Prepare, send and file notice of discontinuance."  (A553). However, when the underlying invoice was produced in discovery, it stated that the attorney who purportedly prepared the Notice of Discontinuance spent "0.00" hours completing the task.   (A553).   The Boyds were also charged for purported expenses described only as "miscellaneous."  (A551)

---

[3] Defendants also overcharged Tanya Warters – another plaintiff in the underlying action – for $409.20 in copy charges based on a charge of 20 cents per page, when the Buchanan Retainer Agreement only permitted 10 cents per page.  Plaintiff Sybil Taylor was also improperly charged $82.20 in copy charges, based on a cost of 20 cents per page.  (A263-64, ¶107; A357; A270, ¶131, A732).

### G. THE MAGISTRATE JUDGE'S REPORT & RECOMMENDATION ON RESPONDENTS' MOTION FOR SUMMARY JUDGMENT

In November 2011, Respondents moved for summary judgment against Appellants' FDCPA and state law claims.

On August 27, 2012, Magistrate Judge Ramon Reyes filed a Report and Recommendation ("R&R"), recommending that each of plaintiffs' federal and state causes of action against defendants be dismissed, with the exception of their unjust enrichment claim. Significantly, the R&R found that there was evidence from which the trier of fact could conclude that Respondents demanded and collected various legal fees, costs, and expenses from each of the Appellants which were prohibited. As the R&R detailed:

> Specifically, a reasonable trier of fact could conclude that Plaintiffs paid monies to the outside counsel – through JER – *to which outside counsel were not entitled.* . . .
>
> Plaintiffs additionally claim that the billing record as to the Jones foreclosure action contains an internal inconsistency, as counsel logged 6.60 hours work but billed Defendants $1350, which is the equivalent of 7.14 hours. (Compare *id.*, Ex. U (Jones Billing Record), at JER2 07035 *with* Ex. O (Jones Recoverable Legal Costs). . . . Plaintiffs claim that Defendants collected from Boyd a $255 legal fee for "Judgment Granted," (*see id.,* Ex. PP (Boyd Itemized Costs)), whereas the corresponding docket sheet does not indicate that judgment was entered (*id.,* Ex. NN). While an invoice from outside counsel reflects a $255 charge to 'prepare, send and file notice file notice of discontinuance,' (*id.*, Ex. QQ, at JER2 15319), the record provides no evidence of the hours spent in

14

preparation of the same.  In light of such evidence, ***a reasonable trier of fact could infer that Plaintiffs paid expenses for services that did not in fact occur.***

(SPA33-34 (emphasis added).[4]  Moreover, the R&R also acknowledged that the record contained evidence indicating that Respondents had charged Appellants at hourly legal billing rates which were in excess of the amounts Respondents themselves were allowed to be charged under their Retainer Agreements with the law firms involved in the foreclosures, as well as rates for copying and other charges which were also more than Respondents were allowed to be charged. (SPA24).

Despite the Magistrate Judge's express finding that the trier of fact could conclude that Respondents collected attorneys' fees, costs, and expenses from plaintiffs "to which outside counsel were not entitled" (SPA33), the R&R recommended dismissal of the Appellants' FDCPA claims.  According to the R&R, Appellants' FDCPA claims were precluded because: (i) the legal fees and expenses at issue were paid pursuant to purported "settlement agreements" between Appellants and Respondents which prevented Appellants from challenging the legality of the fees and expenses (SPA19-21); (ii) the legal fees,

---

[4] See also SPA35 ("Plaintiffs paid monies to JER with the understanding that those fees and costs were in fact borne by Defendants.  To the contrary, Plaintiffs cite to evidence in the record from which a reasonable fact finder could conclude that Defendants collected expenses that had not in fact been incurred by outside counsel."); SPA36 ("a reasonable trier of fact could conclude that Plaintiffs did not have full knowledge of the fact that a portion of the monies Defendants collected from them consisted of costs billed by outside counsel for services not in fact performed").

costs, and expenses collected from plaintiffs were, in any event, "permitted by law" under §1692f(1) of the FDCPA because the Admin. Code and the CPLR generally permit the recovery of attorneys' fees and costs; and (iii) "proof of expenses charged in violation of [Respondents'] retainer agreements [with law firms]. . . is not evidence of improper billing as to plaintiffs" because they were not parties to the Retainer Agreement.[5] (SPA26).

## H. **THE DISTRICT COURT DECISION AT ISSUE**

Appellants filed objections to the R&R's recommendation that the FDCPA claims be dismissed. Among other things, Appellants argued that the R&R's conclusion that the legal fees, costs, and expenses collected from Appellants were "permitted by law" could not be reconciled with the R&R's separate finding that "a reasonable trier of fact could infer" that Appellants "paid expenses for services that did not in fact occur."[6]

---

[5] While not at issue on this appeal, the R&R was plainly in error in finding that Respondents could collect more legal fees and expenses from Appellants under a statutory fee-shifting provision than they were required to pay under their Retainer Agreements with law firms. It is black-letter law that fees and costs "that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." Hensley v. Eckerhart, 103 S. Ct. 1933, 1940 (1983) (emphasis in original); In re Rahmey, 466 N.Y.S.2d 350, 356 (2nd Dep't 1983) (same); see also In Time Products, Ltd. v. Toy Biz, Inc., 38 F.3d 660, 668 (2d Cir. 1994) ("A party is not entitled to reimbursement for fees that it would not have agreed to pay if it [sic] there had been no contractual provision for reimbursement.")

[6] Appellants also demonstrated that no "settlement agreements" of any kind were executed terminating the state foreclosure actions. Rather, as the Respondents were required to do once the lien amounts were paid off by Appellants, the foreclosure actions were dismissed by defendants through a Notice of Discontinuance. (A382, A549)

On October 3, 2012, the district court adopted the R&R's conclusion that the Appellants' FDCPA claims should be dismissed, but on different grounds. Though recognizing the Third Circuit's finding that water and sewer charges are subject to the FDCPA in both <u>Pollice</u> and <u>Piper</u>, the lower court offered two broad legal holdings to support its conclusion that New York City water and sewer charges are outside the confines of the FDCPA.

**1. The Lower Court Rules that There Was No "Debt" Under the FDCPA Because the Water and Sewer Services By Appellants Were Not <u>Negotiated</u>**

First, the court determined that -- to qualify as a "debt" subject to the FDCPA – it is not enough that the obligation arose from the purchase of goods for household purposes; rather, the purchase must also arise from "a consensual transaction, where parties 'negotiate or contract' for consumer services or goods." (SPA103). According to the lower court, since New York City residents are required to obtain water and sewer services from the City, the amounts owed are "more analogous to compulsory taxes" (SPA100) than to "debts" subject to the FDCPA:

> Jones and Boyd did not negotiate or enter into any contract or agreement with the City with respect to the utility charges. Nor could they. Instead, the properties owned by Jones and Boyd were required by the New York City Administrative Code to be connected to City water and sewage mains and be supplied with water at rates provided by the City. <u>See</u> N.Y.C. Admin. Code § 27-

17

> 2024.  The payment by property owners of the water and
> sewer charges associated with that mandatory connection
> did not arise from a consensual consumer transaction or
> any other type of business dealing, as required to invoke
> the FDCPA.

(SPA105-06).

Moreover, although the court below recognized that payments for water and

sewer services on Appellant Boyd's home were based on usage measured by

meter, it found that the purchase was still not an FDCPA "transaction":

> Plaintiffs cite no authority holding that metered water or
> sewer charges are per se debts under the FDCPA. The
> City's method of calculating the water and sewer rates
> and obligations imposed upon the Boyd Property does
> not transform the City's mandatory charges into
> consensual transactions based on negotiations or business
> dealings. Significantly, there is no evidence in the record
> that Boyd even requested water and sewer services from
> the City after such a negotiation or business dealing or
> any form of exchange with the City.

(SPA108-09).

The lower court distinguished the Third Circuit's decision in <u>Pollice</u> by

stating that Pittsburgh residents purportedly made a "voluntary request" to connect

to the city's water and sewer services, whereas New York City residents "are

required by law to do so."  (SPA111).   Moreover – relying on certain information

the court purportedly obtained off of a webpage for the Pennsylvania American

Water Company on October 2, 2012 -- the lower court found that "private

companies [in Pittsburgh] also serve the water and sewage needs of property

18

owners and serve as an alternative to municipal public utilities":

> Plaintiffs have not demonstrated that the administrative regime for water and sewer services in the City of Pittsburgh is in any way similar to the administrative regime in the City of New York. Thus, <u>Pollice</u> is inapplicable here because New York City leaves no room for a voluntary or consensual transaction between parties regarding the provision of water and sewer services.

(SPA112-113, SPA113, n.16))[7]

Curiously, after broadly holding that New York City water and sewer

charges are not debts protected by the FDCPA because they are "mandatory", the

lower court noted the "limited nature" of its "narrow holding":

> In sum, the court holds that the Jones and Boyd Tax Liens are not debts within the meaning of the FDCPA. In doing so, the court notes the limited nature of this narrow holding. Specifically, a New York City tax lien that consists of delinquent mandatory utility charges and property taxes does not constitute a debt within the meaning of the FDCPA.

(SPA115).

---

[7] The court raised several other unorthodox statutory construction arguments *sua sponte* in its attempt to equate water purchases with tax payments. For instance, citing to information the court obtained from the New York City Department of Environmental Protection webpage titled "About DEP Water Rates", the lower court found that since water payments made by City homeowners help to pay for general water and sewer infrastructure, "the water and sewer obligations, like taxes, are imposed upon New York City property owners to fund a public service", and thus "the relationship between the City and Plaintiffs here resembles more the relationship between taxpayer and taxing authority than it does the consensual, transactional "pro tanto exchange" between parties envisaged by the statutory definition of debt." (SPA107). Moreover, citing to text in §1045-j(5) of the New York Public Authority Law that allows liens for unpaid water charges to be foreclosed "in the same manner as a lien for [] taxes", the Court found that "this ordinance confirms that water and sewer charges are to be treated in the same manner as taxes, further supporting the court's determination that water and sewer charges at issue in this action are more analogous to property taxes than to consumer debts." (SPA108). Indeed, the Court found that, since plaintiffs cited to §1045-j(5) in opposition to the summary judgment motion, plaintiffs were "acknowledging that the utility charges secured under the Tax Liens are not debts." (SPA108, n. 14)

**2. The Lower Court Rules that Illegal Amounts Collected by a Debt Collector While a Foreclosure Is Pending Are Not Subject to the FDCPA**

The district court also found that the attorneys' fees, costs, and expenses collected from Jones and Boyd are not subject to the FDCPA because actions taken during a foreclosure proceeding – even if they involve collecting amounts which are not actually owed – are "not debt collection activities actionable under §§1692e and 1692f" of the FDCPA. (SPA116). To support this conclusion, the Court stated that:

> The majority of federal courts have clarified that, unless a monetary judgment is sought against the debtor, the enforcement of a security interest through the foreclosure process is not debt collection for purposes of the [FDCPA].

(SPA118, quoting Warren v. Countrywide Home Loans, Inc. 342 F. App'x 458, 460 (11th Cir. 2009) (unpublished)).

## I. **THE MOTION FOR RECONSIDERATION**

On October 17, 2013, Appellants filed a motion for reconsideration of the Court's decision to grant summary judgment concerning the FDCPA claims, citing precedent from both federal and state courts and various regulatory agencies indicating that the lower court's opinion was contrary to the overwhelming weight of legal authority. On September 27, 2013, the Court denied the motion for reconsideration. (SPA19)

20

**ARGUMENT**

**POINT I**

**THE COURT COMMITTED ERROR IN CONCLUDING THAT CHARGES FOR NEW YORK CITY WATER AND SEWER CHARGES ARE NOT 'DEBTS' SUBJECT TO THE FDCPA**

As its first basis for granting summary judgment to the Defendants-Respondents, the lower court found that New York City water and sewer charges are not "debts" under §1692a(5) of the FDCPA because they do "not arise from consensual, negotiated transactions", but rather "are mandatorily imposed as an incident to real property ownership in New York City and are therefore more analogous to compulsory taxes."  (SPA100).   According to the lower court, because New York City residents like Appellants do "not negotiate or enter into any contract or agreement with the City with respect to the utility charges" (SPA105), the elements required for a purchase of goods to constitute a "transaction" subject to the FDCPA are lacking.   Therefore, even if Respondents improperly charged the Appellants for legal fees and expenses, the lower court held, the FDCPA does not apply.

As shown below, the lower court's insistence that the statutory term "transaction" requires "negotiations" or a formal "contract or agreement", in addition to a purchase of goods or services, is completely at odds with the plain meaning of that term and how that term has been interpreted by the courts.

21

### A. The Court's Interpretation of "Transaction" Is At Odds With Its Ordinary Meaning

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Gross v. FBL Fin. Servs. Inc., 557 U.S. 167, 175 (2009). Moreover, "[b]ecause the FDCPA is 'remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated." Vincent v. Money Store, Inc., 2013 U.S. App. Lexis 22880, *25 (2d Cir. 2013) (quoting N.C. Freed v. Bd. Of Governors of Fed. Reserve Sys., 473 F.2d 1210, 1214 (2d Cir. 1973)).

Section 1692a(5) of the FDCPA defines the term "debt" as

> any obligation or alleged obligation of a consumer to pay money *arising out of a transaction* in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family or household purposes.

15 U.S.C. §1692a(5) (emphasis added). Since §1692a(5) of the FDCPA does not define the word "transaction", a court is required to give the term its "ordinary meaning." U.S. v. Desposito, 2013 U.S. App. Lexis 881, *11 (2d Cir. 2013) ("we begin with the plain language, giving all undefined terms their ordinary meaning").

Courts have recognized that the use of the word "transaction" in a statute "ha[s] a broad meaning." Schindler Elevator Corp. v. U.S., 131 S. Ct. 1885, 1891 (2011) ("Congress covered not only the disclosure of 'allegations' [in the statute at

22

issue] but also 'transactions,' a term that courts have recognized as having a broad

meaning"); Moore v. New York Cotton Exchange, 270 U.S. 593, 610 (1926)

("'Transaction' is a word of flexible meaning" which "may comprehend a series of

many occurrences, depending not so much upon the immediateness of their

connection as upon their logical relationship").

According to Black's Law Dictionary, "transaction" is defined as follows:

> [T]he act of transacting or conducting any business; . . .
> .It may involve selling, leasing, borrowing, mortgaging,
> or lending.  Something which has taken place whereby a
> cause of action has arisen. It must therefore consist of an
> act or agreement, or several acts or agreements having
> some connection with each other, in which more than one
> person is concerned, and by which the legal relations of
> such person between themselves are altered. ***It is a
> broader term than "contract."***

Black's Law Dictionary 1496 (6th Ed. 1990) (emphasis added).  Similarly,

Webster's Third New International Dictionary (hereinafter "Webster's Dictionary")

defines "transaction" as:

> an act, process, or instance of transacting; a
> communicative action or activity involving two parties or
> two things reciprocally affecting or influencing each
> other.

As these definitions demonstrate, the ordinary meaning of the term

"transaction" encompasses far more than the type of formal exchange resulting

from a "contract" or "negotiations" which the district court found necessary to

constitute a "transaction" subject to the FDCPA.   In this case -- irrespective of

23

whether Appellants were statutorily required to purchase water and sewer services from the City -- the provision of water and sewer services in exchange for payment clearly constitutes "an act . . . by which the legal relations of such person[s] between themselves are altered", as well as "an act, process or instance of transacting", and also "a communicative action or activity involving two parties … reciprocally affecting or influencing each other."

Moreover, courts have routinely utilized these dictionary definitions in interpreting the word "transaction" when used in a federal statute or regulation, rejecting attempts to place limitations or qualifications on the term.  For instance, in U.S. v. Maneri, 353 F.3d 165 (2d Cir. 2003), the defendant pled guilty to transporting child pornography, and was given an enhanced sentence based on a U.S. Sentencing Guideline (hereinafter "the Sentencing Guideline"), which allowed additional prison time if the defendant distributed such pornography in exchange for "the receipt . . . of a thing of value."  Maneri, 353 F.3d at 167-8 (quoting U.S.S.G.§2G2.2(b)(2)(B)).  The Sentencing Guideline defined the phrase "distribution for the receipt … of a thing of value" as "any transaction, including bartering or other in-kind transaction…"  Id. at 169.

In Maneri, the defendant sent electronic files containing child porn to a detective posing as a 13-year-old girl with the screen name "nygrl12" after defendant had met her in an internet chat room, and this 'transaction' formed the

24

basis for the principal charge, as well as the finding of enhancement under the

Sentencing Guideline.  On appeal, defendant argued that it was error to enhance his

sentence, because in using the term "transaction", the Sentencing Guideline

required "a specific agreement or understanding between the distributor and the

recipient of child pornography" which was not present.  Id.[8]  In support of his

argument, defendant cited to the definition of "transaction" in Webster's

Dictionary provided above.  (See supra at 20).

However, the Second Circuit rejected the argument that the word

"transaction" required an exchange pursuant to an agreement or understanding

between the parties:

> [A] "transaction" does not necessarily include a specific
> agreement . . . .  Instead, it includes a "communicative
> activity ... involving two parties... reciprocally affecting or
> influencing each other." [Webster's Third New
> International Dictionary]  Maneri's distributions of child
> pornography to "nygrl12" fall within this definition.

353 F.3d at 169 (emphasis added)

Similarly, in Karpova v. Snow, 402 F. Supp.2d 459 (S.D.N.Y. 2005), aff'd,

497 F.3d 262 (2d Cir. 2007), the Court also relied on the same broad dictionary

definitions of "transaction" to interpret the meaning of a federal regulation which

prohibited "transactions" related to travel to Iraq:

---

[8] Though defendant and the detective had discussed meeting to engage in sexual relations, the detective had never requested that defendant send her the electronic files containing child porn or conditioned her willingness to engage in sex with defendant upon such receipt.  See id. at 167.

> The regulations do not define the term "transaction." However, Black's Law Dictionary defines "transaction" as: 'the act or an instance of conducting business or other dealing', 'something performed or carried out; a business arrangement or exchange,' or 'any activity involving two or more persons.' The Merriam Webster Online Dictionary defines 'transaction' in part as: "a communicative action or activity involving two parties or things that reciprocally affect or influence each other." Plaintiff's solicitation of funds was certainly a "communicative action or activity" "involving two or more persons", and thus clearly qualifies as a 'transaction.'

Karpova, 402 F. Supp.2d at 468 n.1. On appeal, this Court affirmed, finding that defendant's solicitation of funds for her travel to Iraq constitutes a "transaction" prohibited by the statute. Karpova v. Snow, 497 F.3d at 268-69.[9] See also Sharfarz v. Goguen, 691 F.3d 62, 69 (1st Cir. 2012) (relying on Black's Law Dictionary's definition to conclude that the word "transaction" "includes not only an 'agreement' . . . but also 'an act' or "several acts or agreements between or among parties whereby a cause of action or alteration of legal rights occur.'").

    In sum, each Appellant's purchase of water and sewer services from the City for their homes clearly constitutes a "transaction" based upon the ordinary meaning of the term. U.S. v. Gayle, 2003 U.S. App. LEXIS 26673, at *8 (2d Cir. 2003)

---

[9] In the motion for reconsideration, the court below dismissed the interpretation of "transaction" in Karpova as "provid[ing] scant guidance in the FDCPA context,." (SPA49, n.2)

26

(statutory interpretation "begins with the plain text, and if that text is unambiguous, it usually ends there as well").

### B. The Lower Court's Interpretation of "Transaction" Conflicts with the <u>Interpretation by Authorities Construing the FDCPA</u>

The lower court's determination that a payment obligation arising from the purchase of goods is not a "transaction" if the consumer "did not negotiate or enter into any contract or agreement" is also completely contrary to how that term has been interpreted by courts entertaining claims under the FDCPA.

Appellate courts construing §1692a(5) of the FDCPA have found that the "definition of 'debt' is plain", and is not burdened by "vocabulary that escapes common understanding":

> [T]he plain language of the [FDCPA] defines "debt" quite broadly as "any obligation to pay arising out of a [consumer] transaction." In examining this definition, we first focus on the clear and absolute language in the phrase, "any obligation to pay." Such absolute language may not be alternatively read to reference only a limited set of obligations . . . . As long as the transaction creates an obligation to pay, a debt is created.

<u>Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.</u>, 111 F.3d 1322, 1325 (7th Cir. 1997); <u>Hawthorne v. Mac Adjustment, Inc</u>., 140 F.3d 1367, 1371 (11th Cir. 1998) (same).[10]

---

[10] There is no exception for debts owed to a government entity and "obligations owed to the government may constitute 'debts' for purposes of the FDCPA." <u>Berman v. GC Services Ltd. Partnership</u>, 146 F.3d 482, 487 (7th Cir. 1998)  As the Seventh Circuit has said, a "debt" is subject to the FDCPA where

Interpreting the specific term "transaction" in §1692a(5), courts have routinely utilized the dictionary definitions of the term in finding that "the ordinary meaning of the term 'transaction' is a broad reference to many different types of business dealings between parties." Hamilton v. United Healthcare of La., Inc., 310 F. 3d 385, 391 (5th Cir. 2002); Bass v. Stolper Koritzinsky Brewster & Neider, 111 F.3d 1322, 1325 (7th Cir. 1997) (citing Webster's Dictionary, the court finds that the word "transaction" in FDCPA "is a broad reference to many different types of business dealings between parties"); Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1371 (11th Cir. 1998) (citing Webster's Dictionary, the court finds that "the ordinary meaning of 'transaction' necessarily implies some type of business dealing between parties"); Turner v. Cook, 362 F.3d 1219, 1227 (9th Cir. 2004) ("the ordinary meaning of 'transaction' necessarily implies some type of business dealing between parties.").

In Beggs v. Rossi, 145 F.3d 511 (2d Cir. 1998), this Court adopted the interpretation of "transaction" used by the Third Circuit in Staub v. Harris to determine which "debts" fall within the purview of §1692a(5), finding that "at a minimum, the statute contemplates that the debt has arisen as a result of the rendition of a service or purchase of property or other item of value."  Id. at 512

---

consumers receive "property or services primarily for personal, family or household purposes from the government in exchange for their payments." Berman, 146 F.3d at 487.

(quoting <u>Staub</u>, 626 F.2d 275, 278 (3rd Cir. 1980)).  Nowhere in the Second

Circuit's decision in <u>Beggs</u> is there any discussion of whether the purchase of

goods was "contracted for", "negotiated", "mandatorily imposed", "voluntary" or

any of the other qualifications which the lower court found must be present before

an exchange could be a "transaction" subject to the FDCPA.   As this Court

determined in <u>Beggs</u>, in the context of taxes being assessed upon car ownership,

there is no "rendition of a service" or "purchase" of an "item of value" by the

taxpayer.   <u>Beggs</u>, 145 F.3d at 512.   In contrast, when an entity provides water and

sewer services to homeowners like Jones and Boyd, there clearly is such a

transaction – i.e., the purchase of water and sewer services for a person's home.

Apart from the decision at issue, *every* decision in this Circuit applying

<u>Beggs</u> has found that – for the FDCPA to apply -- <u>Beggs</u> simply requires "the

rendition of a service or purchase of property or other item of value" for personal,

family, or household purposes.   <u>See</u>, e.g., <u>Patisso v. Law Offices of Baldinger</u>,

2011 U.S. Dist. Lexis 123140, *6-7 (E.D.N.Y. 2011) (quoting <u>Beggs</u>, 145 F.3d at

512); <u>Shmerkovich v. RMC Consulting Group LLC</u>, 2011 U.S. Dist. Lexis 30615,

*9-10 (E.D.N.Y. 2011) (same); <u>Ehlrich v. Rapid Recovery Solutions, Inc</u>., 680

F.Supp.2d 443, 445 (E.D.N.Y. 2010) (same); <u>Beal v. Himmel & Bernstein, LLP</u>,

615 F.Supp.2d 214, 216 (S.D.N.Y. 2009).   In the instant appeal, however, the

district court failed to even refer to this critical portion of the <u>Beggs</u> decision, and

instead characterized the Court's holding as follows: "under <u>Beggs</u>, an obligation levied upon a citizen as an incident to property ownership does not arise from a 'transaction' and thus does not qualify as a debt under the FDCPA." (SPA103). Appellants respectfully submit that this description of Beggs by the lower court completely misconstrues this Court's holding.

In <u>Beggs</u>, the issue was whether personal property taxes levied by a town on the owner of a car constituted a "debt" within the meaning of the FDCPA. Relying upon the Third Circuit's decision in <u>Staub</u>, the district court found that the automobile taxes were not "debts" subject to the FDCPA. <u>Beggs</u>, 994 F.Supp. 114, 117 (D. Ct. 1997). On appeal, the Second Circuit affirmed by means of a brief, one-page opinion:

> In determining that the personal property taxes at issue are not 'debts' within the meaning of the FDCPA, the District Court principally relied upon the decision of the Court of Appeals for the Third Circuit in <u>Staub v. Harris</u>, 626 F.2d 275 (3rd Cir. 1980). In <u>Staub</u>, the Third Circuit held that 'at a minimum, the statute contemplates that the debt has arisen as a result of the rendition of a service or purchase of property or other item of value. The relationship between taxpayer and taxing authority does not encompass that type of *pro tanto* exchange which the statutory definition envisages." Id. at 278. We agree with the district court that ***<u>Staub</u> is persuasive authority and is dispositive in this case.***

<u>Beggs</u>, 145 F.3d at 512 (quoting <u>Staub</u>, 626 F.2d at 278 (emphasis added)). Only *after* reaching the above-holding did the <u>Beggs</u> Court then address "plaintiffs'

attempt to distinguish <u>Staub</u>" by arguing that the car tax at issue was more like a

"transaction-based tax" than the property tax involved in <u>Staub</u>:

> Plaintiffs attempt to distinguish <u>Staub</u> on the ground that,
> unlike the 'per capita tax' at issue in that case, the
> personal property tax at issue here is an excise tax,
> quintessentially a transaction-based tax, such as stamp
> taxes, stock transfer taxes, alcohol or tobacco taxes."
> However as the district court observed, the tax is not
> levied upon the purchase or registration of the vehicle per
> se, but rather upon the ownership of the vehicle by the
> citizen . . . There is simply no 'transaction' here of the
> kind contemplated by the statute..

<u>Beggs</u>, 145 F.3d at 512.

Nothing in <u>Beggs</u> even remotely supports the alternative holding the district

court ascribes to that decision – that "[u]nder <u>Beggs</u>, an obligation levied upon a

citizen as an incident to property ownership does not arise from a transaction."

(Order at 30).[11]  Rather, <u>Beggs</u> held that an automobile tax obligation is not a

covered FDCPA "transaction" because it does not arise from "the rendition of a

---

[11] In fact, both the district court and the Second Circuit in <u>Beggs</u> indicated that a tax imposed on the
*purchase* (as opposed to ownership) of goods *would* be a 'transaction' within the meaning of the FDCPA.
As the District Court found in rejecting plaintiff's argument that the car tax "arises from the purchase of a
family car and is thus transaction-based:":

> A personal property tax is not a tax on a transaction; it is a tax on
> ownership.  A person can acquire ownership of a car by a gift or
> inheritance or even by building it himself.  How ownership is acquired is
> irrelevant to the assessment of the tax and therefore the tax cannot
> reasonably be said to arise out of the purchase of the car. . . Without any
> relation to a consumer transaction, there is no basis for distinguishing
> personal property taxes from the per capita taxes which were at issue in
> <u>Staub</u>.

994 F. Supp. at 117.

service or purchase of property or other item of value." Beggs, 145 F.3d at 512.

Where, as here, there is a "purchase" of a good or service, nothing in Beggs

indicates that the FDCPA is inapplicable merely because the obligation to buy the

goods or services arose "as an incident to property ownership."

In fact, such a rule would run directly contrary to the many cases applying

the FDCPA to monthly common charges assessed to condominium owners.

Despite the fact that common charges are mandatorily imposed "as an incident of

property ownership", the overwhelming weight of legal authority – including all

three federal Courts of Appeals to have considered this issue – have squarely held

that they are "debts" subject to the FDCPA. As the Sixth Circuit recently said in

Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC, 698 F.3d 290 (6th Cir.

2012):

> [Plaintiff] correctly asserts that his obligation to pay past-
> due assessments qualifies as a 'debt' because the
> obligation arose from his original purchase transaction of
> the underlying property. . . By paying the purchase price
> and accepting title to his home, [plaintiff] became
> obligated to pay any assessments pursuant to the
> condominium deed and the by-laws of the association, as
> well as under a Michigan statute addressed to
> condominium property.

Haddad, 698 F.3d at 294 (emphasis added). The Seventh Circuit reached the same

conclusion in Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d 477, 481-82

(7th Cir. 1997), as did the Tenth Circuit in Ladick v. Van Gemert, 146 F.3d 1205,

1206 (10th Cir. 1998).[12]  The lower court's initial Order did not even refer to, much less distinguish, these cases.[13]

In any event, even if the <u>Beggs</u> decision had established a rule holding that obligations levied "as an incident to property ownership" were outside the confines of the FDCPA, that would not describe the water and sewer obligations at issue here.  Unlike the taxes at issue in <u>Beggs</u>, New York City water and sewer charges are "not levied upon the purchase of the [home] per se", or even assessed "upon the ownership of the [home] by the citizen."  <u>Beggs</u>, 145 F.3d at 512.  Rather, pursuant to statute, the water and sewer charges are "levied" in each year *following ownership*, and are based either on actual metered water use in that year, or based on a formula projecting water use based in part on the number of water-using fixtures.  (Admin Code, §§11-312, 11-313. <u>See</u> A163 ¶¶ 6-9).

---

[12] See also <u>Ferrell v. Community Mgmt. Services, LLC</u>, 2011 U.S. Dist. Lexis 48818, *5-6 (D. Del. 2011) (rejecting argument that homeowner dues are analogous to taxes because the obligation arises from owning property in a particular place or neighborhood, court finds that such charges are "debts" subject to FDCPA); <u>Abby v. Windy Pointe Homeowners Ass.</u>, 2011 U.S. Dist. Lexis 36175 (S.D. Fla. 2011) (same); <u>Owen v. Hellmuth & Johnson, PLLC</u>, 550 F.Supp2d 1060, 1066 (D. Minn. 2008) (same); <u>Caron v. Maxwell</u>, 48 F.Supp.2d 932 (D. Ariz. 1999) (same); <u>Taylor v. Mount Oak Homeowners Ass., Inc</u>., 11 F.Supp.2d 753, 755 (D. Md. 1998) (same); <u>Thies v. Law Offices of Wyman</u>, 969 F. Supp. 604, 607-08 (S.D. Cal. 1997) (same)

[13] In denying the motion for reconsideration, the lower court attempted to distinguish these cases by arguing that condominium assessments "are the result of consensual or negotiated agreements between the property owners and the condominium/homeowners associations of which the owners were members."  (SPA54)  This is simply untrue: the purchaser buys a unit from an existing condo owner, not the homeowners association, and has no right to negotiate (or even consent to) assessments.  <u>See</u> <u>Newman</u>, 119 F.3d at 481. ("By paying the purchase price and accepting title to their home, [the debtor] became bound by the Declaration  of Covenants… of their homeowners association which required the payment of regular and special assessments imposed by the association.")

Of the five other courts to consider the issue, each has determined that a homeowner's purchase of water and sewer services is a "transaction" subject to the FDCPA. In Pollice, 225 F.3d 379 (3rd Cir. 2000), for instance, several Pittsburgh homeowners sued the purchaser of liens for delinquent property taxes and water and sewer charges bought from the City of Pittsburgh, alleging that the defendants improperly collected interest and penalties from plaintiffs which violated the FDCPA.

Just as the Respondents contend herein, the defendants in Pollice argued that the water and sewer obligations did not constitute "debts" under §1692a(5) of the FDCPA. The Third Circuit flatly rejected this argument:

> we conclude that homeowners' water and sewer obligations meet the definition of "debt" . . . At the time these obligations first arose, homeowners ('consumers' of water and sewer services) had an "obligation…to pay money" to the government entities which arose out of a "transaction" (requesting water and sewer service) the subject of which was 'services… primarily for personal, family or household purposes.'

Pollice, 225 F.3d at 400[14]; see also Piper v. Portnoff Law Ass., 396 F.3d 227, 232 & n.8 (3rd Cir. 2005) (water and sewer charges levied by the City of Bethlehem, Pa. are debts subject to the FDCPA);  Clay v. Mechionne, 2000 WL 1838368 (D. Conn. 2000) ("a water usage fee owed to a municipality constitutes a "debt" within

---

[14] In contrast, the appellate court in Pollice held that the property tax portions of the tax liens did not constitute "debts" subject to the FDCPA because they did not involve any exchange of money for individual goods or services to the taxpayer.  225 F.3d at 401-03.

the FDCPA"); <u>Allen v. BRT Utility Corp.</u>, 1996 U.S. Dist. Lexis 22441 (D.Conn. 1996) (overdue water bill owed to private utility constitutes a debt subject to FDCPA); <u>Keauhou Master Homeowners Ass. v. County of Hawaii</u>, 87 P.3d 883 (Haw. Sup. Ct. 2004) (same).

In sum, under well-settled FDCPA analysis (including this Court's decision in <u>Beggs</u>), if a payment obligation "has arisen as a result of the rendition of a service or purchase of property or other item of value," there is a "transaction" subject to the FDCPA. <u>Beggs</u>, 145 F.3d at 512. The purchase of water by Appellants and other New York City residents for daily use in their homes clearly constitutes the "purchase" of an "item of value", and the hookup of sewers to individual homes also constitutes "the rendition of a service." That is all that is required to be a "transaction" within the meaning the FDCPA.

By contending that the consumer purchase must also be formally negotiated or contracted for to come within the protection of the FDCPA, the decision below ignores the plain meaning of the words used by Congress, the construction of those words by various federal courts interpreting the FDCPA, and the requirement that the FDCPA be "construed in liberal fashion" by Courts to effectuate the "underlying Congressional purpose" behind the law. <u>Vincent</u>, 2013 U.S. App. LEXIS 22880, *25.

Furthermore, the lower court's ruling imposes a completely arbitrary distinction between purchasers of identical goods and services depending on where they live.  The lower court does not even attempt to explain why Congress would want consumers of water and sewer services in Pittsburgh and Bethlehem, but not New York, to be protected by the FDCPA, or how that conclusion could be "consistent with the statute's broadly worded prohibitions on debt collector misconduct."  Jerman v. Carlisle, 559 U.S. 573, 602 (2010) (emphasis added).

In any event, even if there were some legitimate rationale supporting the lower court's limitation on the "transactions" subject to the coverage of the FDCPA, that still would not support the lower court's determination in this case. It is well-settled that a court is "without authority, absent substantial evidence to the contrary, to add terms or provisions [to statutes] where Congress has omitted them."  Cervantes-Ascencio v. INS, 326 F.3d 83, 86 (2d Cir. 2003).  In Bass, 111 F.3d at 1326, the Seventh Circuit expressly rejected the argument that the term "transaction" can be further restricted by qualifying language not found in the statute:

> Had Congress wanted to limit the meaning of the term 'transaction', such a change would have been easily made.  Because they did not, we are simply powerless to rewrite the [FDCPA] Act's definition of 'debt' by restricting the ordinary meaning of the term 'transaction' to 'credit transaction.'

See Jerman v. Carlisle, 559 U.S. at 604 (a "court may not [] read more into [the FDCPA] than the statutory language naturally supports").  In concluding that a "transaction" under §1692a(5) must be "negotiated" or evidenced by a "contract" to be subject to the FDCPA, the lower court has impermissibly placed a significant judicial limitation on the ordinary meaning of the words used by Congress.

### C. The District Court's Interpretation of "Debt" Also Conflicts With the <u>FTC's Interpretation</u>

In finding that personal property taxes were not "debts" subject to the FDCPA, the <u>Beggs</u> court also noted that the FTC Staff Commentary on the FDCPA states that the term "debt" does "not include unpaid taxes."  This Court concluded that:

> Although such FTC policy statements are not entitled to conclusive weight in the courts, we accord them 'due weight.' We see no reason to disagree with the FTC's interpretation of the FDCPA, which accords with the plain meaning of the statute.

<u>Beggs</u>, 145 F.3d at 512 (internal citations omitted).  Unlike the taxes at issue in <u>Beggs</u>, the FTC Staff Commentary does not exclude water or sewer charges from the "debts" subject to the FDCPA.[15]   For this reason as well, the district court's

---

[15]   According to the FTC Staff Commentary, the term "debt" in the FDCPA "does not include: (i) Unpaid taxes, fines, alimony, or tort claims, because they are not debts incurred from a 'transaction (involving purchase of) property . . . or services . . . for personal, family or household purposes'; (ii) A credit card that a cardholder retains after the card issuer has demanded its return. The cardholder's account balance is the 'debt' and (iii) A non-pecuniary obligation of the consumer such as the responsibility to maintain adequate insurance on the collateral, because it does not involve an 'obligation . . . to pay money.'" Federal Trade Commission, Statements of General Policy or Interpretation, Staff Commentary on the Fair

conclusion that the debt arising from water and sewer services is not a "transaction" was made in error.[16]  Beggs, 145 F.3d at 512.

## POINT II
### THE DISTRICT COURT COMMITTED CLEAR ERROR IN FINDING THAT APPELLANT BOYD'S METERED WATER USAGE WAS NOT SUBJECT TO THE FDCPA

### A. **Boyd's Metered Water Usage Was Clearly A 'Transaction'**

Even if the lower court were correct that the purchase of goods or services must be "negotiated" or "agreed to" in order to constitute a "transaction" subject to the FDCPA, it was clearly in error in holding that Boyd's payment for water based upon usage is not a "consensual" transaction.

In its decision granting summary judgment, the lower court distinguished the Third Circuit's rulings in Pollice and Piper by arguing that, "[u]nlike plaintiffs in Pollice or Piper, Jones and Boyd did not '*voluntarily elect[]*' to avail themselves of municipal water or sewer services; they were required to do so by municipal law." (SPA112 (emphasis supplied in Order)).  Moreover, the District Court found that the fact that Boyd only paid for the water she used did not change the FDCPA analysis:

---

Debt Collection Practices Act, 53 Fed. Reg. 50097, 50102 (Dec. 13, 1988).
[16] Curiously, in denying the motion for reconsideration, the lower court stated that the absence of 'water and sewer charges' and the presence of 'taxes' in the FTC Staff Commentary's list of "debt" exclusions actually "reinforces this Court's conclusion that the water and sewer charges, which resemble municipal taxes rather than consumer debts, fall outside the purview of the FDCPA."  (SPA56)

> Though metered usage arguably may be one factor in
> determining the nature of a lien, no court has held that it is
> the determinative factor . . . Furthermore, Plaintiffs cite no
> authority holding that metered water or sewer charges are
> per se debts under the FDCPA.

(SPA108-09).

The lower court was mistaken when it determined that "no court has held that [metered usage] is the determinative factor" in concluding that water and sewer charges were "debts" under the FDCPA.   In Piper, the Third Circuit held that a payment obligation arising from metered water usage by a resident of Bethlehem, Pennsylvania was a "consensual" transaction subject to the FDCPA, even though Bethlehem property owners incurred "an obligation to pay a water service fee even [if they did] not connect [their] property to the municipal water system."  As the Third Circuit stated:

> It is apparent from the [plaintiff's] account with the City
> that their *service was metered* in the normal fashion and
> that *the amount of their obligation to pay was based on
> the amount of water they chose to use*.  The *consensual
> nature of the transaction* distinguishes the situation
> before us from tax assessments which *Pollice* held not to
> be debts within the meaning of the FDCPA.

Piper, 396 F.3d at 233 n. 8 (emphasis added).  See also Reilly v. Northeast Revenue Services, LLC, 2013 U.S. Dist. Lexis 108554 (M.D. Pa. Aug. 1, 2013) (in which the district court ruled that fixed garbage removal charges were not subject to the FDCPA because "the fee is not based on the amount of waste an owner or

39

resident chooses to dispose[,] unlike the metered water service considered in Piper").

In rejecting the motion for reconsideration, the lower court "decline[d] to adopt [the] reasoning" in <u>Piper</u> because, "irrespective of whether Boyd's water charges were … based on usage, Boyd was required by law to connect her property to municipal water mains..." (SPA59-60).[17] However, just as in Piper, Boyd and other New York City residents whose water usage is metered pay only for the "amount of water they chose to use." <u>Piper</u>, 396 F.3d at 233 n.8. Thus, even if the definition of "debt" in §1692a(5) of the FDCPA required what the lower court termed a "voluntary transaction" – which it does not -- the fact that Boyd and other New York City homeowners can control how much they pay for water by regulating how much they use results in a consensual exchange squarely within the Third Circuit's holding in <u>Piper</u>.

---

[17] In denying the motion for reconsideration, the court cited to information obtained from a webpage for the Pennsylvania American Water Company on September 23, 2013 to argue that Appellants "ignore the critical distinction between the municipal scheme in <u>Piper</u> and the municipal water and sewer scheme" in New York because private companies "serve as an alternative" source for the "water and sewage needs of property owners in the City of Pittsburgh." (SPA58-59) However, <u>Piper</u> involved water and sewer services in *Bethlehem*, Pennsylvania, ***not*** Pittsburgh, and thus the information retrieved by the lower court off the internet is irrelevant to the "municipal scheme" at issue in <u>Piper</u>. In fact, the webpage address cited by the lower court (http://www.amwater.com/paaw/about-us/page9704.html) provides absolutely no support for the conclusion that Pittsburgh residents currently have alternative choices for water and sewer service, much less that they had such choices at the time <u>Pollice</u> was decided.

40

**B. The Order Is Clearly Erroneous in Finding that Boyd's Water and Sewer Usage Was Not Primarily for Personal, Family or Household Use**

The lower court also found that, since Boyd's outstanding water and sewer charges were subsequently bundled with outstanding property taxes owed by Boyd in the lien being sold to JER, and since "only approximately twenty percent of [Boyd's] Tax Lien constituted delinquent" water and sewer charges,

> No reasonable trier of fact could find that the Boyd Tax Lien, eighty percent of which was real estate tax arrearage, involved a transaction the subject of which is primarily for personal, family, or household use.

(Order at 41). Plaintiffs respectfully submit that the lower court's conclusion in this regard reflects a fundamental misunderstanding of the nature of the "transaction" into which Boyd entered.

Section 1692a(5) of the FDCPA defines the term "debt", in relevant part, as an obligation of a "consumer to pay money *arising out of a transaction* in which the … property . . . or services which are the *subject of the transaction* are primarily for personal, family or household purposes." 15 U.S.C. §1692a(5) (emphasis added). In the "transaction" at issue here, Mrs. Boyd did not purchase the lien sold to Respondent JER, she purchased water and sewer services for her home. The fact that New York City subsequently bundled Boyd's water and sewer payment obligations into a lien with Boyd's separate property tax obligations does nothing to change the nature of the original transaction out of

41

which the obligation arose. Nothing in either §1692a(5) or in any case interpreting that section allows a debt collector to transform a transaction "for personal, family or household purposes" subject to the FDCPA into one which is outside the statute through a unilateral act taken years after the debt obligation arose.

In fact, cases interpreting whether a debt was for "primarily personal, family or household purposes" subject to the FDCPA have uniformly found that the nature of the "debt" must be analyzed as of the date when the obligation first arose. In Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, LLC, 214 F.3d 872, 874-75 (7th Cir. 2000), for instance, plaintiff borrowed money to purchase a home in Atlanta for his personal use in 1992. In 1995, he took a job in Chicago, and began renting out the house to make money. Two years later, he received a dunning letter which he believed violated the FDCPA, and filed suit. The district court granted summary judgment to defendant, finding that the loan was for "business" rather than "personal" purposes at the time of the allegedly illegal activity. The Seventh Circuit reversed, however, holding "that the relevant time for determining the nature of the debt is **when the debt first arises**, not when collection efforts begin." Miller, 214 F.3d at 874 (emphasis added).

In Haddad, 698 F.3d at 294-95, the Sixth Circuit came to the same conclusion in a case involving an alleged FDCPA violation arising from the collection of overdue condominium assessments. In that case, plaintiff Haddad

purchased a condominium which he used as his primary residence from 1992 until

2005, when he relocated and began to lease the unit to others.  In 2008, Mr.

Haddad received letters from a law firm mistakenly alleging that he owed monthly

common charges, and demanding their payment along with late fees and attorneys'

fees.

Thereafter, plaintiff Haddad brought suit under the FDCPA.  The district

court granted the defendant's motion to dismiss, finding that the "transaction" at

issue was not primarily for personal or household purposes because Haddad was

renting out the residence to strangers at the time the defendant law firm began its

debt collection efforts.  On appeal, however, the Sixth Circuit reversed, finding

that "the most probative time in determining the purposes that the individual has

for purchasing [] property is at the time of the transaction, *not* when an agency's

collection efforts begin."  Haddad, 698 F.3d at 294.   In language which applies

equally to the lower court's determination that the Respondent's subsequent

bundling of Boyd's water and tax debts transforms Appellant's water purchase into

one which is outside the protection of the FDCPA, the Sixth Circuit stated that

> While debt collector conduct is certainly relevant when
> determining whether a violation of the FDCPA has
> occurred, ***it is not relevant*** when determining whether the
> debt in question is debt that is regulated by the FDCPA.  .
> . . The district court erred in finding that the debt at issue
> does not meet the statutory definition of 'debt' under the

FDCPA … because Haddad no longer derives a 'personal' use from the condominium.

<u>Haddad</u>, 698 F.3d at 294 (emphasis added).

Ignoring this well-settled authority, the lower court fashioned its own rule, examining Boyd's purpose in purchasing water and sewer services for her home not when the obligations arose, but years later, after those obligations had been bundled with Appellant's separate property tax obligations by the defendant-Respondent debt collectors.

**POINT III**
**THE DISTRICT COURT COMMITTED CLEAR ERROR IN**
**CONCLUDING THAT THE FEES AT ISSUE ARE**
**NOT SUBJECT TO THE FDCPA BECAUSE THEY**
**<u>WERE COLLECTED WHILE A FORECLOSURE WAS PENDING</u>**

The lower court also found that the attorneys' fees and expenses collected from Appellants are not subject to the FDCPA because collection actions taken while a foreclosure proceeding is pending – even if they involve the collection of attorneys' fees and expenses which were never actually owed -- do not "constitute debt collection activity subject to §§1692e and 1692f of the FDCPA." (SPA117). To support this sweeping conclusion, the lower court states that:

> The majority of federal courts have clarified that, unless a monetary judgment is sought against the debtor, the enforcement of a security interest through the foreclosure

> process is not debt collection for purposes of the
> [FDCPA].

(SPA118, quoting <u>Warren v. Countrywide Home Loans, Inc</u>. 342 F. App'x 458,

460 (11th Cir. 2009) (unpublished)).  With all due respect, the lower court's

conclusion in this regard is clearly erroneous in several fundamental respects.

### A.  <u>Amounts Collected During Foreclosure Are Subject to the FDCPA</u>

Section 1692f(1) of the FDCPA states, in relevant part, that a debt collector

violates the FDCPA through:

> The **collection of any amount** (including any interest,
> fee, charge, or expense incidental to the principal
> obligation) unless such amount is expressly authorized
> by the agreement creating the debt or permitted by
> law….

15 U.S.C. §1692f(1) (emphasis added).   As Courts interpreting §1692f(1) have

uniformly found, "[t]he only inquiry under §1692f(1) is whether the amount

collected was expressly authorized by the agreement creating the debt or permitted

by law."

<u>Allen v. LaSalle Bank, N.A.</u>, 629 F.3d 364, 368 (3rd Cir. 2011); <u>Turner v. J.V.D.B.

& Assocs., Inc.</u>, 330 F.3d 991, 996 (7th Cir. 2003) ("Whether the collection of a

debt violates § 1692f(1) depends solely on two factors: (1) whether the debt

agreement explicitly authorizes the charge; or (2) whether the charge is permitted

by law.").

Despite the above interpretation, and the plain language contained in §1692f(1), the lower court found that defendant's *actual* collection of the allegedly improper amounts was not "collection" within the meaning of §1692f(1). The lower court reasoned that because Respondents collected money from Appellants during a foreclosure proceeding in which the Respondents "did not seek monetary judgments against" Jones and Boyd, such conduct did not constitute "collection". (SPA116). The district court engaged in no statutory analysis of §1692f(1) to support this novel interpretation, and nothing in the statute supports such a judicially-created foreclosure exception.

The District Court's finding that "the majority of federal courts" have concluded that enforcing a security interest "is not debt collection for purposes of the [FDCPA]" is plainly mistaken. In fact, each of the five federal Courts of Appeals to have considered this issue has found that foreclosure actions are subject to §§1692e and 1692f of the FDCPA. In Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1217-18 (11th Cir. 2012), for instance, the Eleventh Circuit rejected the argument that collection actions taken during the enforcement of a security interest fall outside the FDCPA:

> That rule would create a loophole in the FDCPA. A big one. In every case involving a secured debt, the proposed rule would allow the party demanding payment on the underlying debt to dodge the dictates of §1692e by giving notice of foreclosure on the secured interest. The practical result would be that the Act would apply only to

46

efforts to collect unsecured debts. So long as a debt was secured, a lender (or its law firm) could harass or mislead a debtor without violating the FDCPA. That can't be right. It isn't. A communication related to debt collection does not become unrelated to debt collection simply because it also relates to the enforcement of a security interest. A debt is still a 'debt' even if it is secured.

In <u>Wilson v. Draper & Goldberg</u>, 443 F.3d 373, 376 (4th Cir. 2006), the Fourth

Circuit also rejected the argument embraced by the lower court:

Defendants' argument, if accepted, would create an enormous loophole in the Act immunizing any debt from coverage if that debt happened to be secured by a real property interest and foreclosure proceedings were used to collect the debt. We see no reason to make an exception to the Act when the debt collector uses foreclosure instead of other methods.

<u>Wilson</u>, 443 F.3d at 376. The Third, Fifth, and Sixth Circuits have also

specifically held that collection actions taken while enforcing a security interest are

subject to the FDCPA. <u>See</u> <u>Piper</u>, 396 F.3d at 236 (rejecting argument that the

FDCPA does not apply to the foreclosure of a security interest, the Third Circuit

held that "if a collector were able to avoid liability under the FDCPA simply by

choosing to proceed *in rem* rather than *in personam,* it would undermine the

purpose of the FDCPA"); <u>Kaltenbach v. Richards</u>, 464 F.3d 524, 529 (5th Cir.

2006) (a party which meets the definition of debt collector "is a debt collector for

the purposes of the entire FDCPA even when enforcing security interests"); <u>Glazer</u>

<u>v. Chase Home Finance, LLC</u>, 704 F.3d 453, 461 (6th Cir. 2013) ("***every*** mortgage

foreclosure, judicial or otherwise, is undertaken for the very purpose of obtaining payment on the underlying debt, either by persuasion (*i.e*, forcing a settlement) or compulsion (*i.e.*, obtaining a judgment of foreclosure, selling the home at auction, and applying the proceeds from the sale to pay down the outstanding debt"); Birster v. American Home Mortgage Servicing, Inc., 481 F. App'x 579, 583 (11th Cir. 2012) (actions of defendants were subject to general provisions of the FDCPA even though they related to the enforcement of a security interest in a foreclosure action).

    In light of these Court of Appeals decisions, the lower court's reliance on certain district court or unpublished federal circuit decisions is unpersuasive. In fact, many of the decisions cited with approval within the lower court's decision were expressly rejected by the various Court of Appeals decisions cited above. Birster, 481 F. App'x at 582-83 (Eleventh Circuit rejects the holding in Warren v. Countrywide relied on page 45 of the district court opinion); Glazer, 704 F.3d at 464 (Sixth Circuit rejects the attempt to construe its decision in Montgomery v. Huntington Bank as implying that foreclosure actions are not subject to the FDCPA); Wilson, 443 F.3d at 376 (rejecting holding in Heinneman v. Jim Walter Homes, Inc. that security interest enforcement is not subject to FDCPA).

    The lower court ignored these authorities in its original opinion, while in its order denying reconsideration, the court said that it "declines to follow the

misguided reasoning in these non-controlling cases." (SPA62). Instead, the court

followed a string of other district courts' decisions which found that "foreclosure

activities do not constitute debt collection under the FDCPA." (SPA62-66).

However, virtually all of the cases cited in the order denying reconsideration

involved jurisdictions such as California which provide for non-judicial foreclosure

proceedings, and which present fundamentally different circumstances than the

judicial foreclosure proceedings used in the State of New York. See, e.g.,

Natividad v. Wells Fargo Bank, N.A., 2013 U.S. Dist. Lexis 74067, *16-17 (N.D.

Cal. 2013) ("the majority of courts in this District . . . have held that non-judicial

foreclosure proceedings are not debt collection"). Moreover, even these non-

judicial foreclosure cases are at odds with the lower court's conclusion herein. In

Natividad, for instance (relied upon by the lower court in its Order denying

reconsideration), the lower court stated that not all conduct taken in connection

with non-judicial foreclosures is exempt from the FDCPA:

> [W]hile the Court rejects plaintiffs' argument to the extent
> they assert that *all* actions related to nonjudicial
> foreclosure are considered debt collection, the Court also
> rejects Defendants' argument to the extent they contend
> that *any* action related to a nonjudicial foreclosure cannot
> be considered debt collection.

Natividad, 2013 U.S. Dist. Lexis 74067, *29-30. Thus, even during nonjudicial

foreclosures, courts have found that the FDCPA applies to "communications with

debtors concerning their default that go beyond the statutorily mandated

49

communications required for foreclosure," <u>Natividad</u>, 2013 U.S. Dist. Lexis 74067,

*28, such as those which "obfuscate[] the truth with regard to the loan amounts and

payments," <u>Ottovich Revocable Trust v. Wash. Mut., Inc.</u>, 2010 U.S. Dist. Lexis

99161, *12 (N.D. Cal. 2010), or which give the debtor "inaccurate or deceptive

information." <u>Speleos v. BAC Home Loans Servicing, L.P.</u>, 824 F.Supp.2d 226,

233 (D. Mass. 2011). That is precisely what Appellants allege occurred in this

case: Respondents misrepresented that certain attorneys' fees and expenses were

properly due and owing, and wrongfully collected those improper amounts outside

of the foreclosure proceeding.

 Moreover, the Court's holding in this regard has not only been rejected by

every Court of Appeals which has considered the issue, but also by the federal

agencies charged with interpreting the FDCPA. In December 2011, for instance,

the federal Consumer Finance Protection Bureau ("the CFPB") filed an *amicus*

*curiae* brief in the Eleventh Circuit on the issue of whether the district court

committed error in determining that the FDCPA does not apply to actions taken

during foreclosure proceedings. In the brief, the CFPB stated the government's

position that the FDCPA unequivocally applies to actions taken during foreclosure

proceedings:

> Nothing in the FDCPA's text suggests that attempting to
> obtain payment of a debt ceases to qualify as debt
> collection if it occurs in the context of foreclosure
> proceedings. . .

> Exempting debt collection from the Act's protections whenever it accompanies foreclosure proceedings would undermine this purpose by creating an "enormous loophole" allowing debt collectors to subject consumers to abusive collection practices whenever a "debt happened to be secured by a real property interest and foreclosure proceedings were used to collect the debt.

Brief of the Consumer Financial Protection Bureau as *Amicus Curiae* in Support of Plaintiffs-Appellants and Reversal, (http://files.consumerfinance.gov/f/201112_ CFPB_Birster-amicus-brief.pdf, at 25, 27-28)   Following the CFPB's submission, the Eleventh Circuit reversed the lower court's decision, finding that the FDCPA does apply to foreclosure proceedings.  Birster, 481 F. App'x at 582-83.

The U.S. Supreme Court has frequently stated that "the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." [18]  Blum v. Bacon, 457 U.S. 132, 141 (1982).   As the Supreme Court recently held in Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871 (2011), this principal clearly extends to positions taken by agencies in *amicus* briefs.  Id. at 880-81 (finding that the position taken by the Board of Governors of the Federal Reserve System on an interpretation of an administrative regulation, as stated in its *amicus* brief, was entitled to deference unless plainly erroneous or inconsistent

---

[18] Under the FDCPA, both the FTC and CFPB are given power to enforce the Act. 15 U.S.C. 1692*l*(a)-(c) (2006 & Supp. IV 2010).

with the regulation).[19]   Thus, while not conclusive, the position taken by the FTC

and the CFPB in the <u>Birster</u> amicus brief is entitled to deference and "due weight."

### B.  Whether Defendants Collected Unauthorized Amounts Is the Sole Inquiry To Be Made Under §1692f(1)

Although not an explicit basis for the lower court's conclusion, the Order

also indicates that defendants' actual collection of the fees and expenses at issue is

not debt collection activity subject to the FDCPA because Respondents "supposed

'demands' for attorneys' fees were not demands at all"; rather, the payoff quotes

were provided only "in response to inquiries initiated by Plaintiffs or their

counsel." (SPA126).  Thus, according to the lower court's decision, the collection

of the allegedly improper amounts is not subject to §1692f(1) because the payoff

quotes were not "demands for payments of the delinquent tax liens and interrelated

legal fees and costs." (SPA127).  <u>See also</u> SPA126 ("Plaintiffs have not presented

evidence to establish that Defendants provided the payoff quotes to induce Boyd

and Jones to pay the obligations secured under the Tax Liens.").

Again, Appellants respectfully submit that the lower court's conclusions in

this regard reflect a fundamental misunderstanding of the requirements of

§1692f(1) of the FDCPA.   Unlike §1692e, "the focus of §1692f is on the conduct

---

[19] While the level of deference to agency interpretations may differ depending on the circumstances, the Supreme Court has held that an agency's interpretation may merit "deference whatever its form, given the specialized experience and broader investigations and information available to the agency, and given the value of uniformity in its Administrative and judicial understandings."  <u>United States v. Mead Corp</u>., 533 U.S. 218, 234 (2001) (internal cites omitted)

of the debt collector." <u>Allen</u>, 629 F.3d at 368. In fact, "unlike other provisions of the FDCPA, §1692f does not require a 'communication'" of any kind -- much less a payment demand -- from the debt collector. (Brief for The United States as *Amicus Curiae* in <u>Allen</u>, <u>http://www.justice.gov</u> /osg/briefs/2011/2pet/6invit/2010-1417.pet.ami.inv.pdf, at 9, fn 4). Instead, "[t]he only inquiry under § 1692f(1) is whether the ***amount collected*** was expressly authorized by the agreement creating the debt or permitted by law." <u>Allen</u>, 629 F.3d at 368 (emphasis added); <u>see</u> <u>Turner</u>, 330 F.3d at 996.

In <u>Allen</u>, 629 F.3d at 365-66, the Third Circuit was presented with virtually identical facts to those at issue herein. After falling behind on mortgage payments, the creditor commenced a foreclosure action against the debtor in state court. While the foreclosure action was pending, the debtor's attorney requested a payoff quote from the creditor to obtain the amount necessary to satisfy the loan. <u>Allen</u>, 629 F.3d at 365. In response, the debtor's attorney provided the payoff quote, which purportedly sought legal fees in excess of those allowed to be charged under the mortgage contract. After the debtor commenced an FDCPA action based upon the payoff quote, the creditor dismissed the foreclosure action so that, unlike here, the allegedly improper legal fees were never collected.

The district court in <u>Allen</u> dismissed the FDCPA claim, finding that the plaintiff could not have been deceived because the payoff quotes were provided to

plaintiff's attorney. On appeal, the Third Circuit reversed, finding that the

recipient of the payoff quote was irrelevant:

> The only inquiry under § 1692f(1) is whether the amount
> collected was expressly authorized by the agreement
> creating the debt or permitted by law, an issue we leave
> for the District Court. . . . If the [mortgage] agreement
> does not expressly authorize or state law does not permit
> the amounts sought, [plaintiff] has stated a viable claim
> under §1692f(1).

Allen, 629 F.3d at 369. The Third Circuit remanded the case to the district court to

determine whether the fees sought by defendants by means of the payoff quote

violated the FDCPA.[20]

 As demonstrated by Allen, the question of whether a debtor requested a

payoff quote from the creditor is completely irrelevant to whether or not a debt

collector violated §1692f(1) by collecting amounts in excess of what was actually

owed. To the best of plaintiffs' knowledge, the lower court's conclusion that an

amount is not "collected" within the meaning of §1692f(1) if the payment arises

from a payoff quote requested by the debtor is not supported by a single decision in

this or any other circuit. In fact, federal courts have regularly upheld FDCPA

claims based upon allegedly improper fees contained within payoff quotes. See,

---

[20] Following the Third Circuit's decision, defendants sought certiorari. In response to the Supreme
Court's invitation, the Solicitor General, Federal Trade Commission and Consumer Finance Protection
Bureau filed an Amicus Brief, stating the government's position that Allen was correctly decided. On
January 23, 2012, the Supreme Court denied certiorari in Allen. Fein, Such, Kahn & Shepard, PC v.
Allen, 132 S. Ct. 1141 (2012).

e.g., <u>Menashe v. Steven J. Baum, P.C.</u>, 2011 U.S. Dist. Lexis 111082, *11-12 (E.D.N.Y. 2011) (stating that a demand for improper foreclosure-related legal fees in payoff quote violates FDCPA); <u>Schuh v. Druckman & Sinel, L.L.P.</u>, 602 F.Supp.2d 454, 463-65 (S.D.N.Y. 2009) (same).

In sum, since defendants actually collected legal fees and expenses which the Magistrate Judge himself found to be improper, the lower court's finding that "defendant's judicial foreclosures did not attempt to collect money from the debtor" is not only legally irrelevant for purposes of §1692f(1), but logically inconsistent as well.

## <u>CONCLUSION</u>

The District Court's holding that the FDCPA does not apply to the fees and expenses being collected from Appellants is at odds with the ordinary meaning of the term "transaction" in the FDCPA, and is in direct conflict with the overwhelming weight of judicial authority arising from this and other Circuits. As a result, Appellants respectfully submit that the lower court Order granting summary judgment on the FDCPA claim should be reversed, and that the state law claims over which the Court declined to exercise jurisdiction under §1367(c)(3) should be reinstated.

Dated: New York, New York
   December 23, 2013

     <u>/s/ Paul Grobman</u>
     Paul Grobman
     (Email: grobtown@aol.com)
     555 Fifth Avenue, 17th Flo
     New York, NY 10017
     (212) 983-5880

     Law Offices of Curtis V. Trinko, LLP
     Curtis V. Trinko
     (Email:  ctrinko@trinko.com)
     16 West 46th Street, 7th Floor
     New York, New York 10036
     (212) 490-9550

     Kaufman & Kahn, LLP
     747 Third Avenue, 32nd fl.
     New York, N.Y. 10017
     (212) 293-5556

     *Atttorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,565 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Respectfully submitted,

<u>/s/ Paul Grobman</u>
PAUL GROBMAN
Attorney for Plaintiff-Appellant

555 Fifth Avenue, 17th floor
New York, New York 10017
(212) 983-5880

57